**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| ALEX MIKULSKI, derivatively on behalf of ALEXION PHARMACEUTICALS, INC., | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| LEONARD BELL, DAVID L. HALLAL, DAVID R. BRENNAN, LUDWIG N. HANTSON, VIKAS SINHA, DAVID J. ANDERSON, CARSTEN THIEL, ALVIN S. PARVEN, ANDREAS RUMMELT, ANN M. VENEMAN, M. MICHELE BURNS, CHRISTOPHER J. COUGHLIN, JOHN T. MOLLEN, FELIX J. BAKER, R. DOUGLAS NORBY, WILLIAM R. KELLER, JOSEPH A. MADRI, and LARRY L. MATHIS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ALEXION PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

NATURE OF THE ACTION ................................................................................... 2

JURISDICTION AND VENUE ............................................................................... 7

PARTIES ................................................................................................................. 7
    Plaintiff ................................................................................................................... 7
    Nominal Defendant Alexion ................................................................................. 7
    CEO Defendants .................................................................................................... 8
    CFO Defendants .................................................................................................. 12
    Other Executive Officer Defendants .................................................................. 14
    Director Defendants ............................................................................................ 15

FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS ......................... 26

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...... 29

ALEXION'S CODE OF ETHICS ......................................................................... 31

INDIVIDUAL DEFENDANTS' MISCONDUCT .................................................. 32
    Background ......................................................................................................... 32
    False and Misleading Statements and Omissions ............................................. 40
    May 8, 2017 – Operation Serpent's Chalice & the Fraudulent Lawsuit Scheme ........... 127
    May 23, 2017 – Complete Overhaul .................................................................. 129
    The Bloomberg Exposé ..................................................................................... 130
    Aftermath ........................................................................................................... 137

INSIDER SELLING ............................................................................................ 138
    Defendant Bell ................................................................................................... 139
    Defendant Sinha ................................................................................................. 141
    Defendant Madri ................................................................................................ 142
    Defendant Mathis .............................................................................................. 143
    Defendant Hallal ................................................................................................ 143
    Defendant Parven .............................................................................................. 144
    Defendant Norby ............................................................................................... 145
    Defendant Thiel ................................................................................................. 145
    Defendant Keller ............................................................................................... 146
    Defendant Veneman .......................................................................................... 146

REPURCHASES .................................................................................................. 147

SUMMARY OF THE INDIVIDUAL DEFENDANTS' WRONGFUL CONDUCT ........... 150

DAMAGES TO ALEXION ................................................................................. 151

DERIVATIVE ALLEGATIONS .......................................................................... 153

DEMAND FUTILITY ALLEGATIONS ............................................................. 153

FIRST CLAIM .................................................................................................... 169

SECOND CLAIM ............................................................................................... 171

THIRD CLAIM ................................................................................................... 172

FOURTH CLAIM ............................................................................................... 174

FIFTH CLAIM .................................................................................................... 177

SIXTH CLAIM ................................................................................................... 178

**SEVENTH CLAIM**................................................................................................ **178**

**EIGHTH CLAIM**.................................................................................................... **179**

**PRAYER FOR RELIEF**........................................................................................ **179**

# INTRODUCTION

Plaintiff Alex Mikulski ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Alexion Pharmaceuticals, Inc. ("Alexion" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Leonard Bell, David L. Hallal, David R. Brennan, Ludwig N. Hantson, Vikas Sinha, David J. Anderson, Carsten Thiel, Alvin S. Parven, Andreas Rummelt, Ann M. Veneman, M. Michele Burns, Christopher J. Coughlin, John T. Mollen, Felix J. Baker, R. Douglas Norby, William R. Keller, Joseph A. Madri, and Larry L. Mathis (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Alexion, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rules 10b-5 and 14a-9 promulgated thereunder.  As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Alexion, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Alexion's directors and officers between January 30, 2014 and the present (the "Relevant Period").

2.     Alexion is a biopharmaceutical company that develops and markets drugs to patients with devastating and ultra-rare disorders.

3.     Its lead product since its founding in 1992 has been Soliris® (eculizumab), which is the first and only therapeutic approved for patients with either paroxysmal nocturnal hemoglobinuria ("PNH"), a life-threatening and ultra-rare genetic blood disorder, or atypical hemolytic uremic syndrome ("aHUS"), a life-threatening and ultra-rare genetic disease

4.     Only 11,000 patients worldwide suffer from PNH and aHUS, collectively, and thus the Company was under tremendous pressure to make sales of Soliris to that limited pool of patients.  To do this, the Individual Defendants engaged in several schemes during the Relevant Period and made a plethora of false and misleading statements and omissions of material fact.

5.     During the Relevant Period, the Individual Defendants engaged in and/or caused the Company to engage in the following scheme: (1) management of the Company placed immense and unsustainable pressure on salespeople to make sales of Soliris; and (2) management of the Company encouraged salespeople to use unethical and potentially illegal methods to secure patient orders of Soliris, including using misleading threats to doctors who did not prescribe Soliris that their patient could die if Soliris was not prescribed, even though there was insufficient evidence to indicate that use of Soliris lowers or even affects a patient's risk of death (collectively, the "Fraudulent Sales Pitch Misconduct")

6.      Similarly, during the Relevant Period, the Individual Defendants engaged in and/or caused the Company to engage in the following scheme: (1) management of the Company encouraged and even applied pressure on personnel to use pull-in sales[1] in order to meet certain financial targets even if use of pull-in sales involved inappropriate business conduct, and senior management applied particularly significant pressure on personnel to use pull-in sales to meet targets during the fourth quarter of 2015; (2) senior management did not set an appropriate "Tone at the Top," which resulted in inappropriate business conduct, including conduct that was inconsistent with, and in violation of, the Company's policies and procedures; (3) Company personnel did in fact engage in inappropriate business conduct to realize pull-in sales, as a result of pressure from senior management; and (4) senior management failed to reinforce the need for compliance with the Company's policies and procedures which contributed to inappropriate business conduct in connection with some pull-in sales, including conduct that was inconsistent with, and in violation of, Company policies and procedures (collectively, the "Pull-in Sales Misconduct").

7.      Between January 30, 2014 and May 26, 2017, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose: (1) the Company's engagement in the Fraudulent Sales Pitch Misconduct; (2) the Company's engagement in the Pull-in Sales Misconduct; and (3) that if management stopped applying inappropriate pressure on salespeople and stopped encouraging unethical use of the aforementioned sales methods, and instead reinforced compliance among the

---

[1] Generally, "pulling-in" refers to marketing and sales practices that seek to induce customers to buy product beyond their actual current needs. "Pull-in" sales occur when a customer is encouraged by a sales representative to place an order earlier than it needs to so that the selling company can record the sale in an early financial quarter.

sales force, the Company would not meet its sales targets, projections, and full-year guidance (collectively, the "Adverse Material Facts Regarding Soliris Sales Methods").

8.     Moreover, during the Relevant Period, the Individual Defendants caused the Company to engage in a conspiracy involving the use of patient advocacy groups ("PAGs") to file fraudulent lawsuits against the Brazilian government on behalf of patients, some of whom did not even have the conditions that Soliris is indicated to treat, in order to get the Brazilian authorities to pay for the patients' purchases of Soliris (the "Fraudulent Lawsuit Scheme").

9.     In addition, during the Relevant Period, the Individual Defendants caused the Company to engage in the following schemes, which are described in much further detail herein:

> (a) the Company relied on a team of in-house nurses, who worked with the Company's sales team, to pressure patients and doctors to use Soliris, even if not in the patients' interest (the "Nurse Coordination Scheme");

> (b) the Company encouraged doctors to send patients' test results to "partner labs," which, in turn, would inappropriately share with Alexion the results of these tests so that Alexion could identify patients diagnosed with PNH and aHUS (i.e., potential customers) (the "Patient Information Scheme"); and

> (c) the Company made grants to patient advocacy groups so that Alexion could have greater access to patient populations, and the Company's relately used certain of these groups to obtain illegal reimbursement for Soliris from foreign governments (the "Patient Advocacy Group Scheme").

10.    During the Relevant Period, in breach of their fiduciary duties, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements to the investing public regarding the Company's business, operations, prospects, and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the

Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; (6) the real reasons for the abrupt departures of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"); and (7) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls. As a result of the foregoing, the Company's public statements referenced herein were materially false and misleading at all relevant times.

11.     Due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations, certain Individual Defendants profited handsomely from their engagement in insider sales of Company stock, collectively selling over *$356 million*[2] worth of Company stock on material inside information.

12.     Moreover, due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations and the Company's engagement in the schemes described herein, the Company overpaid *$409.2 million* for repurchases of its own stock through reckless repurchase programs that were initiated and approved by the Individual Defendants during the Relevant Period.

13.     The Company's schemes and misconduct have subjected Alexion to, *inter alia*: (1) massive financial losses; (2) investigations by the SEC, U.S. Attorney's Office for the District of Massachusetts, the Department of Justice, the U.S. Department of Health and Human Services' Office of Inspector General, and Brazilian authorities; (3) significant monetary and regulatory penalties; (4) the need to make massive layoffs; and (5) the need to move its headquarters to another state, sacrificing state grants and cutting short obligations on state-

_____
[2] Unless otherwise noted, all emphases added throughout.

provided loans.  Moreover, the Company was forced to expend considerable sums of money dealing with a massive number of high-level resignations; between December 2016 and May 2017, Alexion announced the departure of (i) its CEO, (ii) two different CFOs, (iii) its founder and Chairman of the Board, (iv) its Chief Compliance Officer, (v) its Chief Commercial Officer, and (vi) two executive vice presidents.

14.   In light of the Individual Defendants' misconduct, which has subjected the Company and 7 of its current and/or former officers and/or directors, including its former CEO, former interim CEO, and two of its former CFOs, to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Connecticut, making claims for violations of the Exchange Act (the "Securities Class Action"), and has also subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, including from over paying for repurchases of Company stock, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, including through insider transactions, the Company will have to expend many millions of dollars.

15.   In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and certain Individual Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Alexion Board of Directors (the

"Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)), and SEC Rules 10b-5 (17 C.F.R. § 240.10b-5) and 14a-9 (17 CFR § 240.14a-9) promulgated thereunder.   This Court also has subject matter jurisdiction under § 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Alexion is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Alexion.   Plaintiff has continuously held Alexion common stock since he purchased it during the beginning of the Relevant Period.

### Nominal Defendant Alexion

21.     Alexion is a Delaware corporation with its principal executive offices at 100

College Street, New Haven, Connecticut 06510.[3]  Alexion's shares trade on the NASDAQ Global Select Market under the ticker symbol "ALXN."

**CEO Defendants**

Defendant Bell

22.     Defendant Leonard Bell ("Bell") was the principal founder of Alexion and served as CEO of the Company from January 1992 to March 31, 2015.  Bell served as a director from 1992 to May 10, 2017 and as Chairman of the Board from October 2014 (upon the death of the Company's longtime Chairman, Dr. Max Link) until May 10, 2017.  According to the Company's Schedule 14A on Form DEF 14A filed with the SEC on April 8, 2015 (the "2015 Proxy Statement"), as of March 9, 2015, Defendant Bell beneficially owned 1,690,924 shares of Alexion common stock.[4]  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Bell owned $312.67 million worth of Alexion stock.

23.     For the fiscal year ended December 31, 2014, Defendant Bell received $20,570,703 in compensation from the Company, which included $1.2 million in base salary, over $2 million in non-equity incentive plan compensation, and over $17 million in all other compensation.  For the fiscal year ended December 31, 2015, the year that Defendant Bell resigned from his position as CEO, he received a whopping $24,918,377 with only $358,308 coming from his base salary.

24.     The 2015 Proxy Statement stated the following about Defendant Bell:

---

[3] On September 12, 2017, the Company announced that it would be relocating the Company's headquarters to Boston, Massachusetts in 2018.
[4] The Company also filed a Schedule 14A on Form DEF 14A with the SEC on April 15, 2013 (the "2013 Proxy Statement"), April 23, 2014 (the "2014 Proxy Statement"), March 31, 2016 (the "2016 Proxy Statement"), and March 31, 2017 (the "2017 Proxy Statement").

The principal founder of Alexion and a director of Alexion since February 1992. Dr. Bell was Alexion's Chief Executive Officer since its founding in January 1992 until he retired as CEO on March 31, 2015. Dr. Bell was appointed Chairman of the Board in October 2014. From 1991 to 1992, Dr. Bell was an Assistant Professor of Medicine and Pathology and co-Director of the program in Vascular Biology at the Yale University School of Medicine. From 1990 to 1992, Dr. Bell was an attending physician at the Yale-New Haven Hospital and an Assistant Professor in the Department of Internal Medicine at the Yale University School of Medicine. Dr. Bell was a recipient of the Physician Scientist Award from the National Institutes of Health and Grant-in-Aid from the American Heart Association as well as various honors and awards from academic and professional organizations. His work has resulted in more than 20 scientific publications and 9 patent applications. Dr. Bell received his A.B. from Brown University and M.D. from Yale University School of Medicine. Dr. Bell is currently an Adjunct Assistant Professor of Medicine and Pathology at the Yale University School of Medicine.[5]

Defendant Hallal

25.     Defendant David L. Hallal ("Hallal") served as Alexion's Chief Executive Officer from April 1, 2015, until his resignation on December 12, 2016.  Before that, he was Alexion's Chief Operating Officer ("COO") since September 2014.  Moreover, from May 2010 to October 2012, Hallal was Senior Vice President, Global Commercial Operations, and from November 2008 to May 2010, Hallal was Senior Vice President, Commercial Operations Americas.  Lastly, from June 2006 until November 2008, Hallal was Senior Vice President, US Commercial Operations.  According to the 2016 Proxy Statement, as of March 15, 2016, Defendant Hallal beneficially owned 482,367 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 15, 2016 was $134.44, Hallal owned over $64.85 million worth of Alexion stock.

26.     For the fiscal year ended December 31, 2016, Defendant Hallal received $13,136,341 compensation from the Company on a $1.15 million base salary.

_____

[5] Unless otherwise noted, formatting amended to fit this Complaint and emphases added throughout.

27.     The 2016 Proxy Statement listed the following qualifications for Defendant Hallal:

> (1) Extensive knowledge and experience with all aspects of Alexion's business, (2) More than 27 years of experience in the biopharmaceutical industry, [and] (3) Extensive experience managing biopharmaceutical global commercial operations.

28.     The 2016 Proxy Statement stated the following about Defendant Hallal:

> Mr. Hallal became Chief Executive Officer on April 1, 2015. Previously, he was Alexion's Chief Operating Officer since September 2014. From October 2012 to September 2014, Mr. Hallal served as Alexion's Executive Vice President, Chief Commercial Officer. From May 2010 until October 2012, Mr. Hallal was Senior Vice President, Global Commercial Operations and was Senior Vice President, Commercial Operations, Americas from May 2008 until May 2010. Mr. Hallal joined Alexion in June 2006 to build and lead Alexion's U.S. commercial operations, initially with the company's first product launch of Soliris. Prior to joining Alexon in 2006, he had 18 years of commercial operations and leadership experience at a number of companies, including OSI Eyetech, Biogen, Amgen, and Upjohn and he was involved in multiple blockbuster product launches in the areas of hematology, oncology, nephrology and immunology. Mr. Hallal holds a BA in Psychology from the University of New Hampshire.

<u>Defendant Brennan</u>

29.     Defendant David R. Brennan ("Brennan") served as Alexion's interim CEO from December 11, 2016 to March 27, 2017, when he was replaced by Defendant Ludwig N. Hantson. He currently serves, and has served, as a Company director since 2014, and was appointed Chairman of the Board on May 10, 2017.  He is a member of the Board's Pharmaceutical Compliance and Quality Committee (the "Quality Compliance Committee"), Science and Innovation Committee, and Strategy and Risk Committee.  Defendant Brennan is also a director at Innocoll Holdings plc and Insmed Incorporated, and has held directorships on the boards of AstraZeneca plc and Reed Elsevier plc in the past five years.  According to the 2016 Proxy Statement, as of March 15, 2016, Defendant Brennan beneficially owned 7,017 shares of the

Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 15, 2016 was $134.44, Brennan owned over $943,000 worth of Alexion stock.

30.     For the fiscal year ended December 31, 2015, Defendant Brennan received $320,082 in fees earned or cash paid as compensation from the Company for his role as a director.  For the fiscal year ended December 31, 2016, Defendant Brennan received over half-a-million dollars from the Company as compensation for his short service as interim CEO and his service as a director.  The Company represented that Defendant Brennan's base salary for 2016 was set at $6 million.

31.     The 2017 Proxy Statement listed the following qualifications for Defendant Brennan:

> (1) Extensive experience as an executive leader in the pharmaceutical industry, serving as chief executive officer of one of the largest multinational pharmaceutical companies in the world, (2) Significant industry and regulatory knowledge from a more than 39 year career in the pharmaceutical industry and serving as a director on multiple public company and industry trade group boards, (3) Extensive experience evaluating and developing complex strategic business plans, (4) Brings valued operational perspectives to the Board on matters of talent recruiting and development, executive compensation, benefits and leadership, [and] (5) Extensive global and M&A experience.

32.     The 2017 Proxy Statement also stated the following about Defendant Brennan:

> Mr. Brennan served as Interim Chief Executive Officer of Alexion from December 11, 2016 to March 27, 2017. From 2006 to 2012 he was Chief Executive Officer and Executive Director of AstraZeneca PLC, one of the world's largest pharmaceutical companies. Mr. Brennan worked for AstraZeneca in increasing roles of responsibility from 1992 through 2012, including as Executive Vice President of North America from 2001 to 2006, and as Senior Vice President of Commercialization and Portfolio Management from 1999 to 2001. Prior to the merger of Astra AB and Zeneca Plc, he served as Senior Vice President of Business Planning and Development of Astra Pharmaceuticals LP, the American subsidiary of Astra AB. Mr. Brennan began his career at Merck and Co. Inc., where he rose from Sales Representative in the U.S. Division to General Manager of

Chibret International, a French subsidiary of Merck. He received a BA in business administration from Gettysburg College, where he is a member of the Board of Trustees.

<u>Defendant Hantson</u>

33.   Defendant Ludwig N. Hantson ("Hantson") has served as Alexion's CEO since March 27, 2017, when the Board approved him to replace interim CEO Brennan.  He has also been a Company director since that time.  Defendant Hantson has served on the boards of Baxalta Incorporated and Baxter International Inc. in the past five years.

34.   The 2017 Proxy Statement stated the following about Defendant Hantson:

> Dr. Hantson became Chief Executive Officer of Alexion on March 27, 2017. Prior to joining Alexion, Dr. Hantson was President and Chief Executive Officer of Baxalta Incorporated. He led Baxalta's successful spin-off as a public company from Baxter International Inc. in July 2015 where he was President of Baxter BioScience. He joined Baxter in May 2010 and established the BioScience division as an innovative specialty and rare disease company with a pipeline of 25 new product candidates, and 13 products launches. Prior to Baxter, from 2001 - 2010, Dr. Hantson held several leadership roles at Novartis AG, including CEO of Pharma North America, CEO of Europe, and President of Pharma Canada. Prior to Novartis, Dr. Hantson spent 13 years with Johnson & Johnson in roles of increasing responsibility in marketing and research and development. Dr. Hantson received his Ph.D. in motor rehabilitation and physical therapy, Master's degree in physical education, and a certification in high secondary education, all from the University of Louvain in Belgium.

**CFO Defendants**

<u>Defendant Sinha</u>

35.   Defendant Vikas Sinha ("Sinha") served as Alexion's CFO and Senior Vice President from September 2005 until his resignation on December 12, 2016.  According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Sinha beneficially owned 403,421 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Sinha owned over $74.6 million worth of Alexion stock.

36.   For the fiscal year ended December 31, 2015, Defendant Sinha received $4,736,454 in compensation from the Company, which included $670,000 in base salary, $700,000 in non-equity incentive plan compensation, and over $3.3 million in all other compensation.

37.   The Company has described Defendant Sinha's experience as follows:

> From June 1994 to August 2005, Sinha held various positions with Bayer AG in the United States, Japan, Germany, and Canada, most recently serving since February 2001 as Vice President and Chief Financial Officer of Bayer Pharmaceuticals Corporation, USA. At Bayer, Mr. Sinha has been responsible for financial and business risk management, strategic planning, contracting, customer services, information systems, and supply chain and site administration in North America. Mr. Sinha was also a member of the Pharmaceutical Management Committee for North America. Prior to his appointment in the United States, Mr. Sinha was Vice President and Chief Financial Officer of Bayer Yakuhin Ltd., in Japan and Manager, Mergers and Acquisitions with Bayer AG in Germany. He began his career at Bayer in Toronto as part of an executive development program in the healthcare division. Prior to Bayer, Mr. Sinha held several positions of increasing responsibilities with ANZ Bank and Citibank in South Asia. Mr. Sinha holds a Masters of Business Administration from the Asian Institute of Management which included an exchange program with the University of Western Ontario (Richard Ivey School of Business). He is also a qualified Chartered Accountant from the Institute of Chartered Accountants of India and a CPA in the United States.

Defendant Anderson

38.   Defendant David J. Anderson ("Anderson") served as Alexion's CFO from December 12, 2016 until his resignation, which became effective on July 31, 2017 (he resigned from the Company completely on or around August 31, 2017). On July 31, 2017, Anderson was officially replaced by Paul J. Clancy, who assumed the roles of CFO and principal financial officer.

39.   In fiscal 2016, Defendant Anderson was paid over $1.18 million for holding his position for 14 work-days, and was given a base salary of $4,550,000.

40.     The Company stated the following about Defendant Anderson:

David J. Anderson, M.B.A. has been with Alexion since December 2016, serving as Executive Vice President and Chief Financial Officer. Prior to joining Alexion, Mr. Anderson served as Senior Vice President and Chief Financial Officer of Honeywell International from 2003-2014, where he was responsible for all corporate finance activities including accounting, treasury, tax, audit, investments, financial planning and acquisitions, and was integral to the reshaping of the company's business portfolio. Prior to joining Honeywell, Mr. Anderson was Senior Vice President and Chief Financial Officer of ITT Industries, as well as Newport News Shipbuilding. Previously, he also held senior financial positions with RJR Nabisco and the Quaker Oats Company. Mr. Anderson serves on the Boards of several public companies, including Cardinal Health, a Fortune 20 leader in healthcare products and services. Mr. Anderson received a Bachelor of Science in Economics from Indiana University and a Masters of Business Administration from the University of Chicago (Booth School of Business).

**Other Executive Officer Defendants**

Defendant Thiel

41.     Defendant Carsten Thiel ("Thiel") served as Alexion's Chief Commercial Officer ("CCO") from September 2015 until June 1, 2017.  According to the 2016 Proxy Statement, as of March 15, 2016, Defendant Thiel beneficially owned 46,425 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 15, 2016 was $134.44, Thiel owned over $6.24 million worth of Alexion stock.

42.     For the fiscal year ended December 31, 2016, Defendant Thiel received $4,187,952 in compensation from the Company, which included $686,069 in base salary, $438,000 in non-equity incentive plan compensation, and about $3 million in all other compensation.

43.     The Company has stated the following about Defendant Thiel:

Carsten Thiel, Ph.D. has been with Alexion since September 2014 and has served as Chief Commercial Officer since September 2015. From January 2015 to September 2015, Mr. Thiel served as Senior Vice President EMEA and Asia Pacific and from September 2014 to January 2015, Mr.

14

Thiel was Senior Vice President EMEA and Australasia-Canada. Prior to joining Alexion, Mr. Thiel served in various senior leadership positions at Amgen from 2002 to 2014, including Vice President, Head of Europe, General Manager, Germany, General Manager, CEE and Head of the Oncology Franchise in Europe. Prior to Amgen, Mr. Thiel held several sales and marketing leadership roles across Europe at Roche. Mr. Thiel has a Master Degree in Biochemistry from the University of Marburg, Germany, and a Ph.D. in Molecular Biology and Biochemistry from the Max Planck Institute, Germany.

**Director Defendants**

Defendant Parven

44.     Defendant Alvin S. Parven ("Parven") has served as a Company director since 1999 but has notified the Board that he will not stand for re-election at Alexion's 2018 annual meeting of shareholders.  He is a member of the Company's Audit and Finance Committee, Leadership and Compensation Committee, and Nominating and Corporate Governance Committee.  According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Parven beneficially owned 43,161 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Parven owned about $8 million worth of Alexion stock.

45.     For the fiscal year ended December 31, 2015, Defendant Parven received $328,805 in fees earned or cash paid as compensation from the Company.

46.     The 2017 Proxy Statement lists the following qualifications for Defendant Parven:

(1) More than 30 years in executive management positions at a multinational insurance company, (2) Extensive experience in managing developed organizations that provide specialized and technical services, particularly in the areas of health insurance and benefits, (3) Possesses extensive experience in provider operations, which brings an important perspective to the Board and to management on matters of reimbursement, (4) Brings valued operational perspectives to the Board on matters of talent recruiting and development, executive compensation, benefits and leadership, [and] (5) Extensive global and deep M&A experience.

47.     The 2017 Proxy Statement also stated the following about Defendant Parven:

Mr. Parven has been President of ASP Associates, a management and strategic consulting firm, since 1997. From 1994 to 1997, Mr. Parven was Vice President at Aetna Business Consulting, reporting to the Office of the Chairman of Aetna. From 1987 to 1994, Mr. Parven was Vice President, Operations at Aetna Health Plans. Prior to 1987, he served in various capacities at Aetna including Vice President, Pension Services from 1983 to 1987. Mr. Parven is a trustee of the Employee Retirement Board of the Town of Palm Beach and a director of the Palm Beach Civic Association. Mr. Parven received his B.A. from Northeastern University.

Defendant Rummelt

48.    Defendant Andreas Rummelt ("Rummelt") has served as a Company director since 2010.  He is Chair of the Quality Compliance Committee, and a member of the Science and Innovation Committee and the Strategy and Risk Committee.   According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Rummelt beneficially owned 23,308 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Rummelt owned over $4.3 million worth of Alexion stock.

49.    For the fiscal year ended December 31, 2015, Defendant Rummelt received $345,082 in fees earned or cash paid as compensation from the Company.

50.    The 2017 Proxy Statement lists the following qualifications for Defendant Rummelt:

(1) More than 25 years in the areas of pharmaceutical manufacturing, quality and technical development, providing an important perspective to the Board and to management, (2) More than 20 years in executive management positions in the pharmaceutical industry, including as a chief executive officer and as a senior executive of a large, multinational pharmaceutical company, [and] (3) Possesses a broad understanding of international business operations, particularly with respect to manufacturing, quality and technical matters

51.    The 2017 Proxy Statement also stated the following about Defendant Rummelt:

Dr. Rummelt has served as the Chief Executive Officer of InterPharmaLink AG, a management consulting firm focused on advising

16

companies in the healthcare industry, since July 2011. From December 2008 until January 2010, Dr. Rummelt was Group Head of Quality Assurance and Technical Operations at Novartis. He had been a member of the Executive Committee of Novartis from January 2006 until his resignation in January 2010. He joined Sandoz Pharma Ltd. in 1985 and held various positions of increasing responsibility in development. In 1994, he was appointed Head of Worldwide Technical Research and Development, a position he retained following the merger that created Novartis in 1996. From 1999 to 2004, Dr. Rummelt served as Head of Technical Operations of the Novartis Pharmaceuticals Division and from 2004 to 2008 as Head of Sandoz. Dr. Rummelt graduated with a Ph.D. in pharmaceutical sciences from the University of Erlangen-Nuernberg, Germany.

Defendant Veneman

52.     Defendant Ann M. Veneman ("Veneman") has served as a Company director since February 2010.  She is Chair of the Nominating and Corporate Governance Committee, and a member of the Pharmaceutical Compliance and Quality Committee and the Strategy and Risk Committee. Defendant Veneman is also a director at Nestle SA, and has been a director at S&W Seed Company within the past five years.  According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Veneman beneficially owned 29,342 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Veneman owned over $5.4 million worth of Alexion stock.

53.     For the fiscal year ended December 31, 2015, Defendant Veneman received $345,082 in fees earned or cash paid as compensation from the Company.

54.     The 2017 Proxy Statement lists the following qualifications for Defendant Veneman:

(1) An attorney who has dedicated more than 25 years to government service, including senior national and international positions, (2) Led state and federal government agencies and an international organization, (3) Possesses extensive experience working with government leaders and organizations, (4) Worked closely with national governments throughout the world and possesses a deep understanding of international political organizations, and (5) Public service experience brings an important

perspective to the Board and an important understanding of state and federal government and international organizations.

55.     The 2017 Proxy Statement also stated the following about Defendant Veneman:

Ms. Veneman served as Executive Director of UNICEF, appointed by the United Nations Secretary General, from May 2005 until April 2010. As Executive Director, Ms. Veneman worked on behalf of the United Nations children's agency to help children around the world by advocating for and protecting their rights. Ms. Veneman was responsible for more than 11,000 UNICEF staff members in more than 150 countries. Prior to joining UNICEF, Ms. Veneman served as Secretary of the U.S. Department of Agriculture, or USDA, from January 2001 until January 2005. From 1986 until 1993, she served in various positions at the USDA, including Deputy Secretary, Deputy Undersecretary for International Affairs and Commodity Programs, and Associate Administer of the Foreign Agricultural Service. From 1995 until 1999, Ms. Veneman served as Secretary of the California Department of Food and Agriculture. Ms. Veneman has also practiced law in Washington, DC and California in both the private and public sectors. Ms. Veneman serves on the not-for-profit boards of the Global Health Innovative Technology Fund and Just Capital. Ms. Veneman received a B.A. from the University of California, Davis, a Master's degree in Public Policy from the University of California, Berkeley, and a J.D. from the University of California, Hastings College of Law.

Defendant Burns

56.     Defendant M. Michele Burns ("Burns") has served as a Company director since 2014. She is Chair of the Strategy and Risk Committee, and a member of the Leadership and Compensation Committee, and the Nominating and Corporate Governance Committee. Defendant Burns also serves as a director for The Goldman Sachs Group, Cisco Systems, Inc., Etsy, Inc., and AB InBev, in addition to having served on the board of Wal-Mart Stores, Inc. in the past five years. According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Burns beneficially owned 20 shares of Alexion common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Burns owned about $3,700 worth of Alexion stock.

57.     For the fiscal year ended December 31, 2015, Defendant Burns received $345,082 in fees earned or cash paid as compensation from the Company.

58.     The 2017 Proxy Statement listed the following qualifications for Defendant Burns:

> (1) Extensive experience and expertise in executive management, human resources, finance, strategy and operations of global organizations, (2) Broad experience serving on public company and non-profit boards provides valued perspective on corporate governance, executive compensation and strategic matters, and (3) Extensive experience in financial accounting and reporting.

59.     The 2017 Proxy Statement also stated the following about Defendant Burns:

> From 2006 to 2012, Ms. Burns served as the Chairwoman and Chief Executive Officer of Mercer LLC, a subsidiary of Marsh & McLennan Companies, Inc. (MMC), a global professional services and consulting firm. She currently serves as Center Fellow and Strategic Advisor, Stanford University Center on Longevity. She served in senior executive roles with MMC, including as Chief Executive Officer, Retirement Policy Center sponsored by MMC from 2012 to 2014, Chief Executive Officer of Mercer from 2006 to 2012, and Executive Vice President and Chief Financial Officer of MMC in 2006. From 2004 to 2006, Ms. Burns served as Executive Vice President, Chief Financial and Chief Restructuring Officer for Mirant Corporation. From 1999 to 2004 she worked in increasing roles of responsibility at Delta Air Lines, serving as Executive Vice President and Chief Financial Officer of Delta from 2000 to 2004. Michele began her career with Arthur Andersen, and over an 18-year tenure rose to Senior Partner, leading Andersen's Southern Region Federal Tax Practice, heading its U.S. Healthcare Tax Practice and its Southeastern Region Financial Services Tax Practice, and serving on its Global Advisory Council. Ms. Burns also serves on the Executive Board and as Treasurer of the Elton John Aids Foundation. She received a BBA in business administration and a Master of Accountancy from the University of Georgia.

### Defendant Coughlin

60.     Defendant Christopher J. Coughlin ("Coughlin") has served as a Company director since 2014.  He is Chair of the Audit and Finance Committee, and a member of the Nominating and Corporate Governance Committee and the Quality Compliance Committee.

Defendant Coughlin also serves as a director for Allergan plc and Dun & Bradstreet Corp., and has served on the boards of Covidien Ltd., Dipexium Pharmaceuticals, Forest Laboratories, and Hologic Inc. in the past five years.  According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Coughlin owned no shares of Alexion common stock.

61.    For the fiscal year ended December 31, 2015, Defendant Coughlin received $339,615 in fees earned or cash paid as compensation from the Company.

62.    The 2017 Proxy Statement listed the following qualifications for Defendant Coughlin:

> (1) Extensive experience in complex financial and accounting matters, including public accounting and reporting, (2) Extensive experience evaluating and developing strategic goals for global organizations, [and] (3) Broad experience serving on public international and domestic company boards provides valued perspective on corporate governance and financial matters.

63.    The 2017 Proxy Statement stated the following about Defendant Coughlin:

> Mr. Coughlin served as Advisor to the Chairman and CEO of Tyco International Ltd., a global provider of diversified products, services and industries, from 2010 to 2012, and as Executive Vice President and Chief Financial Officer of Tyco from 2005 to 2010, during a period of significant international growth and restructuring. Mr. Coughlin previously served at the Interpublic Group of Companies, Inc. as Executive Vice President, Chief Operating Officer from 2003 to 2004. From 1998 to 2003, he served as Executive Vice President and Chief Financial Officer of Pharmacia Corporation. From 1997 to1998 he was President, International at Nabisco Group Holdings and from 1996 to 1997 was Executive Vice President and Chief Financial Officer of Nabisco. From 1981 to 1996, Mr. Coughlin held various positions with Sterling Winthrop Incorporated, including Chief Financial Officer. Mr. Coughlin received a BS in accounting from Boston College.

Defendant Mollen

64.    Defendant John T. Mollen ("Mollen") has served as a Company director since 2014.  He is Chair of the Leadership and Compensation Committee, and a member of the Audit and Finance Committee and the Nominating and Corporate Governance Committee.  According

to the 2015 Proxy Statement, as of March 9, 2015, Defendant Mollen beneficially owned 2,785 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Mollen owned about $515,000 worth of Alexion stock.

65.    For the fiscal year ended December 31, 2015, Defendant Mollen received $336,359 in fees earned or cash paid as compensation from the Company.

66.    The 2017 Proxy Statement listed the following qualifications for Defendant Mollen:

> (1) Significant experience in executive compensation policy and administration, (2) More than 30 years as chief human resources senior executive, (3) Extensive operational experience leading human resource function for large, public, complex, global organizations, including a Fortune 200 company, (4) Brings valued operational perspectives to the Board on matters of talent recruiting and development, executive compensation, benefits and leadership, [and] (5) Extensive global and deep M&A experience,

67.    The 2017 Proxy Statement stated the following about Defendant Mollen:

> Mr. Mollen served as Executive Vice President, Human Resources of EMC Corporation from May 2006 until his retirement in February 2014, including two years as special advisor to the President. He joined EMC as Senior Vice President, Human Resources in September 1999. Prior to joining EMC, Mr. Mollen was Senior Vice President of Human Resources with Citigroup Inc., a financial services company, from July 1997 - September 1999. Prior to Citigroup, he held a number of positions of increasing responsibility with Harris Corp., an international communications and technology company, including Vice President of Administration. Mr. Mollen serves as a director for a number of not-for-profit and professional boards, including the New England Healthcare Institute, the HR Policy Association, and the Center on Executive Compensation, and is an advisory board member for Working Mother magazine, and he is Chairman of the Board of Trustees of Worcester Polytechnic Institute. Mr. Mollen received a B.A. in Economics from St. John Fisher College, and a Master's degree in Labor Relations from St. Francis College in Pennsylvania.

Defendant Baker

68.     Defendant Felix J. Baker ("Baker") has served as a Company director since 2015. He is Chair of the Science and Innovation Committee, and a member of the Quality Compliance Committee and the Strategy and Risk Committee.  Defendant Baker also serves as a director for Genomic Health, Inc. and Seattle Genetics, Inc., and has served on the boards of Synageva BioPharma Corp. and Ardea Bioscience, Inc. in the past five years.  According to the 2016 Proxy Statement, as of March 15, 2016, Defendant Baker beneficially owned 6,702,819 shares of the Company's common stock, which represented 2.98% of all outstanding Company common stock.  Given that the price per share of the Company's common stock at the close of trading on March 15, 2016 was $134.44, Baker owned over $901.1 million worth of Alexion stock.

69.     For the fiscal year ended December 31, 2015, Defendant Baker received $373,222 in fees earned or cash paid as compensation from the Company.

70.     The 2017 Proxy Statement listed the following qualifications for Defendant Baker:

> (1) Broad experience serving as both a director and investor of biotechnology companies providing a strategic perspective of the industry, [and] (2) Extensive experience evaluating and developing strategic business plans and transactions in the biotechnology industry.

71.     The 2017 Proxy Statement stated the following about Defendant Baker:

> Dr. Baker is Co-Managing Member of Baker Bros. Advisors LP, an investment advisor focused on investments in life science and biotechnology companies. Dr. Baker and his brother, Julian Baker, started their fund management careers in 1994 when they co-founded a biotechnology investing partnership with the Tisch Family. Dr. Baker holds a B.S. and a Ph.D. in Immunology from Stanford University, where he also completed two years of medical school.

Defendant Norby

72.     Defendant R. Douglas Norby ("Norby") was a Company director from 1999, and Lead Independent Director from 2014, until September 14, 2017.  He was a member of the Company's Audit and Finance Committee, Leadership and Compensation Committee, and Nominating and Corporate Governance Committee.  In the past five years he has also been a director for Ikanos Communications, Inc., InveSense Inc., MagnaChip Semiconductor Corporation, and Stats ChipPAC, Ltd.  According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Norby beneficially owned 65,903 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Norby owned about $12.2 million worth of Alexion stock.

73.     For the fiscal year ended December 31, 2015, Defendant Norby received $360,549 in fees earned or cash paid as compensation from the Company.

74.     The 2017 Proxy Statement listed the following qualifications for Defendant Norby:

> (1) Extensive experience in financial and accounting matters, including public accounting and reporting, (2) 40 year career, served in executive management positions at several multinational organizations, including as president, chief operating officer and chief financial officer, (3) Extensive experience in financial and accounting reporting processes and internal control systems, [and] (4) Experience serving on public company boards provides valued perspective on corporate governance and financial matters.

75.     The 2017 Proxy Statement stated the following about Defendant Norby:

> Mr. Norby served as Sr. Vice-President and Chief Financial Officer of Tessera Technologies, Inc., a provider of intellectual property for advanced semiconductor packaging from July 2003 until January 31, 2006. From March 2002 to February 2003, Mr. Norby served as Senior Vice President and Chief Financial Officer of Zambeel, Inc., a data storage systems company. From December 2000 to March 2002, Mr. Norby served as Senior Vice President and Chief Financial Officer of Novalux, Inc., a manufacturer of lasers for optical networks. From 1996 until

December 2000, Mr. Norby served as Executive Vice President and Chief Financial Officer of LSI Logic Corporation, a semiconductor company. From July 1993 until November 1996, he served as Senior Vice President and Chief Financial Officer of Mentor Graphics Corporation, a software company. Mr. Norby served as President of Pharmetrix Corporation, a drug delivery company, from July 1992 to September 1993, and from 1985 to 1992, he was President and Chief Operating Officer of Lucasfilm, Ltd., an entertainment company. From 1979 to 1985, Mr. Norby was Senior Vice President and Chief Financial Officer of Syntex Corporation, a pharmaceutical company. Mr. Norby received a B.A. in Economics from Harvard University and an M.B.A. from Harvard Business School.

Defendant Keller

76.     Defendant William R. Keller ("Keller") served as a Company director between 2009 and May 2015, when he retired.  During his time on the Board, Defendant Keller served as a member of the Leadership and Compensation Committee and the Nominating and Corporate Governance Committee.   According to the 2015 Proxy Statement, as of March 9, 2015, Defendant Keller beneficially owned 3,598 shares of Alexion common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2015 was $184.91, Keller owned over $665,300 worth of Alexion stock.

77.     The 2014 Proxy Statement listed the following qualifications for Defendant Keller:

> (1) Lives and works in China and possesses extensive working knowledge and experience of the pharmaceutical industry in China, (2) More than thirty years of executive management experience in the pharmaceutical industry, (3) Former chief executive officer in China, [and] (4) Led the Latin American expansion and operations for a major pharmaceutical company in markets where Alexion is currently focused.

78.     The 2014 Proxy Statement stated the following about Defendant Keller:

> A director of Alexion since December 2009. Mr. Keller is the founder of, and since September 2009 a principal of, Keller Pharma Consultancy, a pharmaceutical consulting firm in China. He is also a senior consultant to the Shanghai Foreign Investment Development Board and the deputy general manager of Zhangjiang Biotech & Pharmaceutical Base Development Co., Ltd. From 2007 to September 2009, Mr. Keller was the

chairman of HBM Biomed China Partners, a specialized venture capital organization dedicated exclusively to life sciences in China. From 1994 to 2003, Mr. Keller was the general manager of Roche China Ltd. and Shanghai Roche Pharmaceutical Ltd. From 1974 to 2003, Mr. Keller served in various positions at Roche Group in South America and Asia. Mr. Keller is the honorary president of the R&D-based Pharmaceutical Association in China, and holds directorships in Cathay Industrial Biotech Ltd. and Coland Pharmaceutical Co., Ltd., which is a pharmaceutical company listed on the Taiwan stock exchange. Mr. Keller graduated from the School of Economics and Business Administration (Zurich) and is Honorary Citizen of Shanghai.

Defendant Madri

79.     Defendant Joseph A. Madri ("Madri") served as a Company director between 1992 and May 2014, when he retired.  Defendant Madri served as a member of the Leadership and Compensation Committee and the Quality Compliance Committee.

80.     The 2013 Proxy Statement stated the following about Defendant Madri:

A director of Alexion since February 1992. Since 1980, Dr. Madri has been on the faculty of the Yale University School of Medicine and is currently a Professor of Pathology and Molecular, Cellular and Developmental Biology. Dr. Madri serves on the editorial boards of numerous scientific journals and he is the author of over 243 scientific publications. Dr. Madri works in the areas of regulation of angiogenesis, vascular cell-matrix interactions, cell-cell interactions, lymphocyte-endothelial cell interactions and endothelial and smooth muscle cell biology and neural stem biology, and has been awarded a Merit award from the National Institutes of Health. Dr. Madri received his B.S. and M.S. in Biology from St. John's University and M.D. and Ph.D. in Biological Chemistry from Indiana University.

Defendant Mathis

81.     Defendant Larry L. Mathis ("Mathis") served as a Company director between 2004 and May 2014, when he retired.  Defendant Mathis served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit and Finance Committee.

82.     The 2013 Proxy Statement stated the following about Defendant Mathis:

A director of Alexion since March 2004. From 1971 until 1998, he served as an executive at The Methodist Hospital System in Houston, Texas - an

organization comprising 16 corporations and 37 hospital affiliates in the U.S. and abroad. During the last fourteen years of his tenure, Mr. Mathis served as President and CEO and as a member of the Executive Committee and the Board of Directors. Following his executive service, he was an organization, management and leadership consultant with D. Peterson & Associates in Houston. Mr. Mathis is also director of Healthcare Trust of America, Inc., a real estate investment trust listed on the NYSE. Mr. Mathis received a Master's degree in Health Administration from Washington University in St. Louis, and a B.A. in Social Sciences from Pittsburg State University in Kansas.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

83.     Each officer and director of Alexion owes to the Company and its shareholders the highest obligations of fair dealing, and the fiduciary duty to exercise good faith and diligence in the administration of the Company and its services and in the use and preservation of its assets and property.

84.     The Individual Defendants owed Alexion and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to manage and control Alexion in a just, equitable, fair, and honest manner due to their ability to control the corporate and business affairs of Alexion and its services and also because of their positions as directors, officers, and/or fiduciaries of the Company.  Moreover, in a manner that benefits all shareholders equally, the Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

85.     Due to their positions of authority and control as officers and/or directors of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the misconduct and wrongful acts outlined herein.

86.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Alexion, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Alexion's Board at all relevant times.

87.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, conflicts, related-party transactions, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC, including all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

88.     The directors and officers of the Company were required to exercise prudent and reasonable supervision over the practices, policies, operations, internal controls, and management of the Company and its services in order to properly and adequately discharge their duties. To that end, and by virtue of such duties, the directors and officers of the Company were required to, *inter alia*:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Alexion's own Code of Ethics and Business Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Alexion conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Alexion and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Alexion's operations would comply with all applicable laws and Alexion's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

28

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

89.     Each of the Individual Defendants further owed to Alexion and the shareholders the duty of loyalty requiring that each favor Alexion's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

90.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Alexion and were at all times acting within the course and scope of such agency.

91.     Because of their advisory, executive, managerial, and directorial positions with Alexion, each of the Individual Defendants had access to adverse, non-public information about the Company.

92.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alexion.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

93.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein and engage in the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group

Scheme.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

94.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 promulgated thereunder; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; (iii) artificially inflate the Company's stock price while the Company repurchased its own stock and certain Individual Defendants engaged in lucrative insider sales; and (iv) cause the Company to engage in the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group Scheme.

95.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws, including by engaging in the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group Scheme.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Alexion was a direct,

necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

96.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

97.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alexion, and was at all times acting within the course and scope of such agency.

<u>**ALEXION'S CODE OF ETHICS**</u>

98.     The Alexion Pharmaceuticals, Inc. Code of Conduct (the "Code of Ethics")[6], applies to directors, officers and employees of Alexion and its subsidiaries.  The Company represented that the Code of Ethics "complies with the requirements of Item 406 of Regulation S-K and the listing standards of the NASDAQ Global Select Market."

99.     As explained by the Company, the Code of Ethics covers areas of professional conduct relating to individual's service to Alexion, including conflicts of interest, unfair or unethical use of corporate opportunities, strict protection of confidential information, compliance with applicable laws and regulations, and oversight of ethics and compliance by employees of the Company.

---

[6] Available on Alexion's investor relations website, http://ir.alexionpharm.com/governance.cfm, or at http://alxn.com/pdfs/Global_Code_of_Conduct.pdf.

100.   In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes described herein, including the dissemination of materially false and misleading statements to the public, and facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 promulgated thereunder.   In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties of loyalty, ethics, and to act in the best interests of the Company.

101.   Indeed, this much has been admitted by the Company, which has recently promised the public that as part of its remedial measures "[m]embers of senior management, with the participation and input of the Audit and Finance Committee and the Board of Directors, has and will increase communication with, and training of employees regarding" (1) the Company's "commitment to ethical standards and the integrity of [its] business practices," (2) "[r]equirements for compliance with applicable laws, [its] Code of Ethics . . . and other Company policies," and (3) "[a]vailability of and processes for reporting suspected violations of law or [the Code of Ethics]."

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

### Alexion is a One-Drug Company and Hangs on Sales of Soliris

102.   Alexion purports to be a biopharmaceutical company focused on serving patients with devastating and ultra-rare disorders through the innovation, development and commercialization of life-transforming therapeutic products.

103.     Alexion was founded and incorporated in Delaware in 1992 by Defendant Bell, then a 33-year-old cardiologist.

104.     Today, its business is separated into two franchises: the (1) complement franchise and (2) the metabolic franchise.  In the Company's complement franchise, Soliris is the first and only therapeutic approved for patients with either PNH, a life-threatening and ultra-rare genetic blood disorder, or aHUS, a life-threatening and ultra-rare genetic disease. PNH and aHUS result from chronic uncontrolled activation of the complement component of the immune system.  In the Company's metabolic franchise, it commercializes Strensiq® (asfotase alfa) for the treatment of patients with Hypophosphatasia ("HPP") and Kanuma® (sebelipase alfa) for the treatment of patients with Lysosomal Acid Lipase Deficiency ("LAL-D").  HPP is an ultra-rare genetic disease characterized by defective bone mineralization that can lead to deformity of bones and other skeletal abnormalities.  LAL-D is a serious, life threatening, ultra-rare disease in which genetic mutations result in decreased activity of the Lysosomal Acid Lipase ("LAL") enzyme leading to marked accumulation of lipids in vital organs, blood vessels and other tissues.

105.     From the Company's founding in 1992 until 2015, however, the Company had marketed only one drug, Soliris.  And even today, when the Company markets three drugs, the Company generates the vast majority of its revenue through sales of Soliris.

106.     Soliris can only be marketed to about 11,000 patients worldwide, however, due to the extreme rarity of the two conditions it treats, PNH and aHUS.

107.     Thus, an obvious quagmire arose early-on for the Company; how does a company generate enough revenue off a drug that, as of May 2017, treated only approximately 11,000 patients worldwide.  Indeed, Defendant Hallal acknowledged as much during an interview in

2015, explaining: "Back in 2007, the bear story on Alexion was, how do you even make a business in this? Aren't there just a few hundred people in the world living with PNH?"

108.    Alexion answered this question, and surmounted its hurdles, by relying on a two-pronged strategy: exorbitant pricing and aggressive sales tactics—including, as detailed below, conduct that was improper and illegal.

109.    As to the first prong, Soliris is one of the most expensive drugs in the world, costing approximately $500,000 to $700,000 per patient per year.  The Company has absolute pricing power because Soliris is the only drug approved to treat PNH and aHUS.  Indeed, the Company has often touted its market exclusivity, protected under statutory exclusivity periods and a wide patent portfolio covering, *inter alia*, Soliris' active ingredient (a protein called eculizumab), dosage, formulation, and use in the treatment of a variety of conditions.

110.    As to the second prong, given the small market for Soliris, and the high mortality rate of patients suffering from PNH and aHUS, each potential customer is of the utmost importance.  This need is compounded by the Company's heavy reliance on Soliris for sustenance and success.

111.    The Company's most recent annual report repeated the well-known reality that the Company "depend[s] heavily on the success of [its] lead product, Soliris" and "[i]f sales of Soliris are adversely affected, [its] business may be materially harmed."  The Company's "ability to generate revenues depends primarily on the commercial success of Soliris and whether physicians, patients and healthcare payers view Soliris as therapeutically effective and safe relative to cost."

112.    Since the Company launched Soliris in the U.S. in 2007, substantially all of its revenue has been attributed to sales of Soliris.  In 2015, the Company received marketing

approval in the U.S., the EU and Japan, of its second marketed product, Strensiq, for the treatment of HPP.  The Company also received marketing approval in 2015 in the U.S. and the EU for its third product, Kanuma, for the treatment of LAL-D.  However, the Company anticipates that Soliris product sales will continue to contribute a significant percentage of its total revenue over the next several years.

113.    According to the Company's 2015 Annual Report, the commercial success of Soliris and its ability to generate revenues depends on several factors, including, among others: (1) the Company's ability to obtain sufficient coverage or reimbursement by government or third-party payers and its ability to maintain coverage or reimbursement at anticipated levels; (2) the number of patients with PNH and aHUS, and the number of those patients who are diagnosed with PNH and aHUS and identified to the Company; (3) the successful continuation of commercial sales in the U.S., Japan and in European countries where the Company is already selling Soliris for the treatment of PNH and aHUS, and successful launch in countries where it has not yet obtained, or only recently obtained, marketing approval or commenced sales; and (4) acceptance of Soliris in the medical community.

114.    Therefore, as further described below, the Company and its sales force used every trick in the book to obtain new customers (i.e., patients) and keep their customers on Soliris, even threatening death if they refused to take Soliris.

The Science of Soliris and the Conditions it Treats

115.    PNH is an ultra-rare blood disorder in which an acquired genetic deficiency causes uncontrolled activation of the body's "complement system," a part of the body's innate immune system (referred to as "complement activation"), which leads to life-threatening complications.

116.    aHUS is a chronic and life-threatening, ultra-rare genetic disease in which uncontrolled complement activation causes blood clots in small blood vessels throughout the body, or TMA, leading to kidney failure, stroke, heart attack and death.

117.    Soliris is a humanized monoclonal antibody functioning as a terminal complement inhibitor, an inhibitor of complement activation.  In people with PNH, it reduces both the destruction of red blood cells and need for blood transfusion, but *does not appear to affect the risk of death*.[7]  It also *does not appear to change the risk of blood clots, myelodysplastic syndrome, acute myelogenous leukemia, or aplastic anemia*.[8]

118.    While the Company has acknowledged that they are "aware of a potential risk for PNH patients who delay a dose of Soliris or discontinue their treatment of Soliris," based on theoretical exercises, it admitted that "[s]everal PNH patients in our studies of Soliris have received delayed doses or discontinued their treatment [and] *[i]n none of those circumstances were significant complications shown to be due to rapid destruction of a larger number of PNH red blood cells*."

119.    Soliris is administered in a doctor's office or clinic by intravenous infusion.

Alexion Operates in a Highly Regulated Industry

120.    As the Company has often disclosed, it operates in many jurisdictions in a highly regulated industry.  In addition to U.S. Food and Drug Administration (the "FDA") and related regulatory requirements, the Company has always been subject to health care "fraud and abuse" laws, such as the federal False Claims Act, the anti-kickback provisions of the federal Social Security Act, and other state and federal laws and regulations.

---

[7] *See* Martí-Carvajal et al., *Eculizumab for treating patients with paroxysmal nocturnal hemoglobinuria*, Cochrane Database of Systematic Reviews 2014, Issue 10. Art. No.: CD010340.
[8] *Id.*

121.   The Company stated the following with regard to applicable laws:

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving any remuneration, directly or indirectly, in cash or in kind to induce, or reward the purchasing, leasing, ordering or arranging for or recommending the purchase, lease or order of any health care item or service reimbursable under Medicare, Medicaid, or other federal health care programs. This statute has been interpreted to apply broadly to arrangements between pharmaceutical manufacturers on the one hand and prescribers, patients, purchasers and formulary managers on the other. Liability may be established without a person or entity having actual knowledge of the federal Anti-Kickback Statute or specific intent to violate it. In addition, PPACA amended the Social Security Act to provide that the government may assert that a claim including items or services resulting from a violation of the federal anti-kickback statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (FCA). A conviction for violation of the Anti-kickback Statute requires mandatory exclusion from participation in federal health care programs. Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration to those who prescribe, purchase, or recommend pharmaceutical products, including certain discounts, education and research grants, purchase of speaking or consulting services, and patient assistance programs, may be subject to scrutiny or penalty if they do not qualify for an exemption or safe harbor. We seek to comply with the anti-kickback laws and with the available statutory exemptions and safe harbors. However, our practices may not in all cases fit within the safe harbors, and our practices may therefore be subject to case-by-case scrutiny.

The FCA prohibits any person from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment of government funds, or knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim. Pharmaceutical companies have been investigated and have reached substantial financial settlements with the Federal government under the FCA for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; providing consulting fees and other benefits to physicians to induce them to prescribe products; reporting inflated prices to private publications that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, or "off-label" uses that caused claims to be submitted to Federal programs for non-covered off-label uses; and

submitting inflated best price information to the Medicaid Rebate Program.

In addition, several U.S. states and localities have enacted legislation requiring pharmaceutical companies to establish marketing compliance programs, file periodic reports with the state or make periodic public disclosures on sales, marketing, pricing, clinical trials, and other activities. Some state laws prohibit certain marketing-related activities including the provision of gifts, meals or other items to certain health care providers. Similar legislation is being considered in other states. Additionally, PPACA enacted the Physician Payment Sunshine Act, being implemented as the Open Payments program, that requires manufacturers to track and report to the federal government, for public dissemination, payments and other transfers of value made to physicians and teaching hospitals. Many of these requirements are new and there is limited guidance on many aspects of how they will be interpreted, implemented and enforced. Nonetheless, if we are found not to be in full compliance with these laws, we could face enforcement action and fines and other penalties, and could receive adverse publicity.

\*\*\*

Although physicians are permitted to, based on their medical judgment, prescribe products for indications other than those cleared or approved by the FDA, manufacturers are prohibited from promoting their products for such off-label uses. In the United States, we market Soliris for PNH and aHUS and provide promotional materials and training programs to physicians regarding the use of Soliris for PNH and aHUS. Although we believe our marketing materials and training programs for physicians do not constitute off-label promotion of Soliris, the FDA, the U.S. Justice Department, or other federal or state government agencies may disagree. If the FDA or other government agencies determine that our promotional materials, training or other activities constitute off-label promotion of Soliris, it could request that we modify our training or promotional materials or other activities or subject us to regulatory enforcement actions, including the issuance of a warning letter, injunction, seizure, civil fine and criminal penalties. It is also possible that other federal or state enforcement authorities might take action if they believe that the alleged improper promotion led to the submission and payment of claims for an unapproved use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false or fraudulent claims for payment of government funds. Even if it is later determined we are not in violation of these laws, we may be faced with negative publicity, incur significant expenses defending our position and have to divert significant management resources from other matters.

\*\*\*

38

Interactions between pharmaceutical companies and physicians are also governed by strict laws, regulations, industry self-regulation codes of conduct and physicians' codes of professional conduct in the individual European Union member states. The provision of any inducements to physicians to prescribe, recommend, endorse, order, purchase, supply, use or administer a medicinal product is prohibited. A number of European Union member states have introduced additional rules requiring pharmaceutical companies to publicly disclose their interactions with physicians and to obtain approval from employers, professional organizations and/or competent authorities before entering into agreements with physicians. These rules have been supplemented by provisions of related industry codes. Additional countries may consider or implement similar laws and regulations. Violations of these rules could lead to reputational risk, public reprimands, and/or the imposition of fines or imprisonment.

We are also subject to the United States Foreign Corrupt Practices Act (FCPA), the U.K. Bribery Act, and other anti-corruption laws and regulations that generally prohibit companies and their intermediaries from making improper payments to government officials and/or other persons for the purpose of obtaining or retaining business. Worldwide regulators are increasing their regulatory and enforcement efforts in this area. For example, the Bribery Act in the United Kingdom, effective as of July 2011 applies to any company incorporated in or "carrying on business" in the United Kingdom, regardless of the country in which the alleged bribery activity occurs and even if the inappropriate activity is undertaken by our international distribution partners.

Recent years have seen a substantial increase in anti-bribery law enforcement activity by U.S. regulators, with more frequent and aggressive investigations and enforcement proceedings by both the Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission ("SEC"), increased enforcement activity by non-U.S. regulators, and increases in criminal and civil proceedings brought against companies and individuals. Our policies mandate compliance with these anti-bribery laws. We may operate in many parts of the world that are recognized as having a greater potential for governmental and commercial corruption. We cannot assure that our policies and procedures will always protect us from reckless or criminal acts committed by our employees or third-party intermediaries. From time-to-time, we may conduct internal investigations and compliance reviews, the findings of which could negatively impact our business. Any determination that our operations or activities are not, or were not, in compliance with existing United States or foreign laws or regulations could result in the imposition of substantial fines, interruptions of business, loss of supplier, vendor or other third-party relationships, termination of necessary licenses and permits, and other legal or equitable sanctions. Other internal or government

investigations or legal or regulatory proceedings, including lawsuits brought by private litigants, may also follow as a consequence. Violations of these laws may result in criminal or civil sanctions, which could disrupt our business and result in a material adverse effect on our reputation, business, results of operations or financial condition. Increasing regulatory scrutiny of the promotional activities of pharmaceutical companies also has been observed in a number of European Union member states.

Laws, including those governing promotion, marketing and anti-kickback/anti-bribery provisions, and industry regulations are often strictly enforced. In the United States, additional governmental resources are being added to enforce these laws and to prosecute companies and individuals believed to be violating them. For example, PPACA included a number of provisions aimed at strengthening the government's ability to pursue anti-kickback and false claims cases against pharmaceutical manufacturers and other healthcare entities, including substantially increased funding for healthcare fraud enforcement activities, enhanced investigative powers for government authorities, and amendments to the civil False Claims Act that make it easier for the government and whistleblowers to pursue cases for alleged kickback and false claim violations. We anticipate that government scrutiny of pharmaceutical sales and marketing practices will continue for the foreseeable future and subject us to the risk of government investigations and whistleblower lawsuits. Responding to a government investigation or whistleblower lawsuit would be expensive and time-consuming, and could have a material adverse effect on our business and financial condition and growth prospects.

122.    Despite knowledge of these regulations and laws, as further described below, the Individual Defendants caused the Company to violate a plethora of federal and state laws and regulations, including but not limited to, the FCPA, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Food, Drug, and Cosmetic Act, the Exchange Act, FTC regulations, SEC regulations, the Anti-Kickback Statute, the FCA, the Patient Protection and Affordable Care Act ("PPACA"), other anti-bribery statutes, and consumer protection laws.

**<u>False and Misleading Statements and Omissions</u>**

<u>January 30, 2014</u>

123.    On January 30, 2014, the Company issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2013 (the

"1/30/14 Press Release").  The 1/30/14 Press Release reported that quarterly net product sales of Soliris were $441.9 million, compared to $320.5 million for the same period in 2012, and $1.551 billion for the full year.  The sales figure for the fourth-quarter 2013 beat analysts' consensus estimates of $431 million.

124.    The 1/30/14 Press Release represented that "[t]he year-on-year increase in Q4 net product sales of 38 percent reflected steady additions of new patients with paroxysmal nocturnal hemoglobinuria (PNH) and atypical hemolytic uremic syndrome (aHUS) commencing Soliris treatment."

125.    The 1/30/14 Press Release quoted Defendant Bell as stating, "In 2013, we provided Soliris to an increasing number of patients with PNH and aHUS worldwide" and that the Company "demonstrated steady growth in PNH, grew steadily the number of new patients with aHUS receiving Soliris in the U.S. and [abroad]."

126.    The 1/30/14 Press Release also projected increasing sales in the year to come stating, "In 2014, worldwide net product sales are expected to be within a range of $2.00 to $2.02 billion."

127.    On the conference call Alexion held the same day with investors and analysts, Defendant Bell attributed the Company's better-than-expected results to legitimate business factors and conditions that allowed Alexion "to serve more patients" in "major countries including . . . Brazil."[9]  Specifically, Defendant Bell stated the following:

> Our fourth quarter performance underscored our strategic growth initiatives. First, our commercial team provided Soliris to an increasing number of patients with PNH and aHUS worldwide and broadened the base in which we will serve more patients in 2014 and beyond.

*** 

---

[9] Full transcript available at https://seekingalpha.com/article/1981811-alexion-pharmaceuticals-management-discusses-q4-2013-results-earnings-call-transcript?part=single.

Looking first on our PNH operations during Q4. We, again, continue to demonstrate strong Soliris growth in our core territories with increasing contribution from the next group of major countries, including Turkey, Russia and Brazil. In 2014, we will go deeper in each of these countries, while also increasing our presence to serve more patients across our nearly 50-country platform. We are driven in these efforts by the knowledge that globally, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone began appropriate therapy.

Turning to our aHUS launch. In Q4, we again observed a steady addition of new patients in the United States, made continued progress in key European countries and initiated aHUS commercial operations in Japan, following our marketing approval late last year. The ongoing strength of the global aHUS launch in the United States and other countries reinforces our confidence that our opportunity to serve patients with aHUS is at least as large as our opportunity to serve patients with PNH, and perhaps larger. As one measure, we continue to observe that match for the time since their respective approvals, more patients in the United States are currently receiving Soliris for aHUS than there had been for PNH. These results support our belief that the incidence of aHUS is higher than that of PNH.

In 2014, we expect to continue to extend our aHUS initiatives in the United States, complete the aHUS reimbursement processes across Western Europe, achieve a robust launch in Japan on our first full year of aHUS operations, and build on our initial presence in Turkey, Russia and Brazil.

128.     On the call, each of Defendants Bell, Hallal, Sinha addressed questions from investors and/or analysts.  In response to one of the questions from an analyst, Defendant Hallal represented that there is a vast market potential for Soliris because many patients don't know that they have the conditions that Soliris treats but "the growth opportunity" is "very, very high" for PNH and the Company "would expect the number of patients [suffering from aHUS and taking Soliris] . . . to increase" if "we get there sooner."  He went on regarding the reasons for the Company's sales success, stating that the Company "achieved strong Soliris revenue growth of 37%, reflecting continued steady growth in PNH and our ongoing strong launch at aHUS in initial countries."  Hallal also attributed the sales success to the Company's "disease education and diagnostic initiatives."  He went on to state as follows:

> Looking first at PNH. We continue to grow our PNH operations by achieving deeper penetration in the nearly 50 countries in which we serve patients, with key countries benefiting from field team expansions deployed for the aHUS launch.
>
> Importantly, throughout 2013, we continued to identify new patients with PNH each quarter, even in our longest established territories. Looking specifically at Q4, strong rates of patient identification and rapid treatment initiation with Soliris continued as in prior quarters, as our disease awareness and diagnostic programs continue to support optimal patient care. We were pleased with our performance in our core territories of the U.S., Western Europe and Japan; saw a steady growth in Turkey, Brazil and Russia; and continued to serve new patients in Korea and Latin America. In 2014, we expect that our efforts will result in more patients being rapidly diagnosed and treated in both established and newer markets and continue to selectively broaden our footprint to address opportunities in Latin America, Europe and Asia Pacific.

129. On the call, Defendant Sinha also commented on the growth of the Company, and stated as follows:

> The fourth quarter of 2013 was another period of sustained growth in revenues and profitability for Alexion, and provided a strong finish to the year. Revenue in Q4 increased 38% year-on-year to $441.9 million, representing a strong ongoing growth in established markets augmented by initial contributions from aHUS in Japan and Russia following approvals in these countries in late Q3, 2013.
>
> For the full-year 2013, we recorded sales of $1.55 billion, an increase of 37% compared to 2012. Looking at the geographic breakdown of sales in 2013, the U.S. contributed 36% of revenue, Europe 33%, Asia Pacific 13%, and Rest of the World 18%.

130. Defendant Sinha further made statements regarding the Company's 2014 guidance, stating:

> I would now like to turn to our 2014 guidance. First, we are again guiding strong top-line year-on-year revenue growth. Revenues for 2014 are forecasted in a range of $2 billion to $2,020,000,000, an increase of approximately 30% year-on-year. 2014 guidance reflects our expectation for continued strong organic growth.

131. The statements referenced above in ¶¶ 123-30 were materially false and misleading because they failed to disclose (1) the Adverse Material Facts Regarding Soliris Sales

43

Methods, (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

February 10, 2014

132.     On February 10, 2014, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2013 ("2013 10-K"), which was signed by, among others, Defendants Bell, Sinha, Keller, Mathis, Madri, Norby, Parven, Rummelt, and Veneman.

133.     Attached to the 2013 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bell and Sinha, attesting to the accuracy of the 2013 10-K.

134.     The Company's SOX certifications contain the following attestations:

1.  I have reviewed this [filing] of Alexion Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

135.    The 2013 10-K reiterated and expanded upon the financial figures reported in the 1/30/14 Press Release.

136.    The 2013 10-K expressly stated that while the Company's "sales force for Soliris is small compared to that of other drugs with similar gross revenues," the Company "believe[d] that a relatively smaller sales force is appropriate to effectively market Soliris due to the incidence and prevalence of PNH and aHUS" (the "Effective Sales Force Representation").

137.    The 2013 10-K also expressly stated that "[b]ecause of factors such as the pricing of Soliris, the limited number of patients, the short period from product sale to patient infusion and the lack of contractual return rights, Soliris customers often carry limited inventory."  This statement was false and the Company knew this was false, since the sales force was "pulling-in"

sales, meaning that customers were carrying much more than a "limited inventory" (the "Limited Inventory Representation").

138. The 2013 10-K further represented that the Company's fantastic sales figures were due to Alexion's "dedicat[ion of] significant resources to the worldwide commercialization of Soliris." The Company represented that it "established sales and marketing capabilities in the United States and in many countries throughout the world" (this and the latter representation collectively referred to as the "Worldwide Commercialization Representations").

139. Moreover, the 2013 10-K, specifically listed out the factors upon which "[t]he commercial success of Soliris and [Alexion's] ability to generate and increase revenues depend." None of these factors were related to the continuation of the unethical and unsustainable sales practices engaged in by the Company (referred to as the "Commercial Success Factors Omission").

140. The 2013 10-K also represented that as of December 31, 2013, "[Alexion's] internal control over financial reporting is effective" (the "Effective Internal Control Representation") and that its disclosure controls and procedures were effective. Regarding the latter, the 2013 10-K stated the following (the following statement as amended to reflect the appropriate period relevant to the statement is hereinafter referred to as the "Effective Disclosure Controls Representation"):

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act,) as of December 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2013, our disclosure controls and procedures were effective to provide reasonable assurance that information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions

46

regarding required disclosure, and ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

141.    The Company's statements contained in the 2013 10-K and the SOX certifications attached thereto, some of which are discussed in ¶¶ 134-140, were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

April 16, 2014

142.    On April 16, 2014, the Company's Board amended and restated Alexion's By-Laws to make it harder to disqualify a conflicted director.  Specifically, the Board eliminated the disqualification of a proposed director nominee if the nominee is party to a compensatory arrangement with, or receives compensation or other payment from, a third party in connection with such nominee's candidacy or service.

143.    One day later, on April 17, 2014, the Board increased the number of Company directors from 9 to 10 and appointed Defendant Mollen as a director of Alexion, effective immediately.  Defendant Mollen was later named to the Compensation Committee.

144.    These two events were not coincidental.  In fact, if not for the Board's changing of established provisions in the Company's By-Laws, Defendant Mollen would have been

disqualified from holding a director position.  Instead, to further the schemes described herein, the Board used their power to let Mollen in.

### April 23, 2014 – Proxy Statement

145.    On April 23, 2014, the Company filed the 2014 Proxy Statement.  The 2014 Proxy Statement invited shareholders to attend Alexion's 2014 Annual Meeting of Shareholders on Monday, May 5, 2014, and purported to "describe[] the business to be considered at the meeting."  It was based upon this proxy statement that shareholders were expected to cast votes on extremely important matters to the Company, including the election of the following director nominees: Defendants Bell, Keller, Mollen, Norby, Parven, Rummelt, and Veneman, and Mr. Max Link[10].

146.    The 2014 Proxy Statement stated that "[t]he Company delivered solid revenue growth and strong financial results in 2013" and went on to list certain operating performance highlights.  Among these highlights were (1) "[a]n increase of net product sales of 37% from the previous year to $1.551 billion, *in line with our internal forecasting*," and (2) "[a]n increase of non-GAAP[11] net income of 47%, to $624.2 million, or $3.08 per share, *in line with our internal forecasting*."

147.    Moreover, the Company touted its stock performance, stating, "Alexion's stock performance has been very strong, both in absolute terms and compared to its self-selected peers, as described [in the 2014 Proxy Statement]."

148.    The 2014 Proxy Statement praised the Company's management and credited them with the wonderful "growth and success" the Company was seeing.  Specifically, the 2014 Proxy Statement stated, "Alexion's workforce and product sales were growing rapidly, and the

---

[10] Max Link, who served as Chairman of the Board, passed away unexpectedly on October 5, 2014 while traveling on business at the age of 74.

[11] "Generally accepted accounting principles."

Compensation Committee believes strongly that the Company's executive leadership is integral to the Company's growth and success."

149.   The 2014 Proxy Statement also stated that it was "critical to the Company's performance to hire highly talented, specialized and experienced employees . . . ."

150.   To promote investor faith and confidence in the Company's management of Alexion, the 2014 Proxy Statement described a prosperous prior year in terms of sales growth and attributed that achievement, in part, to Defendant Hallal.  The 2014 Proxy Statement stated as follows:

> Under Mr. Hallal's leadership, the Company experienced significant growth in global product sales during 2013 (37%), attributed to both strong sales for PNH and strong sales for aHUS. Matched for the time during 2013 since their respective approvals, more patients in the U.S. were receiving treatment with Soliris for aHUS than had been for PNH, which demonstrates a high level of focus on the launch for aHUS while at the same time protecting and growing the PNH business, which was a mandate for the commercial team. 2013 was the first full year that the entire commercial organization was directly aligned under Mr. Hallal's leadership.  The committee recognized his leadership and skill at optimizing the performance of a global, evolving commercial organization.

151.   The 2014 Proxy Statement represented that the Compensation Committee had "evaluate[d]" the Company's performance and achievement of corporate goals.  To this end, the Compensation Committee "determined that Alexion exceeded its corporate objectives and achieved 137% of its approved corporate goals for 2012."

152.   Regarding risk oversight, the 2014 Proxy Statement represented the following:

> The Board is responsible for overseeing Alexion's risk management processes. The full Board performs a periodic risk assessment with management to review the primary risks facing Alexion and to manage the activities of Alexion in identifying and mitigating such risks. Management identifies risks in multiple areas, including compliance, financial, strategic, political and operational risks, and on a regular basis the Board reviews together with management. The Board recognizes that Alexion is subject to both internal and external risks, within and outside its control,

and that management and the Board should regularly seek to identify those risks and mitigate to the extent possible. As part of the risk management process and consistent with its standing oversight role, each Board committee considers the risks within its areas of responsibility and assists the Board in its oversight of the risk management process.

153.    The statements contained in the 2014 Proxy Statement were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls. Moreover, the 2014 Proxy Statement falsely assured investors of Defendant Hallal's positive performance, competency and commitment to the Company.

April 24-25, 2014

154.    On April 24, 2014, the Company issued a press release announcing its financial results for the three months ended March 31, 2014 (the "1Q 2014 Press Release").   The Company reported, once again, growing sales for the quarter – boasting an increase in net product sales by 67% to $566.6 million, compared to $338.9 million during the same period the prior year.

155.    The 1Q 2014 Press Release also reported that "[r]evenue performance for the quarter also reflected steady additions of new patients . . . commencing Soliris treatment."

156.    According to the 1Q 2014 Press Release Defendant Bell told investors, "In the first quarter of 2014, we provided Soliris to an increasing number of patients with PNH worldwide, made important progress in our aHUS operations in Western Europe and other

territories, and continued to execute on key initiatives to further improve operational and financial efficiencies across our global operations."  Focusing on the rest of the year, Defendant Bell stated "[t]hroughout 2014 we will remain focused on serving more patients with PNH and aHUS globally . . . ."

157.   Taking no steps back on forecasts, the Company "reiterat[ed] its 2014 revenue guidance of $2.15 to $2.17 billion as provided in the press release issued on March 10, 2014, and . . . also reiterate[ed] its non-GAAP R&D guidance of $360 to $380 million as provided in the Company's press release on January 30, 2014."

158.   Notably, the results reported in the 1Q 2014 Press Release beat analysts' earnings per share ("EPS") estimates by $0.27 and revenue estimates by $6.38 million.

159.   On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed the Soliris sales results to legitimate business factors and conditions, such as Alexion's "disease education and diagnostic initiatives," stating in relevant part:

> During Q1, we achieved strong Soliris in quarter revenue growth of 41% over the year-ago quarter. This reflects continued steady growth in PNH and our ongoing launch in aHUS, now further supported by the recent reimbursement progress in Europe.
>
> Looking first at PNH in Q1. We were pleased with our steady performance in our core territories of the U.S., Western Europe and Japan. And we also observed consistent growth in serving new patients in Turkey, **Brazil** and Russia.
>
> ***
>
> Now turning to aHUS. During Q1 we were pleased with the ongoing strength of the early stages of our global launch. Importantly, the transformative clinical benefits of Soliris for patients with aHUS, and the overall value proposition with Soliris, are recognized by public and private reimbursement authorities in the U.S., Western Europe and Japan.
>
> ***In the U.S., our aHUS disease education and diagnostic initiatives, again resulted in a steady increase in the number of new patients***

51

> *commencing Soliris therapy. Our U.S. team continues to implement our*
> *plan with urgency to help more patients with this devastating disease*.[12]

160.   On the same call, Defendant Bell was asked by a securities research analyst to discuss the Company's marketing of Soliris and experience working in Brazil and other developing countries.  In an almost there – but not quite there – moment, Defendant Bell started off by saying that "what supports our efforts there with PNH is that the government have established a mechanism to serve their citizens with funding."  Defendant Bell stayed mum on the most important aspects and disclosures regarding these government mechanisms and the Company's abuse thereof.  Defendant Bell went on, however, and it only got worse – attributing new patient acquisition to the Company's "disease awareness activities" – stating that "when we initially launched in these countries our disease awareness activities, there was an initial group of patients that would start treatment. And then through our initiatives, through newly diagnosed patients, newly identified patients, we'd see a steady pattern of patients commencing therapy."

161.   Defendant Bell's statements regarding Alexion's sales of Soliris in Brazil were misleading and omitted material information because Defendant Bell touted the Company's ability to obtain government funding and identify new patients, while failing to disclose that the Company relied on the unsustainable use of illegal and improper sales tactics in Brazil—caused by senior management's failure to set an appropriate tone at the top—including working with patient advocacy groups to file fraudulent lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and fake diagnoses of PNH and aHUS, and delaying registration of Soliris in Brazil to avoid negotiating with the government on price—practices that were key to the Company's Brazil operations, and which an outside law firm, hired by Alexion, concluded were "unethical."

---

[12] Full transcript available at https://seekingalpha.com/article/2163373-alexion-pharmaceuticals-management-discusses-q1-2014-results-earnings-call-transcript?part=single.

162.    Additionally, the statements referenced above in ¶¶ 154-57 and 159-60 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods: (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

163.    The next day, on April 25, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2014 ("1Q 2014 10-Q"), which was signed by Defendants Bell and Sinha.

164.    Attached to the 1Q 2014 10-Q were SOX certifications signed by Defendants Bell and Sinha attesting to the accuracy of the 1Q 2014 10-Q.

165.    The 1Q 2014 10-Q included, among other things, the financial figures reported in the 1Q 2014 Press Release.

166.    The statements contained in the 1Q 2014 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient

Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls..

May 14- August 8, 2014 – SEC Inquiry and Notice

167.    On May 14, 2014, a Senior Assistant Chief Accountant for the SEC wrote a letter to Defendant Sinha demanding information regarding the Company's calculation of net product sales in the 1Q 2014 10-Q.  The SEC was alarmed by the Company's report of an agreement with the French government that provided for prospective reimbursement for Soliris as well as reimbursement for shipments made prior to January 1, 2014, which resulted in the recognition of $87.8 million of net product sales from Soliris in the 1Q 2014 relating to years prior to January 1, 2014.  The SEC stated, "Please tell us how you determined that the $87.8 million related to prior period sales and why recognition in the quarter ended March 31, 2014 is appropriate under GAAP."

168.    Over two weeks later, on May 29, 2014, the Company came up with a response, to which the SEC responded on June 26, 2014.  The SEC was now demanding that the Company make amended disclosures regarding its arrangement with the French government.  The SEC demanded a "proposed disclosure to be included in future filings that explains the events and/or circumstances that caused 'current provisions relating to sales in current year' to significantly increase from the prior year."  The SEC further told the Company to "consider identifying, in your proposed disclosure, the countries where you have material volume based arrangements along with the amount of the contractual limitation."

169.    On July 11, 2014, the Company responded to the SEC's demand with proposed disclosures.  At the SEC's behest, the Company also included the following attestations in its response:

Alexion acknowledges the following:

54

• Alexion is responsible for the adequacy and accuracy of the disclosure in the filings;

• Staff comments or changes to disclosure in response to Staff comments do not foreclose the Commission from taking any action with respect to the filings; and

• Alexion may not assert Staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

170. On August 7, 2014, the SEC, through its Accounting Branch Chief, wrote to Defendant Sinha to inform him that, in light of the Company's assurances, the SEC had completed its review of the Company's filings.  The SEC cautioned Defendant Sinha with the following admonition:

> [O]ur comments or changes to disclosure in response to our comments do not foreclose the Commission from taking any action with respect to the company or the filing and the company may not assert the staff comment as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.  We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filings to be certain that the filings include the information the Securities Exchange Act of 1934 and all applicable rules require.

171. Thus, the Company was officially on notice that its disclosures were inadequate, especially with regard to its dealings with foreign governments and disclosures regarding net product sales.  The Company was even advised to ensure that "that the [Company's SEC] filings include the information the Securities Exchange Act of 1934 and all applicable rules require."

<u>July 24-25, 2014</u>

172. On July 24, 2014, the Company issued a press release announcing its financial results for the three and six months ended June 30, 2014 (the "2Q 2014 Press Release").  The 2Q 2014 Press Release reported net product sales of Soliris of "$512.5 million in the second quarter of 2014, an increase of 38 percent from the same period in 2013."  It also reported that for the quarter, "GAAP net income increased 74 percent to $166.5 million" and "non-GAAP net income

increased 56 percent to $229.1 million."  These financial results beat analysts' EPS estimates by $0.05 and revenue estimates by $2.95 million.

173.    The 2Q 2014 Press Release reported that the Company's "[r]evenue performance for the quarter reflected steady additions of new patients . . . commencing Soliris treatment."

174.    Defendant Bell was quoted as echoing the Company's sentiment, stating that "[i]n the second quarter of 2014, we served an increasing number of new patients with PNH and aHUS worldwide" and that "we will remain focused on serving more patients with PNH and aHUS globally."

175.    With that stated, Alexion announced that the Company was "revising upward its revenue guidance for 2014 from the previous range of $2.15 to $2.17 billion, now to the higher range of $2.18 to $2.20 billion."  The Company also revised upward its non-GAAP earnings per share, from the previous range of $4.75 to $4.85, to the higher range of $4.95 to $5.05 per share.

176.    On the conference call Alexion held the same day with investors and analysts, Defendant Sinha attributed those results to legitimate business factors and conditions when stating the following in relevant part:

> The second quarter was another period of profitable growth and continued operating leverage. In Q2, net sales increased to $512.5 million or 38% above the year ago quarter despite an unfavorable currency headwind of approximately $5 million year-on-year and $3 million sequentially. Our sales performance reflects strong volume growth across all our territory.[13]

177.    On that same call, Defendant Hallal also attributed the Soliris sales results to legitimate business factors and conditions, resulting in "consistent growth in serving new patients," including in Brazil, and stated, in relevant part:

---

[13] Full transcript available at https://seekingalpha.com/article/2340145-alexion-pharmaceuticals-alxn-ceo-leonard-bell-on-q2-2014-results-earnings-call-transcript?part=single.

During Q2, we achieved strong Soliris in-quarter revenue growth of 38% over the year ago quarter. This reflects continued steady growth in PNH globally and the early progress of our ongoing aHUS launch.

Looking first at PNH during Q2. We were pleased with our steady performance in our core territories of the U.S., Western Europe and Japan, and we also continue to observe consistent growth in serving new patients in Turkey, Brazil and Russia. In all territories, including those where we have operated the longest, we consistently observe that the majority of patients with PNH newly starting on Soliris were also newly diagnosed. The steady identification of newly diagnosed patients and the ongoing uptake of Soliris in PNH reflect the ongoing positive impact of our disease awareness and diagnostic initiative. While awareness of PNH has increased significantly over time, more education is required to further enhance the understanding of PNH and appropriate testing of higher-risk patients. Our experience supports our belief that, on a global basis, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone commence appropriate treatment.

In aHUS, the transformative clinical benefits of Soliris for patients with this devastating disease are reflected in the ongoing steady uptake of Soliris in the early stages of our launch.

178.    Regarding the Company's guidance for the rest of the year, Defendant Sinha represented that it was the Company's "[s]trong performance in both PNH and aHUS across our territories [that] enable[d] us to raise sales guidance."

179.    The statements referenced above in ¶¶ 172-78 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

180.    The next day, on July 25, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2014 ("2Q 2014 10-Q"), which was signed by Defendants Bell and Sinha.

181.    Attached to the 2Q 2014 10-Q were SOX certifications signed by Defendants Bell and Sinha attesting to the accuracy of the 2Q 2014 10-Q.

182.    The 2Q 2014 10-Q included, among other things, the financial figures reported in the 2Q 2014 Press Release.

183.    The statements contained in the 2Q 2014 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

October 23-24, 2014

184.    On October 23, 2014, the Company issued a press release announcing its financial results for the three and nine months ended September 30, 2014 (the "3Q 2014 Press Release"). Once again, the Company reported greatly improving financial figures for the quarter: (1) "net product sales of Soliris of $555.1 million in the third quarter of 2014, an increase of 39 percent from the same period in 2013," (2) "GAAP EPS increased 87 percent to $0.88 per share, compared to Q3 2013 GAAP EPS of $0.47 per share," and (3) "non-GAAP EPS increased 53 percent to $1.27 per share, compared to Q3 2013 non-GAAP EPS of $0.83 per share."   These financial results beat analysts' EPS estimates by $0.11 and revenue estimates by $13.22 million.

185.   Like other press releases before it, the 3Q 2014 Press Release represented that "[r]evenue performance for the quarter reflected steady additions of new patients . . . commencing Soliris treatment."

186.   The 3Q 2014 Press Release quoted Defendant Bell as making his usual statement that "[i]n the third quarter of 2014, [the Company] served an increasing number of new patients with PNH and aHUS worldwide," but this time Defendant Bell took it one step further in saying that "[o]ur third quarter performance underscores the significant opportunity we have to serve more patients with PNH and aHUS globally."

187.   Notably the 3Q 2014 Press Release disclosed a tremendous amount of repurchases: during the quarter, the Company repurchased $104.6 million of stock under its share repurchase program.

188.   Looking ahead, the 3Q 2014 Press Release explained that the Company is again "revising upward its revenue guidance for 2014 from the previous range of $2.18 to $2.20 billion, now to the higher range of $2.220 to $2.225 billion."   The Company also revised upwards, once again, its non-GAAP earnings per share guidance, from the previous range of $4.95 to $5.05 per share to the higher range of $5.15 to $5.20 per share.

189.   On the conference call Alexion held the same day with investors and analysts, Defendant Sinha attributed those results to legitimate business factors and conditions, stating that increase in net sales to $555 million in Q3 or 39% above the year-ago quarter, "primarily reflect[ed] strong unit volume growth."[14]  And discussing future growth, Defendant Sinha stated, "Turning to guidance. We are pleased to be increasing our 2014 forecast for both sales and EPS as announced this morning. Strong performance in both our current businesses, PNH and aHUS,

---

[14] Full transcript available at https://seekingalpha.com/article/2590825-alexion-pharmaceuticals-alxn-ceo-leonard-bell-on-q3-2014-results-earnings-call-transcript?part=single.

enables us to raise our 2014 sales guidance to the higher range of $2.220 billion to $2.225 billion."

190.   On the call, Defendant Sinha also represented that "[t]he primary objective of our ongoing stock repurchase program is to mitigate the natural pace of stock dilution from equity grants."

191.   Defendant Hallal, who the Board had just appointed to COO and a director as of September 16, 2014, also attributed the Soliris sales results to legitimate business factors and conditions, resulting in "steady" and "consistent growth," including in Brazil:

> During Q3, we achieved strong Soliris in-quarter revenue growth of 39% over the year-ago quarter. This reflects continued steady growth in PNH globally and the strength of our ongoing aHUS launch.
>
> Looking first at PNH during Q3. Newly diagnosed patients continue to make up the majority of patients newly starting on Soliris across our territories. We are pleased with our steady performance in the U.S., Western Europe and Japan, and we are also observing consistent growth in serving new patients across Turkey, Brazil and Russia.
>
> Overall, we are seeing consistent expansion in the number of patients we serve across our nearly 50-country platform as we implement our strategic initiatives. While awareness of PNH globally has increased significantly over time, more education is still required to further enhance the understanding of PNH and appropriate testing of higher-risk patients.

192.   On the call, Defendant Hallal again attributed the Company's sales success to education initiatives and proper sales force training, as well as revised drug labels.   These innocuous reasons were a ruse.   Specifically, Defendant Hallal stated the following, in relevant part:

> Turning now to aHUS. We continue to add new patients in the U.S., Europe and Japan. During Q3, our global field teams continue to educate physicians on the additional aHUS clinical data in our U.S. and European labels, which demonstrates the immediate and long-term benefits of sustained Soliris treatment. The revised labels, which now specify important longer-term clinical benefits associated with chronic and

60

> sustained Soliris treatment with inclusion of results from 2 years of ongoing treatment, will enhance and broaden our commercial efforts.

193.    Later on the call, an analyst directly and expressly asked management whether there was anything unique driving the Company's sales growth or whether it was simply "demand growth."  Specifically, Matthew Roden of USB Investment Bank, Research Division, asked the following, in relevant part:

> And then just to follow-up on the commercial side. You guys have been reticent to talk about any segment growth, but just wondering if you can give us the sense as to *whether or not there's any -- anything sort of nonrecurring in the Soliris number this quarter? Whether or not it just simply reflects underlying demand growth?*

194.    Defendant Hallal, responding to Mr. Roden, answered in the affirmative – indicating that the Company's sales growth simply reflected natural demand growth.  In full, he stated:

> Yes. We saw growth across all geographies, including Latin America in Q3. Looking at Q4 in Russia, we see an impact on regional healthcare budgets due to increased economic pressure in that country. I think it's also important -- and as a reminder, 2/3 of our business is outside of the U.S. and we anticipate an impact on our non-U.S. business from both major and commodity currencies. And maybe Vikas can provide a little bit more color on that.

195.    Defendant Hallal's response was outright false—the Company's increase in net product sales was not solely due to natural demand growth but was rather driven by unethical and potentially illegal sales practices in the U.S. and fraudulent lawsuits in Brazil.

196.    On the call, Defendant Bell also commented on the Company's sales, stating that "[d]uring the quarter, our commercial organization again provided Soliris to an increasing number of new patients across our PNH and aHUS operations worldwide."  He continued, "In PNH, newly diagnosed patients continue to make up the majority of patients newly starting on Soliris across our territories. And in aHUS, we continue to add new patients in the U.S. and

Europe."  Most strikingly, Defendant Bell, keeping with the apparent Company cover-up story, stated that "[i]n 2015 and beyond, *we see the majority of our growth* ahead of us in both PNH and aHUS, *driven by our disease education initiatives* as we help physicians to optimize patient care worldwide."

197.    The statements referenced above in ¶¶ 184-86, 188-94, and 196 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

198.    The next day, on October 25, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2014 ("3Q 2014 10-Q"), which was signed by Defendants Bell and Sinha.

199.    Attached to the 3Q 2014 10-Q were SOX certifications signed by Defendants Bell and Sinha attesting to the accuracy of the 3Q 2014 10-Q.

200.    The 3Q 2014 10-Q including, among others, the financial figures reported in the 3Q 2014 Press Release.

201.    The statements contained in the 3Q 2014 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent

Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>January 29, 2015</u>

202.  On January 29, 2014, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2014 (the "4Q 2014 Press Release").  Once again, the Company reported greatly improving financial figures for the quarter: (1) "net product sales increased 36 percent to $599 million, compared to $442 million in Q4 2013," (2) "GAAP EPS increased to $0.76 per share, compared to a Q4 2013 GAAP net loss of $0.10 per share," and (3) "non-GAAP EPS increased 49 percent to $1.30 per share, compared to Q4 2013 non-GAAP EPS of $0.87 per share."  These financial results beat analysts' EPS estimates by $0.1 and revenue estimates by $9.03 million.

203.  For the year, the 4Q 2014 Press Release reported the following: (1) "net product sales increased 44 percent to $2.234 billion, compared to $1.551 billion in 2013. Excluding the impact of $88 million for reimbursement of prior year shipments, 2014 net product sales increased 38 percent to $2.146 billion," (2) "GAAP EPS increased to $3.26 per share, compared to 2013 GAAP EPS of $1.27 per share", and (3) "non-GAAP EPS increased 69 percent to $5.21 per share, compared to 2013 non-GAAP EPS of $3.08 per share. Excluding $0.37 per share related to reimbursement of prior year shipments, 2014 non-GAAP EPS increased 57 percent to $4.84 per share."

204.    The 4Q 2014 Press Release represented that "[t]he year-on-year increase in Q4 net product sales of 36 percent reflected steady additions of new patients . . . commencing Soliris treatment."

205.    The 4Q 2014 Press Release quoted Defendant Bell as making his usual statement that "[i]n 2014, we provided Soliris to an increasing number of patients with PNH and aHUS worldwide" and that the Company will "focus on serving more patients with PNH and aHUS globally."

206.    Looking ahead, the 4Q 2014 Press Release provided full-year 2015 guidance as follows:

> In 2015, worldwide net product sales are expected to be within a range of $2.55 to $2.6 billion, which includes an approximately negative 5 percent, or $135 million, foreign exchange impact compared to 2014 exchange rates. Non-GAAP earnings per share for the year are expected to be $5.60 to $5.80, which includes an approximately $0.30 negative foreign exchange impact compared to 2014 exchange rates. 2015 guidance is based on current exchange rates remaining unchanged.

207.    On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed the Company's positive results to legitimate business factors and conditions, including Alexion's ability "to identify a consistently high number of newly diagnosed patients," and stated the following, in relevant part:

> Now turning to our performance in Q4. We advanced our mission by reaching significant milestones across our commercial and pipeline initiatives.
>
> Looking first to PNH. Our performance in 2014 affirms our view that on a global basis, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone commence appropriate treatment. Throughout 2014, as in prior years, we continue to identify a consistently high number of newly diagnosed patients with PNH in the U.S., Europe and Japan, the territories in which we have operated the longest. As we look at 2015, we have strong conviction in our PNH franchise, as we aim to serve many more patients around the world.

Turning to aHUS. We continue to observe a steady addition of new patients commencing Soliris treatment in the U.S. and Europe in 2014, while we made important progress in the early stages of our launch in Japan. Globally, the ongoing strength of our aHUS launch confirms our view that our opportunity to serve patients with aHUS is at least as large as our opportunity to serve patients with PNH and perhaps larger. As one measure in the U.S., now more than 3 years following their respective FDA approvals, more patients are currently receiving Soliris for aHUS than there had been for PNH. In Europe, we are observing a similar trend in the earlier stages of our aHUS launch. These observations support our view that the incidence of aHUS is likely higher than PNH.

Looking at 2015 and beyond, we continue to see that the majority of our aHUS growth is ahead of us, supported by our strength in labels in the U.S. and Europe, which demonstrate the immediate and long-term benefit of early and sustained treatment for patients with aHUS.

\*\*\*

Turning to our 2015 guidance. We announced this morning our revenue forecast of $2.55 billion to $2.6 billion despite currency headwinds. On a constant currency basis, we would expect an in-year sales growth rate of approximately 26%. ***Robust growth for Soliris reflects strong underlying demand with the anticipated addition of a similar number of new patients on treatment year-on-year***.[15]

208.    On the same call, Defendant Sinha also attributed the Soliris sales results to legitimate business factors and conditions and commented on the Company's 2015 guidance, saying that it "reflects our expectation of continued strong growth at Soliris with expected addition of a similar number of new patients on treatment in 2015 compared to 2014 as well as a small initial asfotase alfa contribution."

209.    The statements referenced above in ¶¶ 202-08 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse

---

[15] Full transcript available at https://seekingalpha.com/article/2865266-alexion-pharmaceuticals-alxn-q4-2014-results-earnings-call-transcript?part=single.

Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

February 6, 2015

210.    On February 6, 2015, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K"), which was signed by, among others, Defendants Bell, Sinha, Brennan, Burns, Coughlin, Hallal, Keller, Mollen, Norby, Parven, Rummelt, and Veneman.

211.    Attached to the 2014 10-K were SOX certifications signed by Defendants Bell and Sinha attesting to the accuracy of the 2014 10-K.

212.    The 2014 10-K reiterated and expanded upon the financial figures reported in the 4Q 2014 Press Release.

213.    The 2014 10-K contained many, if not all, of the same false and misleading statements and omissions contained in or omitted from the 2013 10-K, including the Effective Sales Force Representation, Limited Inventory Representation, Worldwide Commercialization Representations, Commercial Success Factors Omission, Effective Internal Control Representation, and Effective Disclosure Controls Representation.

214.    The Company's statements in the 2014 10-K and the SOX certifications attached thereto were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants'

engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

### April 8, 2015 – The 2015 Proxy Statement

215.    On April 8, 2015, the Company filed the 2015 Proxy Statement.  The 2015 Proxy Statement invited shareholders to attend Alexion's 2015 Annual Meeting of Shareholders on Wednesday, May 6, 2015, and purported to "describe[] the business to be considered at the meeting."  It was based upon this proxy statement that shareholders were expected to cast votes on extremely important matters to the Company, including the election of the following director nominees: Defendants Bell, Brennan, Burns, Coughlin, Hallal, Mollen, Norby, Parven, Rummelt and Veneman.

216.    The 2015 Proxy Statement reiterated the Company's financial results for fiscal year 2014, stating that "Soliris net product sales increased 44% to $2.234 billion, and excluding the impact of $88 million for reimbursement of prior year shipments, Soliris net product sales increased 38% to $2.146 billion."

217.    In justifying the grant of a bonus to Defendant Hallal, the 2015 Proxy Statement represented the following:

> Mr. Hallal received an annual cash incentive above target primarily due to his exceptional execution of Alexion's commercial strategy, and his demonstrated leadership across functions within the Company. Soliris product sales for both PNH and aHUS exceeded targets globally, and the Company successfully maintained strong focus on PNH as it continues its global launch of Soliris for the treatment of aHUS. . . .  Under Mr. Hallal's leadership, Alexion has experienced significant growth in global product sales during 2014 (44%), attributed to both strong sales for PNH and strong sales for aHUS. The Committee recognized Mr. Hallal's continuous contributions to and leadership for key company initiatives.

218.    Notably, the Company, in the 2015 Proxy Statement, ensured investors that the Company had taken adequate and satisfactory steps to mitigate risk and had systems in place to identify risks.  Specifically, the 2015 Proxy Statement stated the following, in relevant part:

> The Board has ultimate responsibility for overseeing Alexion's risk management processes. In May 2013, the Board formed a Risk Committee, now **called the Strategy and Risk Committee**, to assist the Board in its oversight of enterprise risk management processes. The committee also has responsibility for overseeing Alexion's strategic planning process on behalf of the Board, which the Board believes is important to align Alexion's strategic priorities with the Company's risk assessments. The committee evaluates management's processes for reviewing, refreshing and modifying its enterprise risk management system and processes. ***Alexion is committed to fostering a company culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation, and the committee oversees the Company's efforts to foster this culture***. The committee reviews with management, internal auditors and external advisors the identification, prioritization and management of risks, the accountabilities and roles of the company functions involved with enterprise risk management, the risk portfolio and the corresponding actions implemented by management. ***The committee regularly informs the full Board of Alexion's most significant risks and how these risks are managed***. The Strategy and Risk Committee seeks to inform the Board of enterprise risks that are or should be delegated to other committees of the Board for review or monitoring.

219.    The 2015 Proxy Statement also advertised the Company's Code of Ethics and ensured investors that the Company's "directors, officers and employees are required to comply with the Code," which the Company represented to cover "areas of professional conduct relating to individual's service to Alexion, including conflicts of interest, unfair or unethical use of corporate opportunities, strict protection of confidential information, compliance with applicable laws and regulations, and oversight of ethics and compliance by employees of the Company."

220.    The statements referenced above in ¶¶ 215-19 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse

Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.  The 2015 Proxy Statement's representation regarding the Company's Code of Ethics was also materially false and misleading because it failed to disclose that senior management was not only failing to comply with the Code of Ethics, but encouraging others to violate the Code of Ethics.

<u>April 23-24, 2015</u>

221.    On April 23, 2014, the Company issued a press release announcing its financial results for the three months ended March 31, 2015 (the "1Q 2015 Press Release").  For the quarter, the 1Q 2015 Press Release disclosed the following financials: (1) "net product sales increased to $600.3 million, compared to $566.6 million in Q1 2014," (2) GAAP EPS was $0.45 per share, and (3) non-GAAP EPS was 1.28 per share.  The Company's revenue figures beat analysts' revenue estimates by $8.92 million.

222.    The 1Q 2015 Press Release represented that the Company's "increase in revenue reflected steady additions of new patients . . . commencing Soliris treatment across the Company's 50-country global platform."

223.    The 1Q 2015 Press Release quoted Defendant Hallal, as CEO, as stating, "In Q1, we provided Soliris to an increasing number of patients with PNH and aHUS worldwide." Notably, this statement was considerably similar to the statement that Defendant Bell was regularly quoted as saying in previous press releases.  Defendant Hallal, however, omitted the term "new patients" and simply represented that the Company provided Soliris to an increasing number of patients.  This subtle difference evinces Defendant Hallal's knowledge that the Company's sales force was simply pushing more drugs to the same clients instead of recruiting

new clients.  The words of executive management, especially when quoted in a press release, are carefully chosen.

224.    The 1Q 2015 Press Release also reiterated the guidance provided in the 4Q 2014 Press Release.

225.    On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed the Company's financial results to legitimate business factors and conditions, including the ability of Alexion's "commercial organization" to identify "newly diagnosed patients" through "diagnostic initiatives," which seemed to be a backtrack from language he used in the 1Q 2015 Press Release.[16]  Specifically, Defendant Hallal stated the following, in relevant part:

> During the quarter, our commercial organization delivered leveraging our world-class expertise in rare diseases to serve more patients with both PNH and aHUS. This resulted in a 25% increase in revenues and a 31% increase in volume year-on-year.
>
> ***
>
> Looking at our operating performance with the strong addition of new patients receiving Soliris in Q1, and with the expected continued growth across our 50-country platform, we are reiterating our 2015 revenue and EPS guidance despite increased currency headwinds, reflecting the ongoing strength of our core business.
>
> Looking more closely at our PNH franchise, in Q1, as in all prior quarters since 2007, we identified a consistently high number of newly diagnosed patients with PNH in the US, Europe and Japan, the three territories in which we have operated the longest, as well as in other key markets such as Turkey and Brazil. The success of our PNH diagnostic initiatives drives our steady growth as we continue to see that the majority of patients newly starting on Soliris are also newly diagnosed. Our experience affirms our view, that on a global basis, the majority of patients with PNH have yet to receive an accurate diagnosis let alone commence appropriate treatment.

---

[16] Full transcript available at https://seekingalpha.com/article/3095446-alexion-pharmaceuticals-alxn-ceo-david-hallal-on-q1-2015-results-earnings-call-transcript?part=single.

In aHUS, our global launch continued to progress. In Q1, we again added a consistent number of new aHUS patients on Soliris treatment. We now see the same trend in Europe three years post approval. The ongoing strength of our aHUS launch confirms our view that our opportunity to serve patients with aHUS is indeed larger than our opportunity to serve patients with PNH.

*** 

Our performance in Q1 reflects the strength of our underlying business as well as the build-out of our metabolic franchise, the advancement of our development opportunities and the broadening of our pipeline. Specifically, Soliris in PNH and aHUS continues to grow steadily across our 50-country operating platform.

226.    Defendant Hallal further explicitly stated that the Company's first quarter 2015 "revenue growth was driven by an increase in volume of 31% compared to the year ago quarter." Defendant Sinha echoed this statement on the call, parroting that the Company's quarterly "revenue growth was driven by a 31% increase in volume, partially offset by a 6.6% currency headwind in Q1 over the year-ago quarter, net of hedging."

227.    Finally, on the call, Defendant Hallal commented on the Company's 2015 guidance, stating that "[w]ith this steady, patient and volume growth in our core business, combined with our effective hedging program, we are reiterating 2015 financial guidance."

228.    The next day, on April 24, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2015 ("1Q 2015 10-Q"), which was signed by Defendants Hallal and Sinha.

229.    Attached to the 1Q 2015 10-Q were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 1Q 2015 10-Q.

230.    The 1Q 2015 10-Q included, and expanded upon, the financial figures reported in the 1Q 2015 Press Release.

231.    The statements contained in ¶¶ 221-23 and 225-27, and the 1Q 2015 10-Q, were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

### May 2015 – Synageva Merger

232.    On May 5, 2015, Alexion entered into an Agreement and Plan of Reorganization (the "Merger Agreement") with Synageva BioPharma Corp., a Delaware corporation ("Synageva"), and Alexion's wholly owned subsidiaries, Pulsar Merger Sub Inc., a Delaware corporation, and Galaxy Merger Sub LLC, a Delaware limited liability company.

233.    According to a press release issued by the Company the next day on May 6, 2015 (the "5/6/15 Press Release"), pursuant to the Merger Agreement, Alexion was to acquire—and did acquire—Synageva for consideration of $115 in cash and 0.6581 Alexion shares for each share of Synageva, implying a total per share value of $230 based on the nine day volume-weighted average closing price of Alexion stock through May 5, 2015 (the "Merger").[17]

234.    Section 5.5 of the Merger Agreement represented that Alexion had adequate internal controls and procedures in place.  Specifically, Section 5.5 states:

> Parent has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange

---

[17] The Merger was completed on June 22, 2015.

Act) as required by Rule 13a-15 or 15d-5 under the Exchange Act. Parent's disclosure controls and procedures are reasonably designed to ensure that all material information required to be disclosed by Parent in the reports that it files or furnishes under the Exchange Act is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the SEC and other public disclosure documents. Based on its most recent evaluation of internal controls over financial reporting prior to the date hereof, management of Parent has disclosed to Parent's auditors and the audit committee of the Parent board of directors (i) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect in any material respect Parent's ability to report financial information and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in Parent's internal control over financial reporting, and each such deficiency, weakness and fraud so disclosed to auditors, if any, has been disclosed to the Company prior to the date hereof.

235.   Since the Company did not actually have effective internal controls and procedures at the time of entry into the Merger Agreement, it could have constituted a breach of contract.

236.   Based on the Company's false assurances and representations, however, the Merger was unanimously approved by both companies' boards of directors, and was valued at approximately $8.4 billion net of Synageva's cash.

237.   The 5/6/15 Press Release quoted Defendant Hallal's comments on the Merger, stating that "[w]ith strong ongoing Soliris growth in PNH and aHUS worldwide, and the anticipated 2015 global launches of Strensiq and Kanuma, we will accelerate and diversify our revenue growth."   Along these lines, the 5/6/15 Press Release touted the sales growth of Soliris, stating that "[s]ince its launch in 2007, Soliris has grown to more than $2 billion in revenues in 2014, with additional growth anticipated as the Company has consistently identified significant numbers of new patients with PNH and aHUS each year."

238.    Defendant Bell, as Chairman of Alexion's Board, was quoted as saying that "Alexion is at the strongest and most promising point in our history given the strength of our clinical, commercial, and operational performance and the depth of our team."

239.    The 5/6/15 Press Release also welcomed the addition of Defendant Baker, Chairman of Synageva's Board, to Alexion's Board.

240.    The statements contained in the 5/6/15 Press Release, mentioned above, were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

241.    In connection with the merger, Alexion and Synageva co-sponsored a "Global Town Hall" event, which was hosted by Defendant Hallal on May 11, 2015.  The presentation for the Global Town Hall included a slide titled, "Continued Soliris Growth Drives Strong Operational Performance," representeing that "[g]rowth in [the] PNH and aHUS markets drives increasing operating and financial leverage."  A reproduction of the slide is below:



242.    The representations in the Global Town Hall presentation were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

June 16, 2015 Prospectus

243.    On June 16, 2015, the Company filed a Prospectus/Offer to Exchange on Form 424B3 with the SEC in connection the Merger (the "Merger Prospectus").

244.    The Company acknowledged, in the Merger Prospectus, that "Alexion's business and marketing methods are subject to regulation by the governments of the countries in which Alexion operates."  The Company specifically pointed to the Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78dd-1, et seq.) and similar anti-bribery laws in other countries, which

prohibit companies and their representatives from offering, promising, authorizing or making payments to foreign officials for the purpose of obtaining or retaining business.  The Company expressly assured investors and the public, in its Merger Prospectus, that it "has policies and procedures designed to help ensure that Alexion and its representatives, including Alexion's employees, comply with such laws . . . ."

245.    Yet, in an alarming new revelation embedded deep within the Merger Prospectus, the Company finally disclosed that on May 8, 2015, it received a subpoena in connection with an investigation by the Enforcement Division of the SEC requesting information related to Alexion's grant-making activities and compliance with the FCPA.  The Company stated that "[w]hile the subpoena seeks information related to Alexion's activities and policies and procedures worldwide, it notes in particular Japan, Brazil, Turkey and Russia" and "also seeks information related to Alexion's recalls of specific lots of Soliris and related securities disclosures."

246.    In an almost stunning move, immediately after this disclosure, the Company represents that it "*is committed to compliance with applicable laws and regulations and strives to operate at the highest ethical standards in all of its markets*."

247.    The statements referenced above in ¶¶ 244-46 were materially false and misleading because they falsely assured investors that the Company was committed to compliance when it was clearly not and in fact engaged in violations of federal and state law when that exact statement was made, and they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the

Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>July 30-31, 2015</u>

248.     On July 30, 2015, the Company issued a press release announcing its financial results for the second quarter of 2015 (the "2Q 2015 Press Release").  The 2Q 2015 Press Release reported the following financial results:

> Net product sales of Soliris® (eculizumab) grew to $636 million, a 24% increase, compared to $512.5 million for the same period in 2014, despite currency headwinds. Non-GAAP diluted earnings per share (EPS) for the second quarter of 2015 were $1.44, compared to $1.12 in the second quarter of 2014. On a GAAP basis, diluted EPS for the second quarter of 2015 was $0.83 per share, impacted by $40.1 million, or $0.20 per share, related to acquisition and restructuring costs resulting from the Synageva acquisition, compared to $0.83 in the second quarter of 2014.

249.     The Company's financial results beat analysts' EPS estimates by $0.06 and revenue estimates by $8.21 million.

250.     Defendant Hallal did not mention that that the Company added new patients in the quarter, instead choosing to merely look forward to "the second half of 2015" where the Company was slated to "continue to serve more patients with PNH and aHUS."

251.     The 2Q 2015 Press Release also announced that the Company was "revising upward its revenue guidance for 2015 from the previous range of $2.55 to $2.6 billion, now to the higher and narrower range of $2.6 to $2.62 billion, which includes an approximately negative 6 percent, or $160 million, foreign exchange impact compared to 2014 exchange rates."  Non-GAAP financial guidance was also revised to include Synageva financial results into Alexion's consolidated results beginning June 22, 2015, the acquisition closing date.  Interestingly, the

inclusion of Synageva's financial results forced the Company to revise its 2015 non-GAAP EPS guidance to the range of $4.70 to $4.80 per share, from the previous range of $5.60 to $5.80 per share.

252.   On the conference call Alexion held the same day with investors and analysts, Defendant Hallal touted that Alexion "fired on all cylinders" and attributed the Company's reported financial results to legitimate business factors and conditions.  Defendant Hallal stated that the Company's "commercial organization delivered steady growth in both PNH and aHUS reflecting the strength of our core Soliris business."[18]

253.   As was usual, Defendant Hallal discussed the Company's revenue growth in detail and attributed it simply to "volume growth."   Specifically, Defendant Hallal stated the following, in relevant part:

> In Q2, product revenues were $636 million, an increase of 24% over Q2 2014, despite the continued weakness in ex-U.S. currencies. This revenue growth was driven by an increase in volume of 31% compared to the year-ago quarter, reflecting the ongoing strength of our core PNH and aHUS businesses. We achieved non-GAAP EPS of $1.44 per diluted share as a result of strong performance in PNH and aHUS in the first half of 2015, and our expectations for continued strong Soliris volume growth, we are increasing our 2015 revenue guidance to the higher range of $2.6 billion to $2.62 billion, despite continued currency headwinds.

254.   Moreover, on the call, Defendant Hallal responded to an analyst's question regarding 2015 revenue guidance and whether the slated commercialization of the Company's other drug products was factored into that.  Defendant Hallal answered that "yes, the initial guidance did include a small initial contribution from [another drug product]," but the delay in the launch of the other drug products caused the Company to lower its expectations because of "the kinetics of an ultra-rare disease launch, and the fact that it takes a period of time to really

---

[18] Full transcript available at https://seekingalpha.com/article/3378045-alexion-pharmaceuticals-alxn-david-l-hallal-on-q2-2015-results-earnings-call-transcript?part=single.

build up the patients on treatment." This would have been a perfect time to disclose that the Company had been pressuring clients and pulling-in sales but Defendant Hallal did not disclose such fact.

255. The statements referenced above in ¶¶ 248 and 250-54 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

256. The next day, on July 31, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2015 ("2Q 2015 10-Q"), which was signed by Defendants Hallal and Sinha.

257. Attached to the 2Q 2015 10-Q were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 2Q 2015 10-Q.

258. The 2Q 2015 10-Q included, and expanded upon, the financial figures reported in the 2Q 2015 Press Release.

259. The statements contained in the 2Q 2015 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient

Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls..

<u>October 29-November 2, 2015</u>

260.    On October 29, 2015, the Company issued a press release announcing its financial results for the three and nine months ended September 30, 2015 (the "3Q 2015 Press Release"). The Company reported the following financials:

> Total revenues grew to $666.6 million, a 20 percent increase, compared to $555.1 million for the same period in 2014, despite 9 percent currency headwinds. Results for the third quarter of 2015 reflect results of Synageva's operations for the first full quarter following the close of the stock and cash acquisition on June 22, 2015. Non-GAAP diluted earnings per share (EPS) for the third quarter of 2015 were $1.16, compared to $1.27 in the third quarter of 2014. On a GAAP basis, net loss for the third quarter of 2015 was $0.81 per share, impacted by $315.6 million, or $1.39 per share, related to a non-cash deferred income tax expense resulting from the integration of Synageva, compared to diluted GAAP EPS of $0.88 in the third quarter of 2014.

261.    The Company's financial results beat analysts' EPS estimates by $0.15 but were below revenue estimates by $0.27 million, representing the first time during the Relevant Period that the Company had not beaten analysts' revenue estimates for the quarter.

262.    Notably, the 3Q 2015 Press Release disclosed that "Alexion expects 2015 total revenues to be at the lower end of our previously guided range of $2.6 billion to $2.62 billion, primarily due to macroeconomic factors in Latin American countries."   At the same time, Alexion increased its 2015 non-GAAP EPS guidance to the range of $4.92 to $4.97 per share, from the previous range of $4.70 to $4.80 per share.

263.    Yet, on the conference call Alexion held the same day with investors and analysts, Defendant Hallal painted an optimistic picture that presented positive financial figures driven by

legitimate business factors and conditions.  On the call, Defendant Hallal stated the following, in relevant part:

> Our global commercial organization continued to identify and serve a consistently high number of newly diagnosed patients across our 50-country platform. In aHUS in Q3 we once again reached a consistent number of new patients. The ongoing strength of our global rollout confirms our view that our opportunity to serve patients with aHUS is indeed larger than our opportunity to serve patients with PNH. We continue to see the majority of our opportunity to serve new patients with PNH and aHUS ahead of us.
>
> ***
>
> Turning to our financial performance. Product revenues in Q3 were $666 million, an increase of 20% over Q3 2014 despite increased weakness in ex-US currencies. ***This revenue growth was driven by a strong 29% increase in Soliris volume compared to the year ago quarter***, reflecting the ongoing strength of our core PNH and aHUS businesses, both in the third quarter and year-to-date.[19]

264.    On the same call, Defendant Sinha attributed the Company's sales results to legitimate business factors and conditions as well, also stating that "Q3 revenues were driven by continued strong growth of Soliris."

265.    The executive on this call assigned to attribute the Company's "strong . . . growth in" Soliris sales during the third quarter of 2015 to "diagnostic initiatives" and "disease awareness programs" was Defendant Thiel.  He stated the following, in relevant part:

> Our global commercial operations delivered a strong 29% volume growth year on year reflecting the underlying strength of our core Soliris business.
>
> Starting with PNH, the ongoing success of our diagnostic initiatives drove steady growth. We are consistently identifying a high number of newly diagnosed patients with PNH in our core markets of the US, Europe and Japan, the territories where we have been operating the longest as well as in other key markets such as Turkey, Brazil and Russia.

---

[19] Full transcript available at https://seekingalpha.com/article/3624196-alexion-pharmaceuticals-alxn-david-hallal-q3-2015-results-earnings-call-transcript?part=single.

> Our experience confirms our view that on a global basis the majority of patients with PNH have yet to receive an accurate diagnosis let alone commence appropriate treatments. In aHUS we also continue to observe a consistent number of new patients commencing Soliris treatment.

266.    Speaking on the 2015 guidance, Defendant Hallal blamed "macroeconomic factors" for dips in Company revenue, stating the following:

> Turning briefly to our 2015 guidance, this morning we guided 2015 revenues to be in the lower end of our previously guided range of $2.6 billion to $2.62 billion. Due to macroeconomic factors in Latin American countries, we expect an impact of approximately $10 million to $15 million in the fourth quarter in countries where we sell in USD, which is due to local government budgetary constraints.

267.    The statements referenced above in ¶¶ 260 and 262-66 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

268.    A few days later, on November 2, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2015 ("3Q 2015 10-Q"), which was signed by Defendants Hallal and Sinha.

269.    Attached to the 3Q 2015 10-Q were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 3Q 2015 10-Q.

270.    The 3Q 2015 10-Q included, and expanded upon, the financial figures reported in the 3Q 2015 Press Release.

271.    The statements contained in the 3Q 2015 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>December 10, 2015 - Investor Day Presentation</u>

272.    On December 10, 2015, Defendants Hallal, Sinha, Thiel, and other Company executives hosted an "Investor Day" conference with analysts and investors ("Investor Day Conference").  Like he did on the November 2, 2015 conference call with investors, during the presentation at the Investor Day Conference, Defendant Thiel described Alexion's "unique commercial capabilities" including in "disease education" and "diagnostic initiatives," stating:

> You have heard earlier from David [Hallal] why we do what we do to bring transformative benefits to patients with devastating diseases who are left alone, undiagnosed and untreated. I want to share with you how we do it and share with you some detailed insights into our unique commercial capabilities. And at the end of this session my objective is that you see us in a unique spot to deliver on our pipeline, on our in-line portfolio and on our next generation program.

> So first what we know well and do well is this. There wouldn't be the rare disease business without disease education. There wouldn't be a rare disease business without rapid and accurate diagnosis and without patient support.

> When we meet a physicians and talk about our diseases in most cases they know very, very little about it. In fact, we look at PNH and aHUS in most cases they have heard maybe once or twice in their medical education and medical school about those diseases. Full of misperceptions.

And our job is to reset their knowledge about those diseases. Once physicians have recognized the devastating nature of the disease they want to know how to test and who to test. And this is why we have built critical capabilities in diagnostic initiatives, in testing to ensure that patients get rapid and accurate diagnosis. And patients are in need once they receive treatment to address their questions about what they want to know and in terms of funding and reimbursement.

***

But I also want to go beyond on our 50 country platform the structure that we have built is that of a highly talented, unique workforce that works integrated in the countries. And what's special about them is that they are passionate about every single patient bringing benefits to them on a weekly basis with my five regional leaders looking at the feedback from advisory boards, from clinical centers, and new scientific evidence and discussing how we can drive those benefits to more patients and on a daily basis we look at patient identification in our programs to serve more patients.

273.     Also during the Investor Day Conference, Alexion published a slide presentation touting the Company's "expert capabilities" to raise "disease awareness" by "partner[ing] with medical experts," the Company's "dedicated diagnostic capabilities" and "lab partnerships," and the Company's "patient support" through "[i]ntegrated field teams" and "[s]pecialized case management."

274.     The statements made and information disseminated by Defendants during the Investor Day Conference were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls..

84

<u>January 12, 2016 – J.P. Morgan Health Care Conference</u>

275.    On January 12, 2016, Defendants Hallal and Sinha attended the "J.P. Morgan Health Care Conference" with analysts and investors. During that conference, Defendant Sinha stated that although Alexion had seen "some difficulties in getting [Brazil] to manage their budgets . . . we helped them out on that and it worked out well . . . .  So, I think it's not a big issue anymore."  Asked for further information from conference participants, Defendant Sinha engaged in the following colloquy:

> [Analyst]: Maybe a quick question for Vikasn [Sinha]. Thinking about – in the orphan disease space, there has been some challenges in Latin America. Maybe you can give us a sense of the geographic contribution of revenues from Latin America?

> [Sinha]: So, as David [Hallal] was mentioning, one third of our business is in U.S., one third in Europe and one third rest of the world. And within the rest of the world, approximately 10% of our business comes out of Latin America. Now, putting it into context, the Latin American issue, there has been some difficulty with the presidential impeachment proceedings started in Brazil and few other issues around oil prices and commodity prices going down there has put some pressure in their budgets. So, this 2015 second half, we saw some difficulties in getting them to manage their budgets and we helped them out on that and it worked out well.

> Going into 2016 when you put that into perspective, I think we have gotten to a good spot with our discussions with the government. And even if the risk hits us, it's not going to be more than 1% to 2% of our overall sales out of that 10% level. So, I think it's not a big issue anymore.

276.    Defendant Sinha's statements regarding Alexion's sales of Soliris in Latin America and specifically Brazil were misleading and omitted material information because they failed to disclose that the Company and the Individual Defendants' were engaged in the Fraudulent Lawsuit Scheme.

February 3, 2016

277.    On February 3, 2016, the Company issued a press release announcing its financial results for the for the fourth quarter and full year of 2015 (the "4Q 2015 Press Release").  The 4Q 2015 Press Release reported the following summary financial information, in relevant part:

> Total revenues for the full year of 2015 were $2.604 billion compared to $2.146 billion for the full year 2014, representing 21 percent revenue growth, excluding the impact of $88 million in 2014 for reimbursement of shipments in prior years. In 2015, the negative impact of currency on total revenue was 8 percent, or $165 million, net of hedging activities, compared to the prior year. Non-GAAP diluted earnings per share (EPS) for the full year of 2015 was $4.99 per share, compared to $5.21 per share in 2014. Full year 2014 non-GAAP EPS included $0.37 per share related to reimbursement of shipments in prior years. On a GAAP basis, Alexion reported diluted EPS of $0.67 per share for the full year 2015, compared to $3.26 per share in 2014. Full year 2014 GAAP EPS included $0.31 per share related to reimbursement of prior year shipments.
>
> Total revenues in the fourth quarter were $701 million, a 17 percent increase, compared to $600 million from the same period in 2014. In the fourth quarter, the negative impact of currency on total revenue was 8 percent or $45 million, net of hedging activities, compared to the same quarter last year. Non-GAAP diluted EPS for the fourth quarter of 2015 was $1.13, compared to $1.30 in the fourth quarter of 2014. On a GAAP basis, diluted EPS for the fourth quarter of 2015 was $0.29 per share, compared to $0.76 in the fourth quarter of 2014.

278.    Defendant Hallal was quoted as stating that "[i]n 2016 we will continue to focus on serving an increasing number of patients with PNH and aHUS globally . . . ."

279.    The 4Q 2015 Press Release contained a table outlining the Company's financial guidance for 2016.  For 2016, the Company expected total product revenues to reach $3.05 to $3.1 billion, Soliris revenues to reach $2.9 to $2.925 billion, and EPS to reach $5.00 to $5.20.

280.    On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed the Company's reported financial results to legitimate business factors and conditions.  Right at the start of the call, Defendant Hallal stated that in the fourth quarter 2015, the Company "achieved many significant commercial R&D and financial

milestones," one of which was that the Company's "commercial team continued to serve a consistently high number of new patients, with PNH and aHUS with Soliris."[20]

281.    On the call, Defendant Hallal continued his praise of the Company's sales growth by stating the following, in relevant part:

> We are pleased that Soliris continues to deliver strong volume growth. As we enter our 10th year since the initial Soliris launch, we delivered 28% year-on-year volume growth in 2015 and continue to see the majority of the opportunity ahead of us, for both PNH and aHUS.

> In PNH, in Q4, as in prior quarters, our global commercial organization continued to identify and serve a consistently high number of new patients across our 50 country platform. In aHUS in Q4, we once again served a consistent number of new patients, supporting our view that our opportunity to serve patients with aHUS is larger than our opportunity to serve patients with PNH.

282.    Looking ahead, Defendant Hallal stated that "we are guiding 2016 total revenues of $3.05 billion to $3.1 billion, which reflects continued strong underlying demand for Solaris, as we serve an increasing number of patients in 2016."

283.    On the same call, in addition to echoing Defendant Hallal's statements on future growth, Defendant Sinha addressed Soliris' past and current sales growth and certain events in Latin America, stating the following, in relevant part:

> We are pleased with our financial performance in Q4 despite continued currency headwinds, as well as macroeconomic factors in Latin American countries.

> Q4 revenues reflected the continued steady growth of Soliris in PNH and aHUS, and the small initial contribution of Strensiq in the U.S. Total revenues increased to $701 million in Q4. This revenue growth was driven by a 25% increase in volume partially offset by 8% or $45 million in currency headwinds net of hedges in Q4 over the year-ago quarter, resulting in 17% revenue growth above the year-ago quarter.

---

[20] Full transcript available at https://seekingalpha.com/article/3862346-alexion-pharmaceuticals-alxn-ceo-david-hallal-q4-2015-results-earnings-call-transcript?part=single.

> Soliris volume growth of 23% was driven by continued growth in PNH and aHUS across all geographies in Q4. However, volume growth was partially impacted by $15 million in Latin American countries due to end of year local government budgetary constraints.

284. When directly asked about the sales of Soliris in Brazil, Defendant Sinha engaged in the following colloquy:

> [Analyst]: Morning and thanks for taking my questions. Just two quick ones perhaps on Soliris trajectories in 2016. I guess first, Vikas, I think you mentioned the impact from Latin America in Q4, and I assume that was mostly Brazil related. Has that issue been fixed in that region? And what does your 2016 guidance imply with regard to continued shipments into Brazil?

> [Singha]: So, let's talk about Brazil first. We had a $15 million impact in Brazil at the year-end. Government restrictions did delay the orders. We feel that we have sorted out the issues right now in February. So we factored that into our guidance in 2016. So we think that the business as usual is ongoing from February onwards.

285. On the same call, Defendant Thiel continued his role in promoting the success of the Company's diagnostic initiatives as the driver of the Company's "steady addition of new patients." Specifically, he stated the following:

> [O]ur global commercial operations continue to serve more patients with Soliris, as we delivered a strong 28% volume growth year-on-year, reflecting the underlying strength of our core Soliris business, while also initiating the launch of the Strensiq and Kanuma for patients with HPP and LAL-D.

> Starting with Solaris and PNH, the ongoing success of our diagnostic initiatives is driving a steady addition of new patients. In 2015, as in prior years, we consistently identified a high number of newly diagnosed patients with PNH across our 50 country platform. We also continue to see that the majority of patients newly starting on Soliris are also newly diagnosed. In 2016, we will continue to execute our PNH diagnostic initiatives with urgency to reach more new patients.

286. The statements referenced above in ¶¶ 277-85 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent

Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

February 8, 2016

287.    On February 8, 2015, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"), which was signed by, among others, Defendants Hallal, Sinha, Bell, Baker, Brennan, Burns, Coughlin, Mollen, Norby, Parven, Rummelt, and Veneman.

288.    Attached to the 2015 10-K were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 2015 10-K.

289.    The 2015 10-K reiterated and expanded upon the financial figures reported in the 4Q 2015 Press Release.

290.    The 2015 10-K contained many, if not all, of the same false and misleading statements and omissions contained in or omitted from the 2014 10-K and 2013 10-K, including the Effective Sales Force Representation, Limited Inventory Representation, Commercial Success Factors Omission, Effective Internal Control Representation, and Effective Disclosure Controls Representation.

291.    The 2015 10-K further represented that the Company's fantastic sales figures were due to Alexion's "dedicat[ion of] significant resources to the worldwide commercialization of Soliris."

292.    In another stunning revelation, the Company reported an escalation in the SEC's investigation into the Company's potential FCPA violations when it disclosed that "in October

89

2015, Alexion received a request from the U.S. Department of Justice (DOJ) for the voluntary production of documents and other information pertaining to Alexion's compliance with the FCPA."

293.  According to a Yale Daily News article[21] citing a March 2015 speech by SEC Director of Enforcement Andrew Ceresney, "In most FCPA cases, biotech employees paid doctors to prescribe drugs or bribed health care officials to clear legal barriers for a drug . . . ." The Yale Daily News article also cites Hughes Parker, an attorney and managing editor of The Law Report Group, stating, "Though certain cases are common, almost any act seeking to gain an unfair business advantage abroad by paying a health care worker would trigger the FCPA . . . ."

<u>March 16, 2016 – Barclays Global Health Conference</u>

294.  On March 16, 2016, Defendant Hallal attended the "Barclays Global Health Care Conference" with analysts and investors.  During the conference, Defendant Hallal attributed Alexion's ability to "continue on an annual basis to identify a similar number of new patients with PNH" to the Company's "disease awareness and diagnostic initiatives . . . across our 50-country operating platform."  Specifically, he stated the following, in relevant part:

> When we look at PNH, really the durability of this franchise stands out on the slide, and what you see on the slide on the left-hand side is that, in our core territories of the U.S., Europe and Japan, the territories where we have been operating the longest, we continue on an annual basis to identify a similar number of new patients with PNH. This makes up the majority of new patients who commence Soliris treatment in any given year. And this continued trend is really driven by our disease awareness and diagnostic initiatives in which we run across our 50-country operating platform.

---

[21] Jiahui Hu, *DOJ Investigates Alexion for Bribery*, Yale Daily News, November 09, 2015, http://yaledailynews.com/blog/2015/11/09/doj-investigates-alexion-for-bribery/   (last   accessed September 18, 2017).

295.    Defendant Hallal's statements during the Barclays Global Health Care Conference were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

March 31, 2016 – 2016 Proxy Statement

296.    On March 31, 2016, the Company filed the 2016 Proxy Statement.  The 2016 Proxy Statement invited shareholders to attend Alexion's 2015 Annual Meeting of Shareholders on Wednesday, May 11, 2016 and purported to "describe[] the business to be considered at the meeting."  It was based upon this proxy statement that shareholders were expected to cast votes on extremely important matters to the Company, including the election of the following director nominees: Defendants Bell, Baker, Brennan, Burns, Coughlin, Hallal, Mollen, Norby, Parven, Rummelt and Veneman.

297.    The 2016 Proxy Statement reiterated the Company's financial results for fiscal year 2015, reporting "Soliris net product sales of $2.590 billion" and that "2015 non-GAAP earnings-per-share (EPS) increased by $0.15, excluding $0.37 per share related to reimbursement for prior year shipments."

298.    In listing out the Company's performance milestones in the previous year, the 2016 Proxy Statement stated that "[t]he [Compensation] Committee determined that Alexion exceeded its corporate objectives and achieved 131.5% of its approved corporate goals for

2014."  The Company purportedly "[i]ncreased net product sales 44% from the previous year,"
and "[i]ncreased non-GAAP net income by 71%."

299.    Notably, the 2016 Proxy Statement disclosed that it was Defendant Hallal that
"recommended annual cash incentives for the other [named executive officers ("NEOs")] based
on strong individual and corporate performance in 2015."  On this recommendation, the
Compensation Committee "determined that annual cash incentive amounts for the NEOs,
including Mr. Hallal, should reflect Alexion's strong 2015 performance and recognition of its
significant achievements."

300.    In justifying the grant of a bonus to Defendant Hallal, the 2015 Proxy Statement
represented that his "leadership and contributions were integral to the Company's 2015
successes."  The sentences that followed noted that "Mr. Hallal assumed the CEO position in
April 2015 after having served as our COO. In 2015, the Company achieved 29% growth in
volume for Soliris."

301.    And as to Defendant Thiel's contributions, the Company stated the following:

> Dr. Thiel assumed the role of Chief Commercial Officer, relocating to
> New Haven, and became responsible for worldwide commercial
> operations. . . . Dr. Thiel oversees the growth of Alexion's complement
> franchise and is responsible for the Strensiq and Kanuma launches. In
> 2015, the Company achieved 29% growth in volume for PNH and aHUS
> and 29% overall growth in year-on-year total revenues on a constant
> currency basis. Dr. Thiel led global commercial initiatives to harmonize
> marketing strategies and field team deployment and execution for the
> Kanuma and Strensiq launches. He expanded global commercial
> capabilities within Alexion's existing structure to position the Company
> for its next stage of growth beginning in 2016.

302.    Notably, the Company, in the 2016 Proxy Statement, ensured investors that the
Company had taken adequate and satisfactory steps to mitigate risk and had systems in place to
identify risks.  Specifically, the 2016 Proxy Statement stated the following, in relevant part:

The Board has ultimate responsibility for overseeing Alexion's risk management processes. In May 2013, the Board formed a Risk Committee, now called the Strategy and Risk Committee, to assist the Board in its oversight of enterprise risk management processes. The Committee also has responsibility for overseeing Alexion's strategic planning process on behalf of the Board - see "Board's Role in Strategy" below. ***The Board believes it is important to align Alexion's strategic priorities with the Company's risk management program***. By designating a single Board committee to oversee both strategy and risk, the Board can execute its oversight and decision-making responsibilities as the Company's strategic priorities and risks evolve with the business and external conditions. Under Ms. Burns' leadership, the Committee focuses on detailed matters of strategy and risk, and the Committee amended its charter in 2015 to reflect the Committee's and the Board's current responsibilities with respect to strategy and risk management. The Committee evaluates management's processes for reviewing, refreshing and modifying its enterprise risk management system and processes. ***Alexion is committed to fostering a company culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation, and the Committee oversees the Company's efforts to foster this culture***. The Committee reviews with management and external advisors the identification, prioritization and management of risks, the accountabilities and roles of the company functions involved with enterprise risk management, the risk portfolio and the corresponding actions implemented by management. ***The Committee regularly informs the full Board of Alexion's most significant risks and how these risks are managed***. The Strategy and Risk Committee seeks to inform the Board of enterprise risks that are or should be delegated to other committees of the Board for review or monitoring.

303.    The 2016 Proxy Statement also advertised the Company's Code of Ethics and ensured investors that the Company's "directors, officers and employees are required to comply with the Code," which the Company represented to cover "areas of professional conduct relating to individual's service to Alexion, including conflicts of interest, ethical conduct, anti-bribery and anti-corruption, gifts, workplace matters, and oversight of ethics and compliance by employees of the Company."

304.    The statements referenced above in ¶¶ 296-303 were materially false and misleading because they falsely attested to Defendant Hallal's success and commitment to the Company when he was knowingly engaging in misconduct at the time when the statements were

made, and they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods, including that senior management was not in compliance with the Code of Ethics and actively encouraging personnel to violate the Code of Ethics; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>April 28-29, 2016</u>

305.    On April 28, 2016, the Company issued a press release announcing its financial results for the first quarter of 2016. (the "1Q 2016 Press Release").  The 1Q 2016 Press Release reported the following financial results for the quarter:

> Total revenues grew to $701 million, a 17 percent increase, compared to $600 million for the same period in 2015. In the first quarter, the negative impact of currency on total revenue was 5 percent or $30 million, net of hedging activities, compared to the same quarter last year. First quarter revenue growth was further negatively impacted by increased macroeconomic weakness in Latin American countries, primarily Brazil and Argentina. Non-GAAP diluted earnings per share (EPS) for the first quarter of 2016 was $1.11 per share, compared to $1.28 per share in the first quarter of 2015. On a GAAP basis, diluted EPS for the first quarter of 2016 was $0.41 per share, compared to $0.45 per share in the first quarter of 2015.
>
> ***
>
> Soliris® (eculizumab) net product sales were $665 million compared to $600 million in Q1 2015. Net product sales increased 11 percent year-on-year, despite continued currency headwinds as well as increased macroeconomic weakness in Latin American countries, primarily Brazil and Argentina. Soliris volume increased 18 percent year-on-year.

306.   The Company's net product sales of $665 million were well below analysts' consensus estimate of $692 million.

307.   The 1Q 2016 Press Release quoted Defendant Hallal as stating, "In Q1 2016, we grew our core Soliris business by serving a steady number of new patients with PNH and aHUS in the U.S., Europe and Japan, partially offset by the increased impact of macroeconomic weakness in Latin America."

308.   The 1Q 2016 Press Release disclosed that the Company was revising downwards its 2016 guidance, now saying that "Alexion expects 2016 total revenues to be at the low end of our previously guided range of $3,050 million to $3,100 million, primarily due to increased macroeconomic weakness in Latin America, partially offset by an increase in Strensiq revenues and the strengthening of foreign currencies" and Soliris revenues were now expected to be $2.835 to $2.875 billion, compared to the prior guidance of $2.9 to $2.925 billion.

309.   On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed the Company's financial results to legitimate business factors and conditions in the Company's "core Soliris business" despite "macroeconomic weakness . . . primarily in Brazil."[22]  Specifically, Defendant Hallal stated the following, in relevant part:

> During the quarter, we achieved many commercial and R&D milestones. First, we grew our core Soliris business, largely driven by a steady number of new patients treated in the U.S., Europe and Japan.
>
> ***
>
> Looking at Soliris in Q1, we grew our core business by serving a consistently high number of new patients with PNH and aHUS in the U.S., Europe and Japan, the territories where we have been operating the longest. This was offset by increased macroeconomic weakness in Latin American countries, primarily in Brazil and Argentina. Despite the weakness in Latin America, we continue to see the majority of growth

---

[22] Full transcript available at https://seekingalpha.com/article/3969394-alexion-pharmaceuticals-alxn-david-l-hallal-q1-2016-results-earnings-call-transcript?part=single.

ahead of us, for both PNH and aHUS across our 50-country operating platform.

Looking more closely at PNH in Q1, globally, we identified and served a high number of newly diagnosed patients by executing our PNH diagnostic initiatives with urgency.

310.   Defendant Hallal also commented on the 2016 guidance as follows:

Turning briefly to our 2016 guidance, we expect total revenues to be at the low end of our previously guided range of $3.05 billion to $3.1 billion, primarily due to increased macroeconomic weakness in Latin America, partially offset by early strength of the Strensiq launch and the strengthening of foreign currencies versus our previous expectations. We also expect 2016 non-GAAP EPS to be at the low end of the previously guided range of $5.00 to $5.20 per diluted share.

311.   In direct response to an analyst's inquiry regarding "Latin American impact in Q1," Defendant Hallal represented that "[i]n Q1, the revenue growth in LatAm was clearly affected by increased macroeconomic weakness, and the new patient starts and treatment interruptions impacted us primarily in Brazil and Argentina. And actually the weakness expanded geographically versus the fourth quarter where we saw weakness primarily in Brazil only."

312.   On the same call, Defendant Sinha echoed Defendant Hallal's comments and attributed the Soliris sales results to legitimate business factors and conditions in the Company's "core territories" despite "macroeconomic weakness . . . primarily in Brazil."   Specifically, Defendant Sinha stated the following, in relevant part:

In Q1, total revenues increased to $701 million. This 17% revenue growth was driven by a 24% increase in volume, negatively impacted by 5% or $30 million in currency headwinds compared to the year-ago quarter.

Soliris revenues were $665 million in Q1. While growth in our core territories remained strong, Soliris revenue growth was impacted mainly by three factors: increasing macroeconomic weakness in Latin America, resulting in an impact to new patient starts and treatment interruptions, primarily in Brazil and Argentina; currency headwinds; and our usual seasonality that we see every year as we move from Q4 to Q1. Year-over-

year, Soliris volume growth was 18%, and was driven by continued growth in PNH and aHUS.

313. On the call, Defendant Sinha also got a question directly asking, "[W]e potentially could have a new government in Brazil, so what could that impact your revenue in Soliris?" To which Defendant Sinha responded in relevant part, "on the Brazil side, it's more the political instability in the country, that's what we see." Thus, Defendant Sinha was defining the ubiquitous "macroeconomic weakness" that the Company was talking about as "political instability."

314. The statements referenced above in ¶¶ 305 and 307-13 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

315. Following the call, several analysts commented on the issues Alexion appeared to be facing in Latin America, and in Brazil specifically. In an April 28, 2016 analyst report, Morgan Stanley stated: "[Management] highlighted Brazil (political) and Argentina (currency down 50%) as the major issues with [Latin America] representing ~10% of Soliris sales."

316. The next day, on April 29, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2016 ("1Q 2016 10-Q"), which was signed by Defendants Hallal and Sinha.

317.    Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 1Q 2016 10-Q.

318.    The 1Q 2016 10-Q included, and expanded upon, the financial figures reported in the 1Q 2016 Press Release.

319.    The statements contained in the 1Q 2016 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

320.    Following the filing of the 1Q 2016 10-Q, on May 1, 2016, Guggenheim Securities issued a report that stated: "Alexion reduced 2016 Soliris revenue guidance below the low end of the prior guidance range and cited macroeconomic headwinds in Latin America . . . particularly Argentina and Brazil as specific countries. Management noted that there was a reduction in new patient starts and treatment interruptions occurred . . . .  The specific factor[s] contributing to the headwinds were not provided by management."

<u>May 10, 2016 – BofA Merril Lynch Health Care Conference</u>

321.    On May 10, 2016, Defendant Sinha hosted a presentation on behalf of Alexion at the "Bank of America Merrill Lynch Health Care Conference" with analysts and investors. During the conference, Defendant Sinha attributed Alexion's lowered guidance to "macroeconomic factors in Brazil," where he said the "issue[]" was "impeachment proceeding

against the government," that "the Minister of Health also had resigned," and, "a lack of coordination going on, and budgetary impacts within their own country is constrained."

322.    At the conference, Defendant Sinha engaged in the following exchanges with analysts:

> [Sinha]: [T]he guidance that we gave, we guided towards the lower end of our guidance of $3.05 billion to $3.1 billion, primarily driven by the weakness that we saw due to the macroeconomic factors in Brazil and Argentina.
>
> ***
>
> [Analyst]: Maybe I can start by asking you, first, about the situation that's happening in [Latin America]. Because you mentioned that in 1Q, and that's the source of the miss, maybe, for 1Q results. So, can you talk about – a little more about what's happening in [Latin America], and what's factored in your guidance for the year? And also, how committed are you to the business in [Latin America] in the longer term?
>
> [Sinha]: So, during our Q1 call, we mentioned about a Latin American situation, mainly in two countries – Brazil and Argentina. Both have different issues. Brazil is in a situation where we have an impeachment proceeding against the government right now. And we also saw, right at the time of the earnings call, that the Minister of Health also had resigned.
>
> And so, it's been a situation where there seems to be a lack of coordination going on, and budgetary impacts within their own country is constrained. What we have seen from moving from Q4 to Q1 is that new patient adds have not been there; and we're also seeing interruptions in the dosing of the existing patients.

323.    Defendant Sinha also answered an analyst's questions regarding the "competitive advantage" of Alexion's "marketing organizations," which went as follows:

> [Analyst]: But you do have the competitive advantage that you do have the sales and marketing organizations in ground in all these markets you're serving today.
>
> [Sinha]: Yes, Ying. And altogether, we are at 50 countries globally now. We're selling in 50 countries. And people on the ground who are constantly educating both the physician, and through physician to the patient. And in US, we actually have case managers who have the ability to talk to the patients too.

99

324.    Defendant Sinha's above-quoted statements made during the May 10, 2016 Bank of America Merrill Lynch Health Care Conference materially misled investors because Sinha failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

July 28-29, 2016

325.    On July 28, 2016, the Company issued a press release announcing its financial results for the second quarter of 2016 (the "2Q 2016 Press Release").   The 2Q 2016 Press Release reported the following financial information, in relevant part:

> Total revenues grew to $753 million, an 18 percent increase, compared to $636 million for the same period in 2015. In the second quarter, the negative impact of currency on total revenue was 3 percent or $18 million, net of hedging activities, compared to the same quarter last year. On a GAAP basis, diluted earnings per share (EPS) for the second quarter of 2016 was $0.51 per share, compared to $0.83 per share in the second quarter of 2015. Non-GAAP diluted EPS for the second quarter 2016 was $1.13 per share, reflecting a reduction of $0.12 per share attributable to the modification of reported non-GAAP income tax expense; prior to this modification non-GAAP diluted EPS would have been reported at $1.25 per share (Table 2). Non-GAAP diluted EPS was $1.30 per share in the second quarter 2015, reflecting a reduction of $0.14 per share attributable to the tax modification.
>
> ***
>
> Soliris® (eculizumab) net product sales were $701 million, compared to $636 million in Q2 2015, representing a 10 percent increase. Soliris volume increased 15 percent year-on-year.

326.    These financial figures beat analysts' revenue estimates by $9.1 million and sales estimates by $4 million.

327.    The 2Q 2016 Press Release reiterated the Company's full-year 2016 earnings guidance, stating "Alexion is reiterating its total revenue and Soliris guidance ranges provided on the first quarter of 2016 earnings call on April 28, 2016."

328.    On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed those results to legitimate business factors and conditions, including the ability of Alexion's "commercial team" to "identify and serve consistently high number of newly diagnosed patients globally be executing [the Company's] . . . diagnostic initiatives."[23] Defendant Hallal further stated the following, in relevant part:

> In Q2 the Alexion team extended our global leadership in rare diseases as we continue to provide life transforming therapies to more patients with rare and devastating disorders.
>
> As our commercial team reached more patients during the quarter, we delivered strong revenue growth and improved our operating margins while also progressing our robust R&D pipeline. Our commercial organization delivered total year-over-year revenue growth of 18% and volume growth of 23% driven by the strength of our three highly innovative marketed therapies.
>
> First, Soliris continued to grow with a steady number of new patients with PNH and aHUS being treated globally. . . .
>
>                ***
>
> Now for a closer look at our commercial performance, starting with Soliris and PNH. In Q2 we continued to identify and serve a consistently high number of newly diagnosed patients globally by executing our PNH diagnostic initiatives with urgency.
>
> Given that one-third of undiagnosed and untreated patients with PNH will die within five years, we aim to deliver the benefits of Soliris to even more patients. Our nine year track record of consistently identifying a similar

---

[23] Full transcript available at https://seekingalpha.com/article/3992873-alexion-pharmaceuticals-inc-alxn-ceo-david-hallal-q2-2016-results-earnings-call-transcript?part=single.

number of new patients with PNH on a quarterly basis across our 50 country platform affirms our view that globally the majority of patients with PNH have yet to receive an accurate diagnosis, let alone commence appropriate treatment.

Moving to Soliris and aHUS, we once again served a consistently high number of new patients globally. We see a significant opportunity ahead to serve more patients, recognizing that a high number of patients with aHUS presenting with severe and rapidly progressing renal failure still do not receive a rapid and accurate diagnosis.

Matched for time now 19 quarters from their respective approvals in the U.S., there are more patients actively receiving Soliris for aHUS than there had been for PNH. Given the higher incidence of aHUS compared to PNH, combined with the improvements we continue to make to our diagnostic initiatives, we expect that this trend of new patient additions will continue, confirming our view that our opportunity to serve patients with aHUS is larger than that of PNH.

As we look forward, the combination of the high proportion of undiagnosed patients with PNH and the high incidence of aHUS gives us great confidence that the majority of growth in our core Soliris business is ahead of us.

329.    On the same call, Defendant Sinha commented on Company revenues and Soliris sales growth, stating, "Soliris revenues were $701 million. Year-over-year volume growth was driven by continued global growth in PNH and aHUS. While macroeconomic weakness in Latin America continues, the guidance we provided in April remains on track for the remainder of the year."  Thus, Defendant Sinha reported that the Company was "reiterating [its] Soliris revenue guidance."

330.    Also on the call, Sinha answered an analyst's question about Latin America by stating that "we are getting full support on the existing patients" in that region.  The exchange was as follows:

[Analyst]: Maybe to start with, Vikas, can you provide an update in the LatAm market because obviously you guys have some headwind in the 1Q. So what's happening in 2Q and what's your outlook for the second half?

[Sinha]: On the LatAm front, as you recall, we have talked about $60 million to $90 million impact that we're expecting this year. We have not seen any change in our views there. Definitely new patient adds are tough there, but we are getting full support on the existing patients.

331.    The statements referenced above in ¶¶ 325 and 327-30 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

332.    The next day, on July 29, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2016 ("2Q 2016 10-Q"), which was signed by Defendants Hallal and Sinha.

333.    Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants Hallal and Sinha attesting to the accuracy of the 2Q 2016 10-Q.

334.    The 2Q 2016 10-Q included, and expanded upon, the financial figures reported in the 2Q 2016 Press Release.

335.    The statements contained in the 2Q 2016 10-Q were also materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient

Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>September 13, 2016 – Morgan Stanley Global Health Care Conference</u>

336.   On September 13, 2016, Defendant Hallal attended the Morgan Stanley Global Health Care Conference with analysts and investors on behalf of Alexion.   During the conference, an analyst asked Hallal how he would respond to "investors" that "worry" about "Soliris" and "Latin America."  Hallal responded that although "Brazil . . . is our largest country in which we operate in Latin America" and had "seen some macroeconomic challenges," he "expected the impact of the Latin American weakness to be no more than 2% to 3% of our global Soliris sales."  Indeed, the following exchange ensued between an analyst and Defendant Hallal at the conference:

> [Analyst]: Just on Soliris, I think when I speak to investors, people tend to bring up the headwinds associated with Soliris, and that's what they worry about. So they . . . worry about Latin America, . . . . Maybe could you address . . . ?

> [Hallal]: . . . "[W]e have from time to time seen some geographic headwinds due to specific macroeconomic challenges. And the most recent one for us has really been the Latin American, both macroeconomic challenges for them as well as political instability in Brazil, which is our largest country in which we operate in Latin America.

> Now, we've guided that we expected the impact of the Latin American weakness to be no more than 2% to 3% of our global Soliris sales. We guided that impact would be about $60 million to $90 million within the Soliris guidance for 2016 and our view on that really remains unchanged.

337.   The above-quoted statements made during the September 13, 2016 Morgan Stanley Global Health Care Conference were misleading because Defendant Hallal failed to disclose that the Company and the Individual Defendants were engaged in the Fraudulent Lawsuit Scheme.

<u>October 27, 2016</u>

338.    On October 27, 2016, the Company issued a press release announcing its financial results for the third quarter of 2016 (the "3Q 2016 Press Release").  The 3Q 2016 Press Release reported the following financials:

> Total revenues grew to $799 million, a 20 percent increase, compared to $667 million for the same period in 2015. In the third quarter, the negative impact of foreign currency on total revenue was 2.5 percent or $16 million, net of hedging activities, compared to the same quarter last year. On a GAAP basis, diluted earnings per share (EPS) for the third quarter of 2016 was $0.42 per share, compared to a loss of $0.81 per share in the third quarter of 2015. Non-GAAP diluted EPS for the third quarter of 2016 was $1.23 per share. Non-GAAP diluted EPS was $1.08 per share in the third quarter of 2015, reflecting a reduction of $0.08 per share to conform to the current non-GAAP income tax expense definition.
>
> ***
>
> Soliris® (eculizumab) net product sales were $729 million, compared to $665 million in Q3 2015.

339.    These financial results beat analysts' EPS estimates by $0.06 and revenue estimates by $12.25 million, as well as net sales estimates by $2 million.

340.    Regarding 2016 guidance, the 3Q 2016 Press Release stated that "Alexion expects 2016 total revenues to be at the upper end of our previously guided range of $3.05 to $3.10 billion. Alexion is reiterating its Soliris revenue guidance and, based on the strength of the Strensiq launch, is further increasing its Metabolic revenue guidance to $225 to $235 million." The 3Q 2016 Press Release added, "Alexion's updated 2016 GAAP EPS guidance is expected to be in the range of $1.79 to $2.09 and non-GAAP EPS guidance is now expected to be at the upper end of the previously guided range of $4.50 to $4.65 per share."

341.    On the conference call Alexion held the same day with investors and analysts, Defendant Hallal attributed those results to legitimate business factors and conditions, including

the Company's "successful programs to identify new patients."[24]  Defendant Hallal stated the

following, in relevant part:

> In Q3, the global Alexion team delivered on our patient-centered
> objectives. Our commercial organization achieved total year-over-year
> revenue growth of 20% and volume growth of 23%, driven by the strength
> of our three highly innovative marketed therapies. First, Soliris continued
> to grow with a steady number of new patients with PNH and aHUS treated
> globally.
>
>        ***
>
> Taking a closer look at our commercial performance, starting with Soliris.
> In Q3, we continued to identify and treat a consistently high number of
> newly diagnosed patients with PNH globally by executing our diagnostic
> initiatives with urgency. In aHUS, we once again served a consistently
> high number of new patients across our 50-country platform, and when
> adjusted for time for their respective approvals, we continue to believe that
> our opportunity to serve patients with aHUS is larger than that of PNH.
>
> As we look forward to our core Soliris business, we are confident that the
> majority of growth is in front of us, due to the combination of the high
> proportion of undiagnosed patients with PNH and the high incidence of
> aHUS, along with our successful programs to identify new patients with
> both diseases.
>
>        ***
>
> Looking at our financial performance for the quarter, we achieved total
> revenues of $799 million, an increase of 20% over Q3 2015, with volume
> growth of 23%. This year-over-year revenue growth was driven by the
> continued growth of Soliris across geographies . . . .

  342.  Looking forward, Defendant Hallal commented on the 2016 guidance, simply

stating that "we now expect total revenues to be at the upper end of our guidance of $3.05 billion

to $3.1 billion. This reflects our prior Soliris revenue guidance of $2.835 billion to $2.875 billion

. . . ."

---

[24] Full transcript available at https://seekingalpha.com/article/4015834-alexion-pharmaceuticals-
alxn-q3-2016-results-earnings-call-transcript?part=single.

343.    On the same call, Defendant Sinha also attributed the Soliris sales results to legitimate business factors and conditions, stating that "Soliris revenues were $729 million. Year-over-year volume growth was driven by continued global growth in PNH and aHUS, despite continued macroeconomic weakness in Latin America."   Defendant Sinha also commented on the Company's reiteration of the 2016 guidance.

344.    The statements referenced above in ¶¶ 338 and 340-43 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; and (6) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

<u>November 2016 – The Truth Begins to Surface</u>

345.    On November 4, 2016, Alexion suddenly cancelled an appearance at the Credit Suisse Healthcare Conference, which was scheduled for November 6-8, 2016, and failed to file its quarterly report by market close within its historical two-day window following an earnings announcement on October 27, 2016.  The only explanation given by the Company for the abrupt cancellation was that "something came up."

346.    On this news, Alexion's share price fell from $129.00 per share on November 4, 2016 to a closing price of $120.05 on November 7, 2016—a $8.95, or 6.94%, drop.

347.    Following this announcement, analysts at Leerink also identified suspicious insider selling, explaining as follows in a report published on November 8, 2016:

As we have been carefully monitoring for SEC filings by Alexion, we noticed yesterday that the company did post an unfortunately timed notification of a significant stock sale by former CEO and current chairman Leonard Bell. On Friday [November 4, 2016] Mr. Bell exercised 36,649 options at prices between $136 and $145, for a total sale of $5.23mm and a profit of $4.4mm. Unsurprisingly these options were exercised as part of a Rule 10b5 sale program, but that will be cold comfort to longstanding investors who would not have been able to take advantage of the unusual volatility. That this volatility was associated with cancelled investor conference appearances, (giving the impression of a possible acquisition) but in reality was more likely to have been connected with the aforementioned "administrative" issue, will only add insult to injury.

***

[W]e believe that the company's board of directors must necessarily be aware of the events, whatever they are.

348.   Things quickly escalated when, on November 9, 2016, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, which was signed by Defendant Sinha (the "11/9/16 Late Filing Notice").

349.   The 11/9/16 Late Filing Notice explained that the Company was unable to file its quarterly report for the period ended September 30, 2016 with the SEC by the date that it was required to be filed.  The Company provided the SEC with the following excuse:

The Audit and Finance Committee of the Board of Directors of Alexion Pharmaceuticals, Inc. ("Company") is *conducting an investigation into allegations that recently have been made by a former employee with respect to the Company's Soliris sales practices*. Specifically, the Audit and Finance Committee is investigating whether Company personnel have engaged in *sales practices that were inconsistent with Company policies and procedures and the related disclosure and other considerations raised by such practices*. The Audit and Finance Committee has retained outside counsel to assist it in the investigation. At this point in time, the Audit and Finance Committee's investigation has not identified instances where Soliris orders were not placed by customers for patients or any facts that require the Company to update its previously reported historical results. The Audit and Finance Committee and its counsel are working diligently to complete the investigation, but at this time it is uncertain when this investigation will be complete and what the results of such investigation will be.

108

350.    The Company issued a press release the same day reiterating the disclosures made in the 11/9/16 Late Filing Notice.

351.    On this news, Alexion's share price fell from $127.16 per share on November 9, 2016 to a closing price of $126.88 on November 10, 2016—a $0.28, or 0.22%, drop.  The Company's share price significantly declined the next trading day to a closing price of $113.62 on November 11, 2016—a $13.26, or 10.45%, drop from November 10, 2016.

352.    Things went from bad to worse when on November 16, 2016, the Company filed a Form 8-K with the SEC announcing that Alexion received a notice from The NASDAQ Stock Market stating that Alexion is not in compliance with NASDAQ Marketplace Rule 5250(c)(1) because Alexion has not timely filed its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the Quarterly Report).  The Company was given "until January 17, 2017 to either file the Quarterly Report or submit a plan of compliance to NASDAQ to address any issues it believes would support its request for an extension of time to regain compliance with NASDAQ continued listing requirements of up to 180 calendar days from the due date of the Quarterly Report."

December 2016 – Things Heat Up for Alexion, and People Drop-Out

353.    While the Company's internal investigation was ongoing, on December 12, 2016, before the market opened, Alexion issued a press release announcing that Defendant Hallal had resigned as CEO "for personal reasons" and that Defendant Sinha had resigned as CFO "to pursue other opportunities" (the "12/12/16 Press Release").

354.    Defendant David Brennan took over as interim CEO and Defendant David J. Anderson took over as CFO, both effective immediately.[25]

---

[25] On March 27, 2017, Alexion issued a press release announcing that the Company's Board had appointed Defendant Hantson as CEO, effective immediately, succeeding Defendant Brennan,

355. The statements contained in the 12/12/16 Press Release as to the reasons for Defendants Hallal's and Sinha's departures were false and misleading because Defendant Hallal and Sinha resigned to attempt to escape liability for knowingly committing the misconduct described herein. This is buttressed by analyst reports that specifically tied the resignations to the findings of the Company's investigation. For example, on December 12, 2016, Cowen & Co. analyst Eric Schmidt published a note to investors describing the announcements as "[a]n [u]nwelcome [s]urprise" and stating, "We are surprised and saddened by today's news as we had expected fairly quick resolution of the investigation into marketing practices without any fallout in senior management" and "[w]e now believe the board lost confidence in its senior leadership team, perhaps due to findings of unprofessional activity that were uncovered during the investigation, and decided that a change needed to be made now."[26]

356. On the news of these high-level resignations, Alexion's stock price dropped $16.99, or approximately 13%, from a closing price of $132.07 per share on December 9, 2016, to a closing price of $115.08 per share on December 12, 2016.

357. The stock losses were tempered by the false and misleading representations in the 12/12/16 Press Release, including Defendant Bell's statements that "[t]his leadership transition comes during a period of great strength and momentum. The fundamentals of Alexion are very strong. . . . We are well-positioned for sustainable growth. Moreover, we have a clear strategy to continue our mission to develop and deliver transformative therapies for patients with devastating and rare diseases." Defendant Bell also made the following false and misleading statements, "[w]ith strong new leaders in place, we will continue to be relentlessly focused on

---

who was until then the interim CEO.

[26] Meg Tirrell, *Drug company Alexion's shares plunge after CEO, CFO exit*, CNBC, December 12, 2016, https://www.cnbc.com/2016/12/12/alexion-ceo-cfo-to-leave-after-losing-board-confidence-source.html (last accessed September 18, 2017).

serving patients and families with devastating and rare diseases. With a dedicated and talented team of 3,000 employees, coupled with our breakthrough medical innovation, Alexion will continue to develop and deliver life-transforming therapies for patients and families who count on us."

358.   Defendant Bell's statements, including the 12/12/16 Press Release, were false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; (6) the real reasons for the abrupt departures of the Company's CEO and CFO; and (7) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.

359.   Notably, Alexion declined to take analysts' questions on a conference call on December 12, 2016, only reiterating statements from its earlier press release.  This only made matters worse.

360.   On December 13, 2016, as analysts and investors continued to react to the volatile situation, the price of Alexion stock dropped a further 4.4% from the closing price of $115.08 per share on December 12, 2016, to close at $110.01 per share on December 13, 2016.

<u>January 4, 2017 – More Revelations About Wrongdoing</u>

361.   On January 4, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2016 ("3Q 2016 10-Q"), which was signed by Defendants Brennan and Anderson.

362.    Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants Brennan and Anderson attesting to the accuracy of the 3Q 2016 10-Q.

363.    The 3Q 2016 10-Q reported net product sales of Soliris for the quarter of $728.85 million.  It also reported that the increase in total net product sales for the three and nine months ended September 30, 2016, as compared to the same periods in 2015, "was primarily due to an increase in unit volumes of 23%, due to increased demand globally for Soliris therapy for patients with PNH or aHUS and sales of Strensiq and Kanuma during 2016."

364.    Moving on to the Audit and Finance Committee's investigation of allegations made by a former employee concerning the Company's Soliris sales practices, the 3Q 2016 10-Q explained that such investigation was complete.

365.    The 3Q 2016 10-Q explained that the former employee alleged that certain of the Company's Soliris sales practices resulted in certain customers placing orders for shipments of Soliris in an earlier fiscal quarter than the fiscal quarter they otherwise would have (referred to in the 3Q 2016 10-Q as "pull-in" or "advanced sales").  According to the 3Q 2016 10-Q, "*The former employee alleged that such practices were used by the Company in order to meet certain financial targets and at times involved inappropriate business conduct*."

366.    The 3Q 2016 10-Q further expanded upon the meaning of "pull-in" or "advanced" sales, defining them as:

> certain Soliris sales transactions, coordinated by Company personnel (primarily personnel in the customer operations department in their capacity as coordinators for the shipment of orders for customers) that increase revenue recognized in an earlier fiscal quarter than the one in which a sale otherwise would have occurred and result in a corresponding decrease in the revenue that will be recognized in the subsequent fiscal quarter. The Company is able to forecast the estimated date of certain shipments of Soliris due to customer order history, known infusion dates, or other similar data to support the operations of our business and patient needs. ***Pull-in sales may occur, for example, when a customer, as a***

> *result of encouragement by a Company employee, places an order for a patient earlier than the customer might otherwise place the order*. Pull-in sales are not inherently problematic or impermissible, when in accordance with U.S. GAAP. The Audit Committee Investigation included a review of sales transactions for evidence of pull-in sales, the reasons for pull-in sales, whether such transactions were conducted in accordance with the Company's policies and procedures, and whether revenue from pull-in sales was properly recognized in accordance with U.S. GAAP.

367.   The Audit Committee seemed to have absolved the Company of wrongdoing, saying that "the Audit Committee Investigation did not identify any instances of improper revenue recognition associated with pull-in sales, instances where Soliris orders were not placed by customers for patients in order to fulfill an actual need, or instances where Soliris was sold to build stock of unwanted product."

368.   But then the 3Q 2016 10-Q explained that there was substantial reason to be concerned and that there was wrongdoing from the top-down.  Specifically, the 3Q 2016 10-Q explained the following:

> The Company concluded and the Audit Committee concurred that there was a material weakness in the Company's internal controls over financial reporting because senior management did not set an appropriate "Tone at the Top" for an effective control environment and such failure resulted in inappropriate business conduct, including conduct that was inconsistent with, and in violation of, the Company's policies and procedures. The Audit Committee Investigation found that *senior management applied pressure on personnel to use pull-in sales to meet targets*, and such pressure was particularly significant *during the fourth quarter of 2015*. The Audit Committee Investigation also found that certain *Company personnel engaged in inappropriate business conduct to realize pull-in sales, as a result of pressure from senior management*.

369.   Notably, the Company disclosed in the 3Q 2016 10-Q that the Company's internal control over financial reporting and disclosure controls were *not* effective.  The 3Q 2016 10-Q stated, "current management, with the participation of our Interim Chief Executive Officer and Chief Financial Officer, has concluded that there was a material weakness in our internal control over financial reporting as of September 30, 2016" and "our Interim Chief Executive Officer and

113

Chief Financial Officer concluded that, as of September 30, 2016, our disclosure controls and procedures were not effective due to the material weakness described below."

370.   In describing the material weakness, the Company explained that it had falsely certified that its internal controls over financial reporting and disclosure controls were effective for previous reporting periods.  Specifically, the 3Q 2016 10-Q stated the following:

> At the time that our Annual Report on Form 10-K for the year ended December 31, 2015 was filed on February 8, 2016, we concluded that our disclosure controls and procedures were effective as of December 31, 2015. At the time that our Quarterly Report on Form 10-Q for the period ended March 31, 2016 was filed on April 29, 2016 and our Quarterly Report on Form 10-Q for the period ended June 30, 2016 was filed on July 29, 2016, we concluded that our disclosure controls and procedures were effective as of March 31, 2016 and June 30, 2016, respectively. *Subsequent to these evaluations, we concluded that our disclosure controls and procedures were not effective as of December 31, 2015, March 31, 2016 and June 30, 2016, as the material weakness described below was determined to exist as of such dates*. We intend to file an amendment to the Company's Annual Report on Form 10-K for the year ended December 31, 2015 to reflect the conclusion by our management that our disclosure controls and procedures were not effective as of December 31, 2015, and that there was a material weakness in our internal controls over financial reporting as of the end of the period covered by that report.
>
> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> *We did not maintain an effective control environment as our senior management failed to set an appropriate Tone at the Top*. Specifically, senior management failed to reinforce the need for compliance with the Company's policies and procedures, which resulted in *inappropriate business conduct*. This control deficiency did not require restatement of our previously reported historical financial results. However, *this control deficiency could result in a misstatement to disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected*. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

371.    In another portion of the 3Q 2016 10-Q, the Company disclosed that the Company's "material weakness arose from actions identified during the Audit Committee Investigation involving 'pull-in' sales practices that failed to demonstrate commitment to integrity and ethical values and the failure by senior management to set an appropriate 'Tone at the Top' for an effective control environment."

372.    In yet another portion of the 3Q 2016 10-Q, the Company elaborated on senior management's failures, stating, in relevant part:

> The Audit Committee Investigation found that senior management failed to set an appropriate Tone at the Top for an effective control environment and senior management failed to reinforce the need for compliance with the Company's policies and procedures which contributed to inappropriate business conduct in connection with some pull-in sales, including conduct that was inconsistent with, and in violation of, Company policies and procedures.

373.    The 3Q 2016 10-Q represented that "[m]anagement is engaged in remedial activities to address the material weakness described above."  This was meant to prevent the issue from happening again, but damage had already been done.

374.    As explained in the 3Q 2016 10-Q, while the Audit Committee Investigation concluded that revenue from the pull-in sales under review was appropriately recognized in the quarter in which such sales actually occurred and that there were no financial statement errors related to the pull-in sales, the Audit Committee Investigation found that certain revenue pulled into the fourth quarter of 2015 from the first quarter of 2016 was realized as the result of employee actions that involved inappropriate business conduct, including conduct that was inconsistent with, and in violation of Company policies and procedures.  Pull-in sales during the fourth quarter of 2015 were estimated to be between approximately $10 million to $17 million and were significantly higher than for other quarters.  Some portion of these estimated sales did

not involve inappropriate business conduct.  These estimated pull-in sales represented less than 1% of total revenue for 2015.

375.    The 3Q 2016 10-Q also disclosed that "[d]uring the past two completed fiscal years and through the third quarter of 2016, but excluding the fourth quarter of 2015, pull-in sales were estimated to be between $1 million to $7 million in the aggregate, representing 0% - 1% of total revenue."

376.    Despite this relatively low percentages of pull-in sales, facts regarding the pull-in sales were material.  The $10 million to $17 million in revenue that was achieved through inappropriate pull-in sales was highly material because it enabled the Company to meet its full-year 2015 financial guidance, and even if the sales were properly recognized as an accounting matter, the fact that they were driven by illegal practices would have been highly material to investors who understood the company to be acting in compliance with relevant policies and ethical rules in this highly regulated industry.

377.    If the above were not enough, the 3Q 2016 10-Q additionally disclosed some more bad news; in December 2016, the U.S. Attorney had served a subpoena and document requests upon the Company in relation to the Company's support for non-profit organizations that provide financial assistance to Medicare patients taking drugs sold by Alexion.  Specifically, the 3Q 2016 10-Q stated:

> In December 2016, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents relating generally to our support of 501(c)(3) organizations that provide financial assistance to Medicare patients taking drugs sold by Alexion,  Alexion's provision of free drug to Medicare patients, and *Alexion compliance policies and training materials concerning the anti-kickback statute or payments to any 501(c)(3) organization that provides financial assistance to Medicare patients*.

378.    The same day, the Company issued a press release announcing the filing of the 3Q 2016 10-Q and reiterating the disclosures therein.

379.    The shocking and damning revelations on January 4, 2017 seemed to confirm that Defendants Hallel and Sinha resigned because of wrongdoing, not because of "personal reasons" or to "pursue other opportunities."  They also confirmed that the Company had made a plethora of false and misleading statements and omissions during the Relevant Period.

380.    Analysts expressed frustration with Alexion's lack of transparency. On January 5, 2017, RBC Capital Markets published a report that stated:

> We believe that the company has missed out on a great opportunity to come out on top of a bad situation by being a lot more open and much more transparent with investors and having the chance to regain much needed trust. The very carefully worded press release left us (as believers in the company and the value of the Soliris franchise) perplexed and in the end disappointed in the management team and the Board: if there was wrongdoing (including material weakness in internal controls over financial reporting), as it appears it has, why not discuss it a lot more openly and talk about the parties responsible? Right now investors are supposed to accept today's facts (of corporate inappropriate behavior), along with the fact that the company's two most senior leaders left a few weeks ago to pursue other opportunities etc. . . . We have a very difficult time recalling when a major biotech had its CEO and CFO gone on the same day (other than a major restructuring). Why not be more open with investors and discuss exactly what happened, with specific numbers, quarters etc., especially if the impact on sales is only <1%? Hold a conference call and take questions (unlike last time). Why not? The investigation is now concluded, correct? This should put investors' minds at ease and allow them to focus on what the value of Soliris and the two metabolic products is going forward.

381.    The Statements in the 3Q 2016 10-Q were false and misleading because they failed to disclose: (1) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (2) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (3) the Company and Individual Defendants' engagement in the Patient Information Scheme; (4) the Company and Individual Defendants' engagement in the Patient

117

Advocacy Group Scheme; and (5) the real reasons for the abrupt departures of the Company's CEO and CFO.

<u>January 19, 2017</u>

382.    On January 19, 2017, Alexion filed an Amended Form 10-K for the fiscal year ended December 31, 2015 (which had initially been filed on February 8, 2016) to reflect that the Company's disclosure controls and procedures were not effective as of December 31, 2015, and that a material weakness existed at the time that 10-K was filed.

<u>February 16, 2017</u>

383.    On February 16, 2017, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2016 (the "4Q 2016 Press Release").  The 4Q 2016 Press Release provided the following financial information for the quarter:

> Total revenues for the full year of 2016 were $3.084 billion, an 18 percent increase compared to 2015. The negative impact of foreign currency on total revenue year over year was 3 percent or $74 million, net of hedging activities. On a GAAP basis, diluted earnings per share (EPS) for the full year of 2016 was $1.76 per share, compared to $0.67 per share in 2015. Non-GAAP diluted EPS for the full year of 2016 was $4.62 per share. Non-GAAP diluted EPS was $4.65 per share for the full year of 2015, reflecting a reduction of $0.34 per share to conform to the current non-GAAP income tax expense definition.

> Total revenues in the fourth quarter grew to $831 million, a 19 percent increase compared to the same period in 2015. The negative impact of foreign currency on total revenue in the fourth quarter was 2 percent or $12 million, net of hedging activities. On a GAAP basis, diluted EPS for the fourth quarter of 2016 was $0.41 per share, compared to $0.29 per share in the fourth quarter of 2015. Non-GAAP diluted EPS for the fourth quarter of 2016 was $1.26 per share. Non-GAAP diluted EPS was $1.04 per share in the fourth quarter of 2015, reflecting a reduction of $0.09 per share to conform to the current non-GAAP income tax expense definition. Both GAAP and non-GAAP results are inclusive of legal, accounting, and other costs associated with the Audit and Finance Committee's completed investigation.

384.    According to the 4Q 2016 Press Release, for the year, "Soliris® (eculizumab) net product sales were $2,843 million, compared to $2,591 million in 2015" and for the quarter, "Soliris® net product sales were $749 million, compared to $689 million in the fourth quarter of 2015."

385.    Thus, for the quarter, the Company was below analysts' revenue estimates by $5.6 million and only beat EPS estimates by $0.01.

386.    Inexplicably, after facing a humongous setback and unknown liability for the wrongdoing recently disclosed by the Company, the 4Q 2016 Press Release announced that "[t]he Company also announced that its Board of Directors has increased the size of the Company's share repurchase authorization to a total of $1 billion."

387.    The 4Q 2016 Press Release additionally provided financial guidance for 2017, showing total revenues of $3.4-$3.5 billion and Soliris revenues of $3.025-$3.1 billion.

388.    On the conference call Alexion held the same day with investors and analysts, Defendants Brennan and Anderson generally stayed mum on the results of the Audit Committee's investigation.[27]  They continued to attribute the Company's sales growth to legitimate business factors and conditions.  Specifically, Defendant Brennan stated the following on the call, "[W]e delivered strong volume growth for Soliris and continue to see that the majority of the opportunity to serve patients with PNH and aHUS with our complement franchise is ahead of us."

389.    On the call, Defendant Anderson stated that "[y]ou can see that net product sales increased to $831 million, 19% above the year ago quarter. The revenue growth was driven by a strong 20% increase in volume, partially offset by currency headwinds of 2% compared to the

---

[27] Full transcript available at https://seekingalpha.com/article/4046771-alexion-pharmaceuticals-alxn-q4-2016-results-earnings-call-transcript?part=single.

same period last year." He also added that "Soliris revenues, you can see, were $749 million in the quarter; year-over-year volume growth of 10%, driven by global growth in both PNH and HUS." Defendant Anderson also stated the following regarding Soliris growth:

> [T]he 2016 net product sales increased to nearly $3.1 billion or 18% over 2015. The revenue growth was driven by a strong 22% increase in volume, partially offset by 3% or $74 million in currency headwinds. ***Full-year Soliris growth was driven by volume growth of 14%, reflecting continued global growth in PNH and aHUS despite continued challenges with access and treatment interruptions in Latin America***.

390. Defendant Anderson also commented on 2017 guidance, stating:

> Looking at Soliris, our revenue guidance is $3.025 billion to $3.1 billion. Our expectation is we will continue to identify a steady number of new patients with both PNH and aHUS globally in 2017. We also expect that patient recruitment for our ongoing and planned 1210 trials, as well as other studies, will have a $70 million to $110 million impact headwind on Soliris revenues during the year.

> In Latin America, access challenges will continue, but we expect Soliris revenues to stabilize year over year, and Carsten will make a few comments about that in a moment.

391. Also on the call, Defendant Thiel further discussed the factors that purportedly contributed to Soliris sales growth in 2017, stating:

> [W]ith Soliris and PNH, in 2016 we continued to identify a steady addition of new patients, even in the territories where we have been operating the longest and despite the ongoing delays in new patient starts and treatment interruptions in Latin America. Additionally, we are still seeing that the majority of patients starting on Soliris are also newly diagnosed. This affirms our view that globally the majority of patients with PNH have yet to receive an accurate diagnosis, let alone initiate treatment.

> [I]n aHUS, we also continue to see a consistent number of new patients initiating Soliris treatment. Matched for time from their respective approvals, we continue to see more patients globally receiving Soliris for aHUS than they have been for PNH. Importantly in the U.S., as of the end of 2016, the number of aHUS patients being treated has now surpassed PNH. This supports our view that the opportunity to serve patients with aHUS is larger than that of PNH.

120

> We're pleased with our performance in 2016 and expect continued growth ahead of us for Soliris in both PNH and aHUS even as we are simultaneously enrolling patients into the ALXN1210 trials.

392.    Defendants' statements in the 4Q 2016 Press Release and on the February 16, 2017 call attributing Alexion's net product sales of Soliris to legitimate business factors and conditions materially misled investors because Defendants failed to disclose that the key drivers of those results were instead directly attributable to Alexion's unsustainable use of illegal and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, including reliance on pull-in sales in a manner that violated the Company's policies and procedures, as well as on other illegal tactics, as described herein.

393.    Defendants' comments on 2017 guidance were also materially misleading because Defendants failed to disclose that these projections rested on the assumption that Alexion would continue to use unsustainable, illegal, and improper sales tactics, caused by senior management's failure to set an appropriate tone at the top, as described herein.

394.    The same day, February 16, 2017, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by, among others, Defendants Brennan, Anderson, Bell, Baker, Burns, Coughlin, Mollen, Norby, Parven, Rummelt, and Veneman.

395.    Attached to the 2016 10-K were SOX certifications signed by Defendants Brennan and Anderson attesting to the accuracy of the 2016 10-K.

396.    The 2016 10-K reiterated and expanded upon the financial figures reported in the 4Q 2016 Press Release.

397.    The 2016 10-K made many of the disclosures regarding the Audit Committee Investigation as the 3Q 2016 10-Q and was materially false and misleading for the same reasons as the 3Q 2016 10-Q.

March 24, 2017

398.   On March 24, 2017, the Company filed an amendment to the 2016 10-K solely to include Exhibit 23.1, the Consent of Independent Registered Public Accounting Firm, which was inadvertently omitted from the original filing.  The mere "inadvertent" omission of that consent evidences that the Company, as of March 24, 2017, still did not have its act together or effective disclosure controls, despite the Company's commitment to remedial activities, which included strengthening the Company's disclosure controls and procedures.

March 31, 2017

399.   On March 31, 2017, the Company filed the 2017 Proxy Statement, which disclosed an egregious wrong committed by the Board.  The 2017 Proxy Statement explained that, instead of clawing back compensation from Defendants Hallal and Sinha due to their knowing and/or intentional wrongdoing, which caused substantial damage to the Company as outlined herein, the Company had entered into separation agreements with them.  These separation agreements provided for the following:

> In connection with Mr. Hallal's resignation in December 2016, he entered into a separation agreement with the Company under which he received a cash payment of approximately $3.65 million, payable in quarterly installments over two years beginning in January 2017. All of Mr. Hallal's unvested LTI awards were cancelled as of the date of his departure, having a value at such time of approximately $12.2 million. The separation agreement with Mr. Hallal contains provisions concerning noncompetition and indemnification, and covenants not to solicit or disparage, and to cooperate with the Company.

> In connection with Mr. Sinha's departure in December 2016, he received severance compensation in accordance with the terms of his employment agreement providing for compensation in the event of his termination by the Company without cause. His employment agreement provided for the acceleration of any then outstanding stock options and restricted stock units, and payments for 18 months of COBRA coverage plus a severance payment of $1,820,700 equal to 1.5 times the sum of (a) Mr. Sinha's then current base salary and (b) Mr. Sinha's 2016 target bonus. Mr. Sinha's unearned PSU awards were forfeited. Mr. Sinha's employment agreement

also contains provisions concerning noncompetition and indemnification, and covenants not to solicit or disparage, and to cooperate with the Company.

400.    Moreover, for the year ended December 31, 2016, Defendant Hallal, instead of being held liable for damage caused to the Company, was paid over $13.1 million.  Similarly, Defendant Sinha was paid over $5.7 million for the same period.

401.    The Board breached their fiduciary duties in allowing Defendants Hallal and Sinha to escape liability, and further breached their fiduciary duties by overcompensating them in light of their wrongdoing and failing to recoup their compensation pursuant to the Company's executive compensation recoupment policy, or "clawback" policy.

402.    The statements contained in the Company's 2017 Proxy Statement were materially false and misleading because they failed to disclose that Defendants Hallal and Sinha were key instigators and conspirators of the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group Scheme, and further failed to disclose the real reasons for the their abrupt departures.

<u>April 27, 2017</u>

403.    On April 27, 2017, the Company issued a press release announcing its first quarter 2017 financial results (the "1Q 2017 Press Release").   The 1Q 2017 Press Release reported the following financials:

> Total revenues in the quarter were $870 million, a 24 percent increase compared to the same period in 2016. First quarter revenues included a benefit of $29 million from a change in revenue recognition in 2017 for certain non-U.S. markets; excluding the benefit of this accounting change, revenues increased to $841 million, a 20 percent increase compared to the same period in 2016. The negative impact of foreign currency on total revenue year-over-year was 2 percent or $12 million, net of hedging activities. On a GAAP basis, diluted earnings per share (EPS) in the quarter was $0.75 per share, compared to $0.41 per share in the first

quarter of 2016. Non-GAAP diluted EPS for the first quarter of 2017 was $1.38 per share. Non-GAAP diluted EPS was $0.99 per share in the first quarter of 2016, including a reduction of $0.12 per share to conform to the current non-GAAP income tax expense definition.

404. The 1Q 2017 Press Release further reported that net product sales of Soliris for the quarter were $783 million, which "include[ed] a benefit of $29 million from a change in revenue recognition in 2017 for certain non-U.S. markets."

405. This Company's Soliris sales figure beat analysts' consensus estimates by $41 million (in part because of a revenue-recognition change).

406. The 1Q 2017 Press Release quoted Defendant Hantson as stating, "As we continue to grow our business, we will be anchored by a culture of compliance and driven by passion and dedication to patients."

407. The 1Q 2017 Press Release further stated, "Alexion is reiterating its 2017 revenue and operating margin guidance provided on the fourth quarter and full year 2016 earnings call."

408. On the conference call Alexion held the same day with investors and analysts, Defendant Anderson attributed the Company's financial results to legitimate business factors and conditions, stating, "Soliris revenue was $783 million. Year-over-year volume for Soliris grew 19%. If you exclude the $29 million revenue recognition benefit, Soliris revenue was $754 million in the quarter, reflecting volume growth of 15%, again, driven by growth across geographies in both PNH and aHUS."[28]

409. Looking ahead, Defendant Anderson stated the following, in relevant part:

Now for Soliris, our revenue guide remains $3.025 billion to $3.1 billion. It assumes we're going to continue to identify a steady number of new patients in PNH as well as aHUS globally. We expect that patient recruitment for our ongoing and planned ALXN1210 trials as well those

---

[28] Full transcript available at https://seekingalpha.com/article/4066340-alexion-pharmaceuticals-alxn-q1-2017-results-earnings-call-transcript?part=single.

other studies will have a $70 million to $110 million impact, so a headwind on the Soliris revenue during the year.

We expect its impact to increase in the second quarter and through the year. And importantly, this guidance is a framework for the year, and we'll expect some, again, variability in quarter-to-quarter revenue due to the timing of bulk orders in certain non-U.S. markets.

410.   On the same call, Defendant Thiel also commented on the factors that purportedly contributed to Soliris sales growth in 2017, stating:

Let me start with Soliris and PNH on slide 17. In Q1, we continued to identify and serve a steady number of new patients even in the markets where we have been operating the longest and despite the ongoing delays in new patient starts and treatment interruptions in Latin America. Additionally, we're still seeing that the majority of patients starting on Soliris are also newly diagnosed. This affirms our view that globally, the majority of patients with PNH have yet to receive an accurate diagnosis, let alone initiate treatment.

Now, turning to atypical HUS on slide 18. We're seeing a growing number of new patients starting on Soliris. Some of this new patient growth is driven by physicians, identifying patients that received a shorter duration of Soliris therapy. Still, on a net basis, the number of atypical HUS patient additions is higher than PNH. Due to this strong momentum, even though atypical HUS was approved four years after PNH, the number of patients being treated in leading markets like the U.S. as well as other markets such as Spain and Turkey has now surpassed PNH. This strengthens our view that the opportunity to serve patients with atypical HUS is larger than that of PNH.

In summary, we are pleased with our Soliris performance in the first quarter of 2017 and expect continued growth ahead of us in both PNH and atypical HUS even as we are simultaneously enrolling patients into our ALXN1210 trials.

411.   Later in the call, Defendant Thiel further discussed Soliris sales results, stating:

Indeed, we are very pleased with what we have seen in the first quarter, both consistently in PNH and in aHUS. Normally, Q1 tends to be seasonally a rather lower quarter. In addition, we knew in Q1 that our R&D organization would execute flawlessly in recruiting patients in the ALXN1210 study. And we, of course, saw a significant leadership change bringing uncertainty in our organization. So, we said we need to keep an eye on the ball and drive operational excellence in Q1.

So, it's not really one big item that drove Q1 performance but the sum of many. Field days, patient identification, conversion to treatment, these metrics scored very high and across the globe. The one region that continues to be a challenge for us is Latin America as we have stated earlier, and we expect that this will continue in 2017.

So, as I look to Q2, Q3, as Dave has earlier mentioned, the timing of bulk orders, the access challenges in Latin America as well as the impact of the ALXN1210 study recruitment and potential competitor recruitment will impact the Q2 and Q3 results. So, clearly, strong performance in Q1, but as you saw, we're keeping our previous revenue guidance for the year.

412.    Also on the call, Defendant Hantson, responding to an analyst's question regarding the sustainability of the Soliris pricing model, engaged in the following exchange:

[Analyst]: [W]e have heard a lot of talks about the Soliris pricing in the future. If you could help us understand if we should expect any significant change to your pricing strategy in near term or you have seen any incremental pressure from the payers? Thank you.

[Hantson]: Well, it's safe to say that yes, there is increased pressure on pricing I think across geographies, but I believe our model is sustainable. And just to make a couple of points why I believe that. First of all, our products are very innovative. They are very valued, and they are truly transformative for patients, and that's being recognized by the payer. I would say number two is our therapies are unique, and they are not interchangeable. So, you've seen discussions on tenders, our bidding process and so on. That's not really something that would work for our products. And number three is we are growing our company through volumes, not through price increase. So, I do believe that this is a sustainable model for us for now, and I know that Dave wants to add a couple of things here.

413.    The statements referenced above in ¶¶ 403-04 and 406-12 were materially false and misleading because they failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; and (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme.

**May 8, 2017 – Operation Serpent's Chalice & the Fraudulent Lawsuit Scheme**

414.    Additional details about Alexion's improper sales tactics came to light before the close of trading on May 8, 2017, when reports emerged that the Company's São Paulo, Brazil offices were raided by Brazilian authorities as part of "Operation Serpent's Chalice"—a multiyear coordinated federal investigation into healthcare fraud in the pharmaceutical industry.

415.    Specifically, as reported by the Brazilian news magazine *Exame*, the Brazilian Federal Police and Federal Attorney General's Office have been investigating a criminal scheme involving the filing of fraudulent lawsuits for the purpose of transferring large amounts of public funds from Brazil's national health system to Alexion for Soliris (the Fraudulent Lawsuit Scheme referred to herein).  Because Soliris is not yet approved for sale in Brazil, the only way citizens can get access to the drug is to file a lawsuit for a judgment awarding publicly funded access to Soliris through the constitutionally protected right to medical care, guaranteed to all Brazilian citizens.  As reported by Bloomberg, Brazil's health ministry has paid more than 1.29 billion reais (or approximately $400 million) since 2010 to grant its citizens access to Soliris through these lawsuits.

416.    Upon information and belief, Brazilian authorities began investigating Alexion and the Company's relationship with a patient advocacy group called the Associacao dos Familiares, Amigos e Portadores de Doenças Graves (or "AFAG"), whose offices were also raided on May 8, 2017 as part of the investigation.  The investigation has focused on the allegedly fraudulent filing of lawsuits aimed at obtaining government reimbursement for sales of Soliris in circumstances involving inconclusive and ***fake diagnoses*** of PNH and aHUS.  More than 900 lawsuits for access to Soliris have been filed in Brazil over the past six years by AFAG and other patient advocacy organizations.

417.    According to *Exame*, the Brazilian authorities' investigation began when a patient reported being induced by AFAG to file a lawsuit for access to Soliris in order to treat aHUS—a disease she did not have.  In the federal warrant application to search and seize documents from Alexion's São Paulo office, the Brazilian Federal Police alleged that a representative of Alexion facilitated contact between the misdiagnosed patient and AFAG.  The patient reported being misdiagnosed by two doctors and giving power of attorney to AFAG—which Brazilian authorities alleged did not charge legal fees—to file an action on her behalf.

418.    According to *Exame*, the Brazilian Federal Attorney General's Office is aware of at least ten similar lawsuits filed by AFAG involving Soliris.  These lawsuits were supported by diagnoses from the same group of physicians and were filed by the same group of attorneys, according to the Brazilian newspaper, *O Globo*.  The medical reports were also suspiciously similar.  After these suspicious details emerged, a Brazilian judge ordered independent medical reevaluations for patients who filed lawsuits involving aHUS diagnoses.  According to Brazilian authorities, several actions involving diagnoses by the same doctors were abruptly withdrawn shortly after the judge's order.

419.    According to *Exame*, Brazilian authorities are also investigating Alexion's financial contributions to AFAG.  Alexion disclosed to investors that it gave more than $500,000 to the AFAG in 2015.  The average payment in 2015 was approximately $26,000 per entity.  Indeed, AFAG received more in 2015 than any of the 115 other foreign Patient Advocacy Organizations in 18 countries that received financial support from Alexion that year.

420.    On news that Alexion's offices in Brazil were raided, Alexion's stock price fell $4.42, or 3.4%, from an opening price on May 8, 2017 of $129.12 per share, to close that same day at $124.70 per share.

**May 23, 2017 – Complete Overhaul**

421.   Just over two weeks after the Company's Brazilian offices were raided, Alexion announced a significant shakeup of its executive leadership team, including the departure of the Company's second CFO in just six months.

422.   On May 23, 2017, the Company issued a press release announcing that (1) "Carsten Thiel, who is leaving the Company, effective June 1, 2017, to pursue new opportunities" will be replaced with Mr. Brian Goff on June 1, 2017, (2) "David Anderson, Chief Financial Officer, will resign his position at the end of August 2017" and the Company had yet to find a replacement, (3) "Dr. Martin Mackay, Executive Vice President, Head of Research & Development, is retiring from the Company at the end of 2017" and the Company had yet to find a replacement, and (4) "Ms. Clare Carmichael, Executive Vice President, Chief Human Resources Officer, will be leaving the Company, effective June 1, 2017, to pursue new opportunities" and the Company had yet to find a replacement.

423.   This news was extremely distressing and damaging to the Company because, as was continuously disclosed and represented during the Relevant Period in the Company's SEC filings, "[t]he success of [Alexion's] business is dependent in large part on [its] continued ability to attract and retain [its] senior management, and other highly qualified personnel in [its] scientific, clinical, manufacturing and commercial organizations."

424.   Thus, on news that a cadre of executives was leaving the Company, Alexion's stock price dropped $10.78, or 9.3%, from a closing price of $115.42 per share on May 22, 2017 to close at $104.64 per share on May 23, 2017, on heavy trading volume.

425.   The management departures announced on May 23, 2017 were not the only changes to Alexion's leadership that the Company made in 2017.  Just months earlier, on March 2, 2017, Alexion announced that Defendant Bell, the Company's founder and the Chairman of its

Board, would leave the Company.  In addition, Alexion also announced in March 2017 that its Chief Compliance Officer, Edward Miller, was leaving the Company.

426.    This means that between December 2016 and May 2017, Alexion announced the departure of (i) its CEO, (ii) two different CFOs, (iii) its founder and Chairman of the Board, (iv) its Chief Compliance Officer, (v) its Chief Commercial Officer, and (vi) two executive vice presidents.

427.    Analysts have tied the Company's management losses to the Company's aggressive sales tactics.

### The Bloomberg Exposé

428.    On May 24, 2017, the day after the Company lost a cadre of key executives, Bloomberg released an in-depth exposé detailing Alexion's illicit and aggressive sales practices (the "Bloomberg Exposé").[29]  The Bloomberg Exposé provided specifics about the wide range of tactics Alexion used to "pull in" sales of Soliris—that is, to encourage patients to purchase Soliris at times when they did not need it.

429.    Relying on interviews with more than 20 current and former employees and a review of over more than 2,000 pages of internal documents, the Bloomberg Exposé provides details about a number of Alexion's improper and unethical sales tactics, including:

> (a) relying on a team of in-house nurses, who worked with the Company's sales team, to pressure patients and doctors to use Soliris, even if not in the patients' interest (the "Nurse Coordination Scheme" referred to above);
>
> (b) encouraging doctors to send patients' test results to "partner labs," which, in turn, would inappropriately share with Alexion the results of these tests so that Alexion could identify patients diagnosed with PNH and

---

[29] Elgin & Bloomfield et al., *When the Patient is a Gold Mine: The Trouble With Rare-Disease Drugs*, Bloomberg, May 24, 2017, https://www.bloomberg.com/news/features/2017-05-24/when-the-patient-is-a-gold-mine-the-trouble-with-rare-disease-drugs (last accessed September 18, 2017).

aHUS (i.e., potential customers) (the "Patient Information Scheme" referred to above); and

(c) making grants to patient advocacy groups so that Alexion could have greater access to patient populations, and the Company's related use of certain of these groups to obtain illegal reimbursement for Soliris from foreign governments (the "Patient Advocacy Group Scheme" referred to above).

430.   Employees interviewed by Bloomberg explained that for new arrivals at the Company, the sales culture was intense.  Managers stressed that sales staff needed to question doctors, many of whom had not seen patients with rare diseases, and to "transform no to yes," according to a sales manager who left the Company in 2016.  If doctors did not think patients were sick enough to warrant a drug that is as expensive as Soliris, *sales staff were instructed to warn the doctor that the doctor's patient could die*.  Such a technique is inappropriate and especially egregious because there is insufficient evidence, according to a meta-analysis, to indicate that use of Soliris lowers or even affects a patient's risk of death.  The Company's system of high pressure, unethical, and potentially illegal sales practices was reminiscent of a boiler room operation.

431.   The Company closely tracked key details, such as the number of tests ordered by each physician in their core markets.  Sales staff also maintained detailed spreadsheets that included a wide range of information about potential patients, including dates of birth, information about symptoms, doctor, and hospital, and patients in some cases were identified by their initials.

Nurse Coordination Scheme

432.   As part of the Nurse Coordination Scheme referenced herein, the sales staff worked alongside a team of Company nurses that assisted in the administration of treatments to Soliris patients.  As licensed practitioners, these in-house nurses are supposed to prioritize their

patients' interests over their employers' profits, which is why most drug companies, to avoid conflicts, maintain a firewall between their nurses and salespeople. At Alexion, however, nurses reported directly to sales, and nurses often faced pressure to secure and keep customers.

433. Several former employees told Bloomberg that, during weekly Friday sales meetings, managers gathered their sales staff and nurses to talk about their customers. If a patient had stopped taking Soliris, managers would question the nurse assigned to the patient and ask what steps were taken to keep the patient on the drug, whether the nurse told the patient that the patient could develop potential fatal blood clots if Soliris was no longer taken, and whether the nurse steered the patient to another doctor who would resume the treatment.

434. As one former longtime Company nurse explained, "It was your feet to the fire, sweat pouring down your back."

435. The Bloomberg Exposé details the story of one patient, named Stacey, who was diagnosed with PNH in 2004. When she tried Soliris once it became available, her blood results showed little improvement as a result of the treatment. When she told her Alexion nurse that she and her doctor were going to stop treatment, the Alexion nurse started calling Stacey, urging her to continue the treatment. Stacey explained: "I felt like they were scaring me, saying 'Oh my gosh, you really shouldn't stop. *You could get a clot and die*.'"

Patient Information Scheme

436. The Bloomberg Exposé also details how the Company engaged in the Patient Information Scheme, including the steps Alexion took to locate patients suffering from PNH and aHUS and to steer doctors to prescribe them Soliris. Alexion worked to persuade doctors to test more frequently for PNH and aHUS, and took unethical and potentially illegal steps to view the results of these tests, which traditionally are shared only amongst the doctor, the patient, and the lab that performs the test.

437.    To this end, according to former employees and internal documents, sales representatives were instructed to urge doctors to send the tests to preferred "partner labs," which for Alexion included regional labs, such as Dahl-Chase in Maine and Machaon Diagnostics Inc. in Oakland, California, as well as national labs such as Laboratory Corp. of America Holdings (known as LabCorp), Quest Diagnostics Inc., and Mayo Medical Laboratories, a division of the Mayo Clinic.

438.    Unbeknownst to patients and many of the doctors, ***several of these preferred labs had agreements with Alexion to provide the Company with copies of the patients' test results***. Although patient names were often removed from the test results shared with Alexion, the lab provided a number of other ***identifying and personal details***, such as the patient's age, gender, ZIP code, the hospital and doctor ordering the test, and a summary of the results.  With this information, sales representatives were able to easily locate patients (i.e., potential customers) who would have otherwise been extremely difficult to find.  When a result for PNH or aHUS was reported by a lab to Alexion, the diagnostic team at the Company passed the information to the sales team, which descended on the doctor listed in the lab result.  As a former account representative of the Company explained, "[i]t was like Normandy."

439.    Improper sharing of identifiable patient health information, as it seems to have occurred here, can constitute a serious violation of the HIPAA.  Indeed, in May 2017, after investigative reporters began poking around and asking Alexion questions about these data gathering practices and so-called "partner lab" relationships, the Company halted these practices and explained that it was reviewing its relationships with labs, further calling into question the legality of these previously undisclosed agreements.

The Patient Advocacy Group Scheme

440.   The Bloomberg Exposé also provided additional details about the Patient Advocacy Group Scheme, which involved Alexion's relationship with PAGs, which Alexion regularly fund around the world.  Indeed, the Company disclosed on its website that in 2015 it funded more than 75 of these groups.

441.   PAGs host meetings each year to bring together patients diagnosed with PNH or aHUS and their families, and Alexion provides grants that pay for travel, lodging, and meals.

442.   Alexion used these PAG meetings as a way to gain access to patients (and potential customers).  The Company would send its in-house nurses to these meetings, who were instructed to gather sign-in sheets with names and contact information of patients, apparently without the knowledge or permission of the groups themselves.

443.   Alexion also used its connections and contributions to PAGs to further the Fraudulent Lawsuit Scheme.  As mentioned above, Alexion has a particularly close relationship with the PAG AFAG in Brazil—a relationship that is the subject of an investigation by Brazilian authorities and that sparked the raid of Alexion's offices in Brazil on May 8, 2017.

444.   For drug makers to be reimbursed for drugs sold in Brazil, companies are supposed to negotiate with the government on price.  Five former managers and executives of the Company explained that Alexion avoided this step, and delayed registering Soliris in Brazil for years.  Instead, the Company took advantage of fraudulent lawsuits to obtain its desired price for Soliris.

445.   The Brazil constitution guarantees healthcare for each citizen, and citizens can sue the government to get access to drugs that have not yet been approved for sale by regulators.  If the citizen's lawsuit is successful, the government must pay for the drug without the usual price

negotiations, meaning Alexion receives the full price of Soliris in the event of a successful lawsuit.

446.    Because most patients in Brazil cannot afford to pursue such a lawsuit, which is known as "judicialization," Alexion began funding PAGs, who would in turn cover the costs of patients' lawsuits.  One such PAG's primary lawyers, who worked on these lawsuits on behalf of patients, initially came from a law firm owned by the sister of Alexion's local manager, according to a December 2014 confidential analysis prepared by an outside law firm that Alexion commissioned to review its business practices in Brazil.

447.    In 2012, Alexion began funding AFAG.  Although AFAG works with other drug companies, much of its funding comes from Alexion: In 2014 and 2015, Alexion contributed 1.672 million Brazilian reais (approximately $500,000) to AFAG, which represented roughly 30% of the group's budget.   In 2016, the donation increased to 2.675 million reais (approximately $817,000).

448.    Because of these significant contributions, Alexion was granted special access, and each week, an Alexion manager would go through patient files at AFAG's office, according to internal documents reviewed by Bloomberg.  The Alexion manager told AFAG which cases to pursue and brought all relevant patient information back to Alexion, according to a former manager.  Three former managers of the Company explained that few doctors, patients, or government officials understood the extent of Alexion's influence within AFAG.

449.    Alexion's outside law firm, hired to review the Company's business practices in Brazil, concluded in its December 2014 confidential report that these operations were "unethical."  These unethical business practices have been lucrative for the Company.  By the end of 2016, Alexion projected that 600 Brazilians would be on Soliris, which would produce

revenue of more than $200 million, according to internal documents reviewed by Bloomberg. Strikingly, while Soliris treats just 0.0003% of Brazil's population, the drug accounted for 30% of the country's judicialization budget in 2013 and 2014.

450.    Alexion is still under investigation in Brazil for its relationship with AFAG.  As described above, Brazil's national police are alleging that some of the lawsuits funded by Alexion through its donations to AFAG were fraudulent and used inaccurate diagnoses to generate patients, according to a request for a search warrant reviewed by Bloomberg.  In one case, armed guards regularly delivered far more Soliris than was needed to a woman who was incorrectly diagnosed with aHUS.  After years of excessive shipments, the patient had stockpiled about 2.2 million reais of the drug in her refrigerator, and she ultimately reported the situation to Brazilian authorities, which issued a search warrant for Alexion's offices.

451.    Alexion's grants to PAGs overseas have also caught the attention of U.S. regulators.  The May 2015 subpoena from the SEC described above involves these grants that Alexion has made in Brazil, Colombia, Japan, Russia, and Turkey.  The SEC's investigation is still ongoing.

Effect of the Bloomberg Exposé

452.    Following the release of the Bloomber Exposé (which occurred before the market opened on May 24, 2017), Alexion's stock price fell $3.42 from an opening price on May 24, 2017 of $104.50 per share, to close that same day at $101.08 per share, a decline of 3.27%.  Over the next two days, as the market continued to absorb this information, Alexion's stock price slid further.  On May 25, 2017, Alexion's stock price fell $5.86 from an opening price of $104.36 to close at $98.50, a decline of approximately 5.62%, and then closed on May 26, 2017 at a price of $97.70—a decline of over 6.5% from the May 24, 2017 opening price.

July 6, 2017

453.    On July 6, 2017, Bloomberg reported that Alexion is under investigation by the U.S. Department of Health and Human Services' Office of Inspector General, related to the Company's support for charities that aid Medicare patients.  The U.S. Attorney's Office for the District of Massachusetts is conducting a similar investigation of the Company for the same alleged misconduct, and Alexion announced on January 4, 2017 that it had received a subpoena in December 2016 in connection with that investigation.

**Aftermath**

July 7, 2017

454.    According to a recent report published on FiercePharma on July 7, 2017, [30] "[t]he U.S. Attorney's Office for the District of Massachusetts isn't the only one investigating Alexion over its support of organizations that help Medicare patients."

455.    According to the article, "The U.S. Department of Health and Human Services' Office of Inspector General ("OIG")—which probes potential waste, fraud and abuse in Medicare, Medicaid and other HHS programs—is investigating the situation, too."  Moreover, as told to Bloomberg by the OIG and noted in the article, "there is an 'open and ongoing investigation' into the Connecticut biotech."  The article additionally noted that the Company "is 'aware' that the OIG is 'working on this inquiry with the U.S. Attorneys' Office and the Department of Justice.'"

456.    The ongoing regulatory investigations suggest that additional details about Alexion's improper conduct are likely to emerge after the filing of this Derivative Complaint.

---

[30] Carly Helfand, *Alexion under HHS investigation as part of DOJ Medicare probe*, FiercePharma, July 7, 2017, http://www.fiercepharma.com/pharma/alexion-under-hhs-investigation-as-part-doj-medicare-probe (last accessed September 18, 2017).

September 12, 2017

457.   On September 12, 2017, the Company issued a press release announcing that it committed to an operational plan to re-align the global organization with its refocused corporate strategy.  Among other things, the re-alignment focuses investments in priority growth areas, specifically citing as a goal: "Maximize Leadership in Complement and Grow Rare Disease Business by Focusing Investments in Priority Growth Areas."  The re-alignment also includes the relocation of the Company's headquarters to Boston, Massachusetts in 2018.

458.   According to the press release, the plan is expected to reduce the Company's global workforce by approximately 20% over the next twelve months.  The restructuring will achieve cost savings "by focusing the development portfolio, simplifying business structures and processes across the Company's global operations," and closing of multiple Alexion sites, including the Company's Rhode Island manufacturing facility and certain regional and country-based offices.

459.   The Connecticut Department of Economic and Community Development called the news of Alexion's headquarters move "disappointing" and said it would ask for the return of $26 million in economic development aid from Connecticut meant to jump-start the state's biotechnology sector, with penalties and interest.

460.   The Company has already agreed to pay the money back.

## INSIDER SELLING

461.   At least ten (10) of the Individual Defendants engaged in unauthorized and illegal insider selling during the period of time that the Company's stock price was artificially inflated due to the Individual Defendants' misconduct as described herein.

**Defendant Bell**

462.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Bell made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| March 1, 2017 | 1,240 | 132.5 | 164,300 |
| February 28, 2017 | 2,738 | 131.71 | 360,621 |
| February 9, 2017 | 246 | 126.84 | 31,202 |
| February 7, 2017 | 1,010 | 128.09 | 129,370 |
| February 6, 2017 | 7,715 | 125.89 | 971,241 |
| January 10, 2017 | 100 | 144.99 | 14,499 |
| January 9, 2017 | 5,187 | 144.91 | 751,674 |
| January 5, 2017 | 34,878 | 137.46 | 4,794,399 |
| November 4, 2016 | 37,317 | 140.59 | 5,246,471 |
| October 31, 2016 | 1,634 | 135.32 | 221,121 |
| August 8, 2016 | 1,010 | 137.14 | 138,511 |
| February 8, 2016 | 11,474 | 138.79 | 1,592,510 |
| February 5, 2016 | 2,136 | 142.93 | 305,298 |
| February 4, 2016 | 2,262 | 144.38 | 326,587 |
| December 29, 2015 | 28,968 | 190.84 | 5,528,397 |
| December 28, 2015 | 400 | 190.15 | 76,060 |
| December 24, 2015 | 5,632 | 190 | 1,070,080 |
| December 17, 2015 | 70,000 | 187.95 | 13,156,220 |
| December 11, 2015 | 21,319 | 187.77 | 4,003,068 |
| December 8, 2015 | 70,000 | 188.04 | 13,162,940 |
| November 25, 2015 | 35,000 | 181.79 | 6,362,755 |
| November 2, 2015 | 35,000 | 180.12 | 6,304,200 |
| September 9, 2015 | 1,050 | 180.1 | 189,105 |
| August 7, 2015 | 1,003 | 190.01 | 190,580 |
| August 4, 2015 | 2,200 | 196.52 | 432,344 |
| June 18, 2015 | 27,835 | 179.63 | 5,000,001 |
| March 19, 2015 | 15,952 | 188.07 | 3,000,092 |
| March 2, 2015 | 1,230 | 180.34 | 221,818 |
| February 10, 2015 | 5,740 | 171.15 | 982,401 |
| February 9, 2015 | 8,660 | 173.98 | 1,506,666 |
| February 4, 2015 | 2,223 | 173.41 | 385,490 |
| February 3, 2015 | 3,000 | 174.25 | 522,750 |
| December 18, 2014 | 13,735 | 182.03 | 2,500,182 |

| December 17, 2014 | 16,680 | 177.96 | 2,968,422 |
| December 9, 2014 | 16,665 | 199.94 | 3,332,000 |
| December 8, 2014 | 59,934 | 198.57 | 11,900,854 |
| December 5, 2014 | 56,721 | 197.59 | 11,207,785 |
| November 20, 2014 | 5,210 | 191.96 | 1,000,111 |
| September 26, 2014 | 60,000 | 165.66 | 9,939,600 |
| September 18, 2014 | 12,388 | 161.45 | 2,000,042 |
| September 16, 2014 | 32,047 | 160.2 | 5,133,929 |
| September 10, 2014 | 12,199 | 165.38 | 2,017,470 |
| September 8, 2014 | 21,214 | 165.11 | 3,502,643 |
| September 5, 2014 | 90,919 | 163.76 | 14,888,713 |
| September 4, 2014 | 85,668 | 167.81 | 14,375,947 |
| August 27, 2014 | 5,912 | 169.17 | 1,000,133 |
| August 15, 2014 | 35,000 | 170.06 | 5,952,100 |
| August 14, 2014 | 35,000 | 166.29 | 5,820,045 |
| August 13, 2014 | 24,542 | 162.4 | 3,985,694 |
| August 12, 2014 | 80,458 | 160.26 | 12,894,601 |
| August 4, 2014 | 5,145 | 157.88 | 812,292 |
| July 30, 2014 | 20,489 | 166.25 | 3,406,234 |
| July 29, 2014 | 1,200 | 164.93 | 197,916 |
| July 28, 2014 | 105,600 | 163.39 | 17,254,195 |
| June 20, 2014 | 90,280 | 163.06 | 14,720,966 |
| May 27, 2014 | 70,000 | 166.31 | 11,641,490 |
| May 20, 2014 | 70,000 | 156.78 | 10,974,810 |
| April 29, 2014 | 66,210 | 156.35 | 10,351,734 |
| April 28, 2014 | 3,790 | 155.12 | 587,904 |
| February 7, 2014 | 4,620 | 156.32 | 722,198 |
| February 4, 2014 | 8,870 | 153.63 | 1,362,698 |
| February 3, 2014 | 2,920 | 157.14 | 458,848 |
| **TOTAL** | 1,557,575 | N/A | 264,054,327 |

463.    Thus, before the fraud was exposed, Defendant Bell sold 1,557,575 Company shares on inside information, for which he received over *$264 million*.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

464.    Defendant Bell's insider sales of Company stock during the Relevant Period were highly unusual and suspicious as measured by (i) profits and the total amount and percentage of shares disposed, (ii) the contrast with his prior trading history, and (iii) the timing of the sales.

465.    Specifically, when Defendant Bell's sales during the Relevant Period are compared to his sales during the same amount of time but immediately preceding the Relevant Period, referred to as the "Control Period," several notable things become clear.  First, during the Relevant Period, Defendant Bell decreased his *total* shareholdings (i.e., the net shares owned by Defendant Bell after stock grants pursuant to equity compensation plans and other programs) by over 485,000 shares or approximately 55.39% compared to a 49.58% decrease in the Control Period.  Second, Defendant Bell received over 33% more in profits from sales of his stock than he did during the Control Period.  Moreover, the timing of Defendant Bell's stock sales could not be more suspect and this was noticed by market analysts.  On November 8, 2016, analysts at Leerink reported that Defendant Bell made a "significant stock sale" yielding "a profit of $4.4mm" just as the first corrective disclosure was entering the market, i.e., November 4, 2016.

466.    While Defendant Bell purports to have traded pursuant to a 10b5-1 trading plan, such is a red herring.  Bell had full control over such trading plan. In fact, between entering into the plan in 2002 and the start of the Relevant Period, Defendant Bell modified his trading plan three times, yet at the outset of the Relevant Period—on April 30, 2014 and July 30, 2014—he modified his plan twice in short order so that he could sell an additional 457,460 shares.

**Defendant Sinha**

467.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sinha made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| August 8, 2016 | 277 | 137.14 | 37,987 |
| February 29, 2016 | 1,122 | 140.07 | 157,158 |
| February 8, 2016 | 3,890 | 136.42 | 530,685 |
| February 4, 2016 | 703 | 144.6 | 101,657 |
| February 5, 2016 | 1,954 | 143.92 | 281,213 |
| August 4, 2015 | 675 | 196.52 | 132,651 |
| March 2, 2015 | 487 | 180.34 | 87,825 |
| February 10, 2015 | 1,985 | 171.15 | 339,732 |
| February 9, 2015 | 2,703 | 174.63 | 472,038 |
| February 3, 2015 | 895 | 174.06 | 155,783 |
| February 4, 2015 | 676 | 174.37 | 117,874 |
| December 18, 2014 | 5,493 | 182.08 | 1,000,165 |
| December 3, 2014 | 50,000 | 199.08 | 9,954,000 |
| December 2, 2014 | 25,000 | 200.16 | 5,004,000 |
| November 6, 2014 | 5,693 | 195 | 1,110,135 |
| October 31, 2014 | 19,307 | 195.18 | 3,768,340 |
| November 3, 2014 | 30,000 | 191.98 | 5,759,400 |
| August 4, 2014 | 1,525 | 157.82 | 240,675 |
| February 7, 2014 | 1,620 | 156.51 | 253,546 |
| February 4, 2014 | 2,700 | 153.63 | 414,801 |
| February 3, 2014 | 852 | 157.14 | 133,883 |
| January 29, 2014 | 994 | 133.41 | 132,604 |
| **TOTAL** | 158,551 | | 30,186,152 |

468.    Thus, before the fraud was exposed, Defendant Sinha sold 158,551 Company shares on inside information, for which he received over *$30 million*.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Madri**

469.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Madri made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| March 11, 2014 | 60,000 | 179.12 | 10,746,900 |
| February 7, 2014 | 30,000 | 159 | 4,770,000 |
| **TOTAL** | 90,000 | N/A | 15,516,900 |

470.    Thus, before the fraud was exposed, Defendant Madri sold 90,000 Company shares on inside information, for which he received over ***$15.5 million***.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Mathis**

471.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Mathis made the following sale of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| February 3, 2014 | 80,729 | 157.25 | 12,694,473 |

472.    Thus, before the fraud was exposed, Defendant Mathis sold 80,729 Company shares on inside information, for which he received about ***$12.7 million***.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Hallal**

473.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hallal made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| August 8, 2016 | 332 | 137.14 | 45,530 |
| April 1, 2016 | 1,414 | 136.04 | 192,360 |
| February 29, 2016 | 2,014 | 140.18 | 282,322 |
| February 5, 2016 | 6,722 | 142.86 | 960,291 |

| February 4, 2016 | 629 | 144.43 | 90,846 |
| February 8, 2016 | 3,946 | 138.41 | 546,154 |
| August 7, 2015 | 329 | 190.01 | 62,513 |
| August 4, 2015 | 612 | 196.52 | 120,270 |
| March 2, 2015 | 730 | 180.34 | 131,648 |
| February 10, 2015 | 1,980 | 171.15 | 338,877 |
| February 9, 2015 | 2,920 | 173.93 | 507,875 |
| February 3, 2015 | 765 | 174.02 | 133,125 |
| February 4, 2015 | 608 | 174.38 | 106,023 |
| December 18, 2014 | 5,494 | 182.03 | 1,000,072 |
| November 3, 2014 | 30,000 | 190.01 | 5,700,300 |
| August 4, 2014 | 1,349 | 158 | 213,142 |
| February 6, 2014 | 10 | 156.95 | 1,569 |
| February 7, 2014 | 1,610 | 156.8 | 252,448 |
| February 3, 2014 | 729 | 157.14 | 114,555 |
| February 4, 2014 | 2,390 | 153.63 | 367,175 |
| January 29, 2014 | 729 | 133.41 | 97,255 |
| **TOTAL** | 65,312 | | 11,264,350 |

474.    Thus, before the fraud was exposed, Defendant Hallal sold 65,312 Company shares on inside information, for which he received about ***$11.3 million***.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**<u>Defendant Parven</u>**

475.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Parven made the following sales of Company stock:

| **Date of Sale** | **# Shares Sold** | **Price per share ($)** | **Value ($)** |
| --- | --- | --- | --- |
| January 5, 2017 | 22,659 | 137.86 | 3,123,724 |
| November 2, 2015 | 895 | 178.73 | 159,963 |
| November 11, 2014 | 15,000 | 195.66 | 2,934,900 |
| May 13, 2014 | 12,276 | 160.78 | 1,973,735 |
| February 11, 2014 | 2,471 | 174.06 | 430,102 |
| **TOTAL** | 53,301 | | 8,622,424 |

476.    Thus, before the fraud was exposed, Defendant Parven sold 53,301 Company shares on inside information, for which he received over ***$8.6 million***.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Norby**

477.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Norby made the following sale of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| December 11, 2015 | 45,442 | 187.59 | 8,524,601 |

478.    Thus, before the fraud was exposed, Defendant Norby sold 45,442 Company shares on inside information, for which he received over ***$8.5 million***.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Thiel**

479.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Thiel made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| February 28, 2017 | 3,783 | 131.01 | 495,610 |
| February 27, 2017 | 71 | 131.2 | 9,315 |
| February 28, 2017 | 54 | 0 | 0[31] |
| February 6, 2017 | 165 | 125.69 | 20,738 |
| December 9, 2016 | 2,308 | 130 | 300,040 |
| October 14, 2016 | 4,584 | 120.28 | 551,363 |
| October 3, 2016 | 29 | 122.41 | 3,549 |

---

[31] As reported on Defendant Thiel's Form 4 filed with the SEC on February 27, 2017.

| | | | |
|---|---|---|---|
| September 12, 2016 | 225 | 124.2 | 27,945 |
| September 13, 2016 | 3,000 | 129 | 387,000 |
| September 6, 2016 | 1,000 | 125.94 | 125,940 |
| February 16, 2016 | 187 | 143.49 | 26,832 |
| November 10, 2015 | 3,000 | 173.34 | 520,020 |
| September 10, 2015 | 812 | 170.01 | 138,052 |
| **TOTAL** | 19,218 | | 2,606,404 |

480.    Thus, before the fraud was exposed, Defendant Thiel sold 19,218 Company shares on inside information, for which he received over *$2.6 million*.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Keller**

481.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Keller made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| December 4, 2014 | 5,000 | 196.25 | 981,250 |
| June 5, 2014 | 3,425 | 170 | 582,250 |
| **TOTAL** | 8,425 | | 1,563,500 |

482.    Thus, before the fraud was exposed, Defendant Keller sold 8,425 Company shares on inside information, for which he received about *$1.6 million*.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Veneman**

483.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Veneman made the following sales of Company stock:

| Date of Sale | # Shares Sold | Price per share ($) | Value ($) |
|---|---|---|---|
| December 11, 2015 | 895 | 187.48 | 167,794 |
| December 11, 2014 | 1,235 | 193.03 | 238,392 |
| June 4, 2014 | 1,236 | 170.01 | 210,132 |
| April 29, 2013 | 3,115 | 99 | 308,385 |
| December 12, 2012 | 4,579 | 95 | 435,005 |
| February 17, 2012 | 2,000 | 81.1 | 162,200 |
| **TOTAL** | 13,060 | | 1,521,908 |

484.    Thus, before the fraud was exposed, Defendant Veneman sold 13,060 Company shares on inside information, for which she received over *$1.5 million*.  Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the fraud.

485.    In total, before the fraud was exposed, at least ten (10) of the Individual Defendants collectively sold $356.3 million worth of Company common stock based on material non-public information.   And as will be shown even further at trial, each of the Individual Defendants' insider sales during the Relevant Period were highly unusual and suspicious as measured by (i) profits and the total amount and percentage of shares disposed, (ii) the contrast with his or her prior trading history, and (iii) the timing of the sales.

## REPURCHASES

486.    Over the course of the Relevant Period, the Company made repurchases every year.  On May 26, 2017, just two days after the Bloomberg Exposé was published, the price per share of Company stock fell to $97.70 at the close of market.  This reflected the true price per share of Alexion stock, had the Individual Defendants not engaged in their schemes as outlined herein.   Therefore, any repurchases by the Company should have been made valuing their common stock at $97.70.

487.    During the fiscal year ended December 31, 2014, the Individual Defendants caused the Company to repurchase 1,903,000 shares of its own common stock at an average price per share of approximately $159, for a total cost to the Company of approximately $302,599,000.

488.    Due to the artificial inflation of the Company' stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $61 more than each such share was worth during the fiscal year ended December 31, 2014.  Thus, the total over payment by the Company for its repurchases of its own stock during the fiscal year ended December 31, 2014 was $116,653,900.

489.    During the fiscal year ended December 31, 2015, the Individual Defendants caused the Company to repurchase 1,963,000 shares of its own common stock at an average price per share of approximately $166.94, for a total cost to the Company of approximately $327,699,000.

490.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $69 more than each such share was worth during the fiscal year ended December 31, 2015.  Thus, the total overpayment by the Company for its repurchases of its own stock during the fiscal year ended December 31, 2015 was $135,918,120.

491.    During the fiscal year ended December 31, 2016, the Individual Defendants caused the Company to repurchase approximately 3,000,000 shares of its own common stock at

an average price per share of approximately $143.33, for a total cost to the Company of approximately $430,000,000.

492.  Due to the artificial inflation of the Company' stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $46 more than each such share was worth during the fiscal year ended December 31, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the fiscal year ended December 31, 2016 was $136,890,000.

493.  During the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 550,000 shares of its own common stock at an average price per share of approximately $123.74, for a total cost to the Company of approximately $68,057,000.

494.  Due to the artificial inflation of the Company' stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $26 more than each such share was worth during the three months ended March 31, 2017.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2017 was $14,322,000.

495.  During the month ended April 30, 2017, the Individual Defendants caused the Company to repurchase 270,000 shares of its own common stock at an average price per share of $118.08, for a total cost to the Company of approximately $31,881,600.

496.  Due to the artificial inflation of the Company' stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company

149

paid on average $20 more than each such share was worth during the month ended April 30, 2017.  Thus, the total over payment by the Company for its repurchases of its own stock during the month ended April 30, 2017 was $5,400,000.

497.    Thus, in total, the Company overpaid approximately *$409.2 million* for repurchases made between the beginning of the Relevant Period and the date the Company's stock began to trade at its true price following the Bloomberg Exposé.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS' WRONGFUL CONDUCT

498.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company's above-alleged internal control failures, and willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

499.    The Individual Defendants also failed to take any actions to stop the wrongful conduct and eventually exposed the Company to substantial liabilities.

500.    The Individual Defendants also breached their fiduciary duties by engaging in, and/or causing the Company to engage in, the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Nurse Coordination Scheme, Patient Information Scheme, Patient Advocacy Group Scheme, and the Fraudulent Lawsuit Scheme.  These schemes involved violations of a plethora of federal and state laws and regulations (and even violations of Brazilian law), including but not limited to, the FCPA, the HIPAA, the Food, Drug, and Cosmetic Act, the Exchange Act, FTC regulations, SEC regulations, the Anti-Kickback Statute, the FCA, PPACA, other anti-bribery statutes, and consumer protection laws.

501.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose: (1) the

Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (2) the Company and Individual Defendants' engagement in the Patient Information Scheme; (3) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; (4) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (5) the Adverse Material Facts Regarding Soliris Sales Methods; (6) that Defendants Hallal and Sinha resigned from the Company not for "personal reasons" or "to pursue other opportunities" but rather to attempt to escape liability for knowing misconduct that the Company had discovered they engaged in and/or to avoid culpability for their part in the Fraudulent Sales Pitch Misconduct and the Pull-in Sales Misconduct and the other schemes outlined herein; (7) that the Company was not committed to complying with applicable law or Company policies, procedures, and ethics; and (8) that Alexion was not maintaining effective internal controls and disclosure controls and procedures.

502.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Company overpaid for repurchases of its own common stock and certain Individual Defendants benefitted themselves by engaging in insider sales.

503.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

## DAMAGES TO ALEXION

504.    As a direct and proximate result of the Individual Defendants' conduct, Alexion will lose and expend many millions of dollars.

505.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and certain of the Individual Defendants, the investigations and eventual enforcement actions by the SEC, U.S. Attorney's Office for the

District of Massachusetts, the DOJ, the OIG, and Brazilian authorities, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

506.    Such costs include, but are not limited to, costs incurred in connection to fines and settlement fees arising from breaches of applicable law relating to the Nurse Coordination Scheme, Patient Information Scheme, Patient Advocacy Group Scheme, and the Fraudulent Lawsuit Scheme.

507.    Such losses include, but are not limited to, the hundreds of millions of dollars lost due to over payment for repurchases of the Company's own common stock.

508.    Such losses include, but are not limited to, fees and penalties incurred as a result of the Company's being forced to move its headquarters to Boston.

509.    Such losses include, but are not limited to, the compensation paid to Defendants Hallal and Sinha, and other executive director defendants herein, who engaged in intentional and knowing misconduct that damaged the Company and whose compensation would have been subject to and recoverable under the Company's clawback policy.

510.    Additionally, these losses include, but are not limited to, all lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

511.    As a direct and proximate result of the Individual Defendants' conduct, Alexion has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

512.    Plaintiff brings this action derivatively and for the benefit of Alexion to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Alexion, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 promulgated thereunder, as well as the aiding and abetting thereof.

513.    Alexion is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

514.    Plaintiff is, and has been since the Relevant Period began, a shareholder of Alexion.  Plaintiff will fairly and adequately represent the interests of Alexion in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

515.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

516.    A pre-suit demand on the Board of Alexion is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following ten (10) individuals: Defendants Hantson, Brennan, Parven, Veneman, Rummelt, Burns, Coughlin, Mollen, and Baker (collectively, the "Director-Defendants"), and non-defendant Paul A. Friedman ("Friedman") (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

517.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause and/or allow the Company to engage in the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme, and to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices and two of the Director-Defendants engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

518.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein.  The fraudulent schemes were intended to make the Company appear more stable, profitable, and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants and before the fraud was exposed, the Company repurchased its own stock for hundreds of millions of dollars and ten of the Individual Defendants collectively sold $356.3 million worth of Company stock at artificially inflated prices based on material inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

519.    Additional reasons that demand on Defendant Hantson is futile follow.  Defendant Hantson is the Company's CEO and has served as a Company director since March 27, 2017, and is thus, as the Company admits in the 2017 Proxy Statement, not independent.  Moreover, Defendant Hantson is a named defendant in the Securities Class Action and faces a substantial

likelihood of liability therein.  While the truth had begun to leak out before Defendant Hantson took control of the Company, he contributed to the Company's false and misleading statements, and is arguably even more culpable than most for his misconduct because he was on notice that the Company was under fire for its misconduct yet still issued false and misleading statements. For instance, Defendant Hantson approved the 2017 Proxy Statement, which contained information regarding the signing of separation agreements with Defendants Hallal and Sinha. Defendant Hantson should have taken this opportunity to place proper blame on Defendants Hallal and Sinha for attempting to escape liability through their abandonment.  Indeed, he could have and should have corrected the Company's false statements regarding the reasons for Defendant Hallal's and Defendant Sinha's departures, yet he utterly and inexplicably failed to do so.  The most natural inference is that Defendant Hantson was covering for Defendant Hallal and Sinha, who so clearly engaged in intentional and knowing misconduct as alleged herein.  Neither did Defendant Hantson take the opportunity in the 1Q 2017 Press Release and related conference call or any other subsequent Company filing to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods; (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; and (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme.  Instead, Defendant Hantson participated in an April 27, 2017 conference call and discussed the Company's sales and operations in Brazil and said nothing of the Company's aforementioned schemes.  Thus, he either actively concealed the details of these schemes or at the very best conducted little, if any, oversight of the Company's engagement in such schemes, and the scheme to make false and misleading statements and/or omissions of

material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   His lack of oversight of the schemes to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the Company's quarterly filing for the second quarter of 2017 filed with the SEC on July 27, 2017, which contained the same false and misleading statements of material fact that the previous quarterly reports contained, even though the filers had the advantage of knowing about the May 8, 2017 raid of the Company's Brazilian offices in Operation Serpent's Chalice.   Thus, for these reasons, too, Defendant Hantson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

520.   Additional reasons that demand on Defendant Brennan is futile follow. Defendant Brennan served as Alexion's interim CEO from December 11, 2016 to March 27, 2017 and has served as a Company director since 2014.   He was appointed Chairman of the Board on May 10, 2017.   Defendant Brennan is a named defendant in the Securities Class Action and faces a substantial likelihood of liability therein.   Defendant Brennan received lavish compensation, including $320,082 in 2015 and over half-a-million dollars from the Company as compensation for his short service as interim CEO.   A day after Defendant Brennan took over as CEO, the Company issued the 12/12/16 Press Release, which contained some of the most obvious and egregious lies, including ones relating to the reasons for Defendants Hallal's and Sinha's departure.   Moreover, Defendant Brennan botched the long-awaited filing of the 3Q 2016 10-Q, which he signed and attested to its contents, by failing to fully disclose the truth even though he was well aware of it due to the Audit Committee's completed investigation.   As fully described herein, immediately after the filing of the 3Q 2016 10-Q, analysts expressed frustration

with Alexion's lack of transparency.  The 3Q 2016 10-Q failed to disclose the Company and Individual Defendants' engagement in, or any details regarding, the Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, Patient Advocacy Group Scheme and further failed to disclose the real reasons for the abrupt departures of the Company's CEO and CFO.  It was only a matter of months before the door was blown right open, literally with the May 8, 2017 raid on Alexion's Brazil offices, and figuratively with the Bloomberg Exposé. Thus, he either actively concealed the details of these schemes or at the very best conducted little, if any, oversight of the Company's engagement in such schemes, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 3Q 2016 10-Q.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately ***$409.2 million*** during the Relevant Period for repurchases of its own common stock.  His large Company stock holding, worth nearly $1 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  Thus, for these reasons, too, Defendant Brennan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

521.    Additional reasons that demand on Defendant Parven is futile follow.  Defendant Parven has been a Company director since 1999.  As an initial matter, Defendant Parven has no incentive to grant any demand because he has already informed the Board that he will not stand for re-election at Alexion's 2018 annual meeting of shareholders.  During the Relevant Period,

Defendant Parven served as a member of the Company's Audit and Finance Committee, Leadership and Compensation Committee, and Nominating and Corporate Governance Committee.  Thus, he had a hand in all of the Board's business.  As a member of the Audit Committee, and pursuant to the Audit and Finance Committee Charter, Defendant Parven was responsible for reviewing the Company's press releases and SEC filings, and for oversight of the Company's financial statements, accounting, and financial reporting processes.   Instead, Defendant Parven conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 2014-2016 10-Ks.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately *$409.2 million* during the Relevant Period for repurchases of its own common stock.  His large Company stock holding, worth nearly $8 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Defendant Parven's insider sales before the fraud was exposed, which yielded over $8.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Further, as a member of the Leadership and Compensation Committee, Defendant Parven was responsible for the Company's failure to properly claw-back the compensation of executive officers who knowingly and intentionally engaged in misconduct, hurt the Company, and then abandoned the Company, such as Defendants Hallal and Sinha.  Thus, for these reasons, too, Defendant Parven

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

522.    Additional reasons that demand on Defendant Veneman is futile follow. Defendant Veneman has been a Company director since 2010.   During the Relevant Period, Defendant Veneman served as Chair of the Nominating and Corporate Governance, and a member of the Pharmaceutical Compliance and Quality Committee and Strategy and Risk Committee.   Thus, she had a hand in much of the Board's business.   As a member of the Strategy and Risk Committee, pursuant to its charter, Defendant Veneman was responsible for overseeing the Company's risk management processes.   In this, Defendant Veneman utterly failed.   The Company had been misrepresenting that its internal controls were effective even though they ***were not effective as of December 31, 2015, March 31, 2016 and June 30, 2016***.   Indeed, the Company's internal controls suffered from a ***material weakness***.   This is in addition to the Company's and Individual Defendants' engagement in all the schemes described herein, including the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme.   Defendant Veneman, as a member of the Strategy and Risk Committee signed multiple SEC filings that falsely attested to adequate internal and risk controls.   In reality, Defendant Veneman conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets.   Her lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that she signed the 2014-2016 10-Ks.   She also conducted little, if any, oversight of the

artificial inflation of the Company's stock price which resulted in the Company over paying approximately *$409.2 million* during the Relevant Period for repurchases of its own common stock.  Her large Company stock holding, worth over $5.4 million before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible.   Defendant Veneman's insider sales before the fraud was exposed, which yielded over $1.5 million in proceeds, demonstrate her motive in facilitating and participating in the fraud.  Thus, for these reasons, too, Defendant Veneman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

523.    Additional reasons that demand on Defendant Rummelt is futile follow. Defendant Rummelt has been a Company director since 2010.   During the Relevant Period, Defendant Rummelt served as Chair of the Quality Compliance Committee, and a member of the Science and Innovation Committee and Strategy and Risk Committee.  Thus, he had a hand in much of the Board's business.  As a member of the Strategy and Risk Committee, pursuant to its charter, Defendant Rummelt was responsible for overseeing the Company's risk management processes.  In this, Defendant Rummelt utterly failed.  The Company had been misrepresenting that its internal controls were effective even though they *were not effective as of December 31, 2015, March 31, 2016 and June 30, 2016*.  Indeed, the Company's internal controls suffered from a *material weakness*.  This is in addition to the Company's and Individual Defendants' engagement in all the schemes described herein, including the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme.   Defendant Rummelt, as a member of the Strategy and Risk Committee signed multiple SEC filings that

falsely attested to adequate internal and risk controls.  In reality, Defendant Rummelt conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 2014-2016 10-Ks.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately ***$409.2 million*** during the Relevant Period for repurchases of its own common stock.  His large Company stock holding, worth over $4.3 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  Thus, for these reasons, too, Defendant Rummelt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

524.    Additional reasons that demand on Defendant Burns is futile follow.  Defendant Burns has been a Company director since 2014.  During the Relevant Period, Defendant Burns served as Chair of the Strategy and Risk Committee and as a member of the Leadership and Compensation Committee, and Nominating and Corporate Governance Committee.  Thus, she had a hand in much of the Board's business.  As Chair of the Strategy and Risk Committee, pursuant to its charter, Defendant Burns assumed the highest responsibility for overseeing the Company's risk management processes.  In this, Defendant Burns utterly failed.  The Company had been misrepresenting that its internal controls were effective even though they ***were not effective as of December 31, 2015, March 31, 2016 and June 30, 2016***.  Indeed, the Company's internal controls suffered from a ***material weakness***.  This is in addition to the Company's and

Individual Defendants' engagement in all the schemes described herein, including the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme. Defendant Burns, as Chair of the Strategy and Risk Committee signed multiple SEC filings that falsely attested to adequate internal and risk controls.  In reality, Defendant Burns conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  This is not surprising given that Defendant Burns simultaneously serves on the Board of *five* public companies, which is simply begging for a lack of oversight.  Her lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that she signed the 2014-2016 10-Ks. Defendant Burns also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately *$409.2 million* during the Relevant Period for repurchases of its own common stock.  Further, as a member of the Leadership and Compensation Committee, Defendant Burns was responsible for the Company's failure to properly claw-back the compensation of executive officers who knowingly and intentionally engaged in misconduct, hurt the Company, and then abandoned the Company, such as Defendants Hallal and Sinha.  Thus, for these reasons, too, Defendant Burns breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

525.   Additional reasons that demand on Defendant Coughlin is futile follow. Defendant Coughlin has been a Company director since 2014.  During the Relevant Period, he

served as Chair of the Audit and Finance Committee and a member of the Nominating and Corporate Governance Committee and Quality Compliance Committee. As Chair of the Audit and Finance Committee, and pursuant to the Audit and Finance Committee Charter, Defendant Coughlin was chiefly responsible for reviewing the Company's press releases and SEC filings, and for oversight of the Company's financial statements, accounting, and financial reporting processes. Instead, Defendant Coughlin conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 2014-2016 10-Ks. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately *$409.2 million* during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Defendant Coughlin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

526. Additional reasons that demand on Defendant Mollen is futile follow. Defendant Mollen has been a Company director since 2014. During the Relevant Period, he served as Chair of the Leadership and Compensation Committee and a member of the Audit and Finance Committee and Nominating and Corporate Governance Committee. Accordingly, Defendant Mollen had some of the most important responsibilities on the Board. Nevertheless, he underperformed in all aspects. As a member of the Audit Committee, and pursuant to the Audit and Finance Committee Charter, Defendant Mollen was responsible for reviewing the

Company's press releases and SEC filings, and for oversight of the Company's financial statements, accounting, and financial reporting processes. Instead, Defendant Mollen conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 2014-2016 10-Ks. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately *$409.2 million* during the Relevant Period for repurchases of its own common stock. His large Company stock holding, worth over $515,000 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Further, as Chair of the Leadership and Compensation Committee, Defendant Mollen was chiefly responsible for the Company's failure to properly claw-back the compensation of executive officers who knowingly and intentionally engaged in misconduct, hurt the Company, and then abandoned the Company, such as Defendants Hallal and Sinha. Thus, for these reasons, too, Defendant Mollen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

527. Additional reasons that demand on Defendant Baker is futile follow. Defendant Baker has been a Company director since 2015. During the Relevant Period, he served as Chair of the Science and Innovation Committee and as a member of the Quality Compliance Committee and Strategy and Risk Committee. As a member of the Strategy and Risk Committee, pursuant to its charter, Defendant Baker was responsible for overseeing the

Company's risk management processes.  In this, Defendant Baker utterly failed.  The Company had been misrepresenting that its internal controls were effective even though they **were not effective as of December 31, 2015, March 31, 2016 and June 30, 2016**.  Indeed, the Company's internal controls suffered from a **material weakness**.  This is in addition to the Company's and Individual Defendants' engagement in all the schemes described herein, including the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme. Defendant Baker, as a member of the Strategy and Risk Committee signed multiple SEC filings that falsely attested to adequate internal and risk controls.  In reality, Defendant Baker conducted little, if any, oversight of the Company's engagement in the schemes described herein, and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  His lack of oversight of the scheme to make false and misleading statements and/or omissions of material fact is evident in the fact that he signed the 2015-2016 10-Ks.  He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying approximately **$409.2 million** during the Relevant Period for repurchases of its own common stock.  Of all the Directors, Defendant Baker beneficially owned by far the largest amount of Company stock, worth over **$901 million** before the fraud was exposed and representing 2.98% of all outstanding Company common stock, which glaringly reveals his interest in keeping the Company's stock price as high as possible.  Defendant Baker has an unparalleled interest in that regard.  Thus, for these reasons, too, Defendant Baker breached his fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

528.   Reasons that demand on non-defendant Friedman is futile follow.  Friedman is an unelected director on the Board who was appointed to the Board on September 14, 2017 by the same corrupt, non-independent, and interested Directors discussed herein.  Thus, Friedman is considered fruit from the poisonous tree and cannot be trusted to impartially consider a demand on the Board to bring an action against the Individual Defendants, many of whom appointed him to his current position on the Board.

529.   Additional reasons why demand on the Board is futile, follow.

530.   The Individual Defendants face a substantial likelihood of liability for the Company's repurchases of its own stock during the Relevant Period which resulted in a total over payment by the Company of approximately *$409.2 million*.  The repurchases were made while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein.   Thus, any demand on the Director-Defendants, particularly Defendants Parven and Veneman, who engaged in insider sales and benefitted especially from the artificial inflation, would be futile.

531.   Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question

the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile, and is therefore excused.

532.   Demand is also futile, and therefore excused, because the Directors failed to take legal action against Defendants Hallal and Sinha, who were significant contributors to the wrongdoing alleged herein and signed almost all of the SEC filings referenced herein. Defendants Hallal and Sinha left the Company without disclosing the truth behind their respective roles in the wrongdoing, and the Directors failed to claw-back the compensation already paid to Defendants Hallal and Sinha.  Instead, the Company facilitated the dissemination of lies regarding their departure, representing that Defendant Hallal left for "personal reasons" and Defendant Sinha left "to pursue other opportunities."

533.   Moreover, demand in this case is excused because the Director-Defendants violated the Code of Ethics.  In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the schemes alleged herein, including the schemes to issue materially false and misleading statements to the public, engage in the Fraudulent Sales Pitch Misconduct, Pull-in Sales Misconduct, Fraudulent Lawsuit Scheme, Nurse Coordination Scheme, Patient Information Scheme, and Patient Advocacy Group Scheme, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 promulgated thereunder.  In violation of the Code of Ethics, the Director-Defendants consciously disregarded their duties of loyalty, ethics, and to act in the best interests of the Company.

534. Alexion has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Alexion any part of the damages Alexion suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

535. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

536. The acts complained of herein constitute violations of fiduciary duties owed by Alexion's officers and directors, and these acts are incapable of ratification.

537. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Alexion. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Alexion, there would be no directors' and officers' insurance

protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

538.    If there is no directors' and officers' liability insurance, then the Directors will not cause Alexion to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event as well.

539.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

540.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

541.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Alexion.  Not only is Alexion now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Alexion by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of millions of dollars of its own shares on the open market at artificially-inflated prices, damaging Alexion by hundreds of millions of dollars.

542.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

543.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alexion not misleading.

544.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Alexion.

545.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.  Indeed, the Company was on notice, at the very latest

as of August 2014 that its disclosures were inadequate, especially with regard to its dealings with foreign governments and disclosures regarding net product sales, as explained herein.

546.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K's filed with the SEC during the Relevant Period, including all of the Individual Defendants who were officers and/or directors at the relevant time, who signed at least one of the 2014-2016 10-Ks.

547.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

548.    Plaintiff on behalf of Alexion has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

549.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

550.    The Individual Defendants, by virtue of their positions with Alexion and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Alexion within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Alexion to engage in the illegal conduct and practices complained of herein.

**THIRD CLAIM**

**Against Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

551.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

552.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

553.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

554.    Under the direction and watch of the Directors, the 2014 Proxy Statement, 2015 Proxy Statement, and 2016 Proxy Statement failed to disclose: (1) the Adverse Material Facts Regarding Soliris Sales Methods, (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the

172

Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; (6) the real reasons for the abrupt departures of the Company's CEO and CFO; and (7) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.  Moreover, the 2014 Proxy Statement falsely assured investors of Defendant Hallal's positive performance, competency and commitment to the Company.  Additionally, the 2015 Proxy Statement's representation regarding the Individual Defendants' compliance with the Company's Code of Ethics was false because at the time the statement was made, senior management was not only failing to comply with the Code of Ethics, but encouraging others to violate the Code of Ethics.

555.    Finally, the statements contained in the Company's 2017 Proxy Statement were materially false and misleading because they failed to disclose that Defendants Hallal and Sinha were key instigators and conspirators of the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group Scheme, and further failed to disclose the real reasons for the abrupt departures of the Company's CEO and CFO.

556.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014-2017 Proxy Statements were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in each of the 2014-2017 Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

557.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in each of the 2014-2017 Proxy Statements.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

558.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

559.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Alexion's business and affairs.

560.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

561.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Alexion.

562.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

563.   In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to engage in the Fraudulent Sales Pitch Misconduct, the Pull-in Sales Misconduct, the Fraudulent Lawsuit Scheme, the Nurse Coordination Scheme, the Patient Information Scheme, and the Patient Advocacy Group Scheme.

564.   In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to violate federal and state laws and regulations, including but

not limited to, FCPA, HIPAA, the Food, Drug, and Cosmetic Act, the Exchange Act, FTC regulations, SEC regulations, the Anti-Kickback Statute, the FCA, PPACA, other anti-bribery statutes, and consumer protection laws, as well as internal Company policies and procedures by engaging in the aforementioned schemes and creating a material weakness in the Company's internal controls.

565.   In further breach of their fiduciary duties owed to Alexion, the Individual Defendants willfully or recklessly caused the Company to: (1) allow Defendants Hallal and Sinha to escape liability for their intentional or reckless misconduct, and, going even further, (2) overcompensate them in light of their wrongdoing and fail to recoup their compensation pursuant to the Company's executive compensation recoupment policy, or "clawback" policy.

566.   In further breach of their fiduciary duties owed to Alexion, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) the Adverse Material Facts Regarding Soliris Sales Methods, (2) the Company and Individual Defendants' engagement in the Fraudulent Lawsuit Scheme; (3) the Company and Individual Defendants' engagement in the Nurse Coordination Scheme; (4) the Company and Individual Defendants' engagement in the Patient Information Scheme; (5) the Company and Individual Defendants' engagement in the Patient Advocacy Group Scheme; (6) the real reasons for the abrupt departures of the Company's CEO and CFO; and (7) that Alexion was not maintaining effective internal controls or disclosure controls and procedures, and in fact had a material weakness in such controls.  As a result of the foregoing, the Company's public statements referenced herein were materially false and

misleading at the times that they were made.  The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

567.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Alexion's securities and disguising insider transactions.  Such material misrepresentations and omissions also led to the Company over paying for repurchases of its own stock by approximately *$409.2 million*.

568.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Alexion's securities and engaging in insider transactions.

569.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

570.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Alexion has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

571.    Plaintiff on behalf of Alexion has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

572.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

573.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alexion.

574.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Alexion that was tied to the performance or artificially inflated valuation of Alexion, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

575.    Plaintiff, as a shareholder and a representative of Alexion, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation—including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

576.    Plaintiff on behalf of Alexion has no adequate remedy at law.

## SIXTH CLAIM

**Against Individual Defendants for Abuse of Control**

577.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

578.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Alexion, for which they are legally responsible.

579.    As a direct and proximate result of the Individual Defendants' abuse of control, Alexion has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Alexion has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

580.    Plaintiff on behalf of Alexion has no adequate remedy at law.

## SEVENTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

581.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

582.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Alexion in a manner consistent with the operations of a publicly-held corporation.

583.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Alexion has sustained and will continue to sustain significant damages.

584. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

585. Plaintiff, on behalf of Alexion, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

586. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

587. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Alexion to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs, to defend unlawful actions, to engage in internal investigations and respond to external investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products. The Individual Defendants have also caused Alexion to lose hundreds of millions of dollars as a result of over payment for repurchases of its own stock.

588. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

589. Plaintiff on behalf of Alexion has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Alexion, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have violated Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9 promulgated thereunder;

(c)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Alexion;

(d)      Determining and awarding to Alexion the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)      Directing Alexion and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Alexion and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Alexion to nominate at least five candidates for election to the board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations; and

4. a proposal prohibiting the Company from repurchasing common stock on the open market or from senior executives pursuant to Rule 10b5-1 trading plans within six months of sales of Alexion common stock by the Company's senior

executives.

       (f)     Awarding Alexion restitution from Individual Defendants, and each of them;

       (g)     Awarding Plaintiff pre and post judgment interest and the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (h)     Granting such other and further relief as the Court may deem just and proper.

Dated: September 22, 2017

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*